N1B6HAD1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                        20 CR 468(RMB)
                                         Trial
5   ROBERT HADDEN,

6              Defendant.

7   ------------------------------x

8                                        New York, N.Y.
                                         January 11, 2023
9                                        9:00 a.m.
    Before:
10
                    HON. RICHARD M. BERMAN,
11
                                         District Judge
12                                       -and a jury-
                              APPEARANCES
13

14  DAMIAN WILLIAMS,
         United States Attorney for the
15       Southern District of New York
    BY:  PAUL MONTELEONI
16       JANE KIM
         LARA POMERANTZ
17       Assistant United States Attorneys

18  DAVID PATTON
    FEDERAL DEFENDERS OF NEW YORK, INC.
19       Attorney for Defendant
    BY:  DEIRDRE D. VON DORNUM
20       MICHAEL WEIL
         KATHRYN WOZENCRAFT
21
    Also Present:
22  Aaron Spivack, FBI Special Agent
    Connor Hamill, USAO Paralegal
23  Sarah Howard, Investigator
    Caroline Kissick, Federal Defenders Paralegal
24

25

N1B6HAD1

1            (Trial resumed; jury not present)

2            THE COURT:  So if we can go over the list of witnesses

3    just briefly.  I think it's pretty much consented to.  I just

4    want to know who's still disputed and who isn't.  So if you can

5    just briefly tell us who is coming today.

6            MS. KIM:  Sure.  The witnesses we're planning to call

7    today are Ms. Anderson, who will have some more direct and

8    cross-examination.

9            THE COURT:  Yep.

10           MS. KIM:  Followed by Keyvan Gabbay, followed by

11   Dr. Lisa Rocchio.

12           THE COURT:  Okay.  Okay.  And as to whom there's no

13   dispute?

14           MS. KIM:  Correct.

15           THE COURT:  Okay.

16           MS. KIM:  Followed by Sara Stein.

17           THE COURT:  Yep.  An indicted --

18           MS. KIM:  Yes.  And then we also plan to call Rosalina

19   Lozada, who is a Columbia employee.  She is one of the nurses.

20           THE COURT:  One of the two?

21           MS. KIM:  Yes.

22           THE COURT:  Okay.  So this is in terms of time, I

23   think this can all be done today?

24           MS. KIM:  Yes.  We believe so, your Honor.  And with

25   respect to Ms. Lozada, we would just note, we had her be

N1B6HAD1

1    available for several trial days.  She is not available after

2    today.  And so to the extent that the Court is able to give us

3    a ruling so she can testify today, we would appreciate that.

4              THE COURT:  Okay.  But she's going to come in?

5              MS. KIM:  She's here today.

6              THE COURT:  No.  I think I'm going to give you the

7    green light on her.

8              MS. KIM:  Great.  Terrific.

9              THE COURT:  Now, would you be able to, or want to take

10   her out of turn to make sure you get her done?

11             MS. KIM:  We may do that just depending on how the day

12   goes.  We may take her before Ms. Stein, depending how the

13   testimony goes this morning.

14             THE COURT:  Okay.  So the names that we've just gone

15   over, is that a full day or no?  Do you think there's room for

16   more.

17             MS. KIM:  I believe it will be.  Your Honor, can I

18   have one minute?

19             Your Honor, it may not be a full day.  We may need to

20   end early.  The additional witnesses that we have, two are

21   traveling -- have traveled in from out of town.  Those are in

22   the process of traveling out of town.

23             THE COURT:  Which are those?

24             MS. KIM:  Those are the witness testifying under the

25   name Charlotte Brookes, the witness testifying under the name

N1B6HAD1

1    Gabriella Diaz, and Jessica Sell-Chamberts.

2              THE COURT:  Those people, are you saying, are not

3    necessarily available even if they are --

4              MS. KIM:  Correct.

5              THE COURT:  So they're prepared --

6              MS. KIM:  We will have them prepared to testify

7    tomorrow.

8              THE COURT:  Okay.  So they're not available today,

9    even if they are going to --

10             MS. KIM:  Yes, your Honor.

11             MS. VON DORNUM:  Your Honor, are you not calling

12   Dr. Rocchio?

13             THE COURT:  She mentioned Dr. Rocchio.

14             MS. KIM:  I said her.

15             MS. VON DORNUM:  I didn't hear her.

16             THE COURT:  Yep.

17             MS. VON DORNUM:  Thank you.

18             MS. KIM:  We also have on our list Amalia Hudson, who

19   was the state court reporter for the plea transcript.  She will

20   be called as a custodian because there is no stipulation as to

21   the authenticity of the transcript.

22             THE COURT:  Oh, okay.

23             MS. KIM:  So we were going to call her and a paralegal

24   to read the transcript today, but given that there is a

25   potential dispute on that as raised by the defense, we were

N1B6HAD1

1    holding off.

2              THE COURT:  What's the dispute?

3              MS. KIM:  The defense would like an additional portion

4    of the plea transcript to be presented to the jury.

5              THE COURT:  Oh, okay.  And so do I know what that

6    portion is?

7              MS. VON DORNUM:  You had asked us to meet and confer

8    about it last night.  Unfortunately, we were not able to reach

9    agreement on that, so we can send you a letter.

10             But, in brief, the government on opening statement

11   said that Mr. Hadden had pled guilty to something in state

12   court but not of the indicted victims, none of the four

13   indicted victims.  Then yesterday on the cross-examination -- I

14   mean on the direct examination, pardon me, of Ms. Anderson, she

15   was asked -- oh, no, I'm sorry.  I'm getting all confused.  Let

16   me start over.  Of Ms. Kanyok.

17             THE COURT:  Right.

18             MS. VON DORNUM:  She was asked repeated questions; he

19   pled guilty to the lick, yes.  He didn't plead -- did he plead

20   guilty to the manual stimulation; did he plead guilty to the

21   breast exam; did he -- all of which implied that he had refused

22   to accept responsibility for some of the acts, which is not the

23   case, legally, right?  There was a plea agreement in the state

24   that covered all of the acts, and he pled guilty to two counts

25   in full satisfaction of the indictment and with an agreement

N1B6HAD1

1    with the Manhattan DA's Office that he had covered for all the

2    acts.  All of those acts were known to the Manhattan DA's

3    Office.

4            So it leaves an implication.  We hoped the government

5    would agree just to include the one additional sentence where

6    the ADA says in the state court, "Your Honor, the parties have

7    agreed this plea covers all acts known to the prosecution as of

8    today."  They have not agreed to that.

9            THE COURT:  Okay.  So the doable proposition is

10   whether I approve one sentence or addition to the plea

11   transcript?

12           MS. VON DORNUM:  Yes.

13           THE COURT:  What you want to do and the government

14   opposes.  Okay.

15           MS. KIM:  Your Honor, what the defense is essentially

16   suggesting and arguing is that the defendant has admitted to

17   all of the acts that he was charged with in state court.  And

18   that is simply not true.  The defendant was charged in the

19   state indictment in nine counts.  He pled to two of them.  He

20   admitted guilt to two of them.

21           THE COURT:  Right.

22           MS. KIM:  It is not true, and it is not accurate, to

23   say that he has accepted responsibility for all of these acts.

24           THE COURT:  What is this sentence?  Is it --

25           MS. KIM:  The sentence from the plea transcript?  Is

N1B6HAD1

1    it to analyze orally or is it -- does it require a brief?

2              MR. MONTELEONI:  Your Honor, we think that this

3    actually does require some briefing.  We would propose putting

4    in letters tonight.

5              Of course, whether the defendant accepted

6    responsibility or didn't accept responsibility is just not an

7    element of any of the charged violations under Section 2422(a).

8    And the sentence that they want actually refers to coverage he

9    received for all victims known to the District Attorney's

10   Office in 2016.  So it would actually provide -- create a miny

11   trial about the internal knowledge of a separate prosecutor's

12   office six years ago, all in order to support the point.

13             THE COURT:  A miny trial here?

14             MR. MONTELEONI:  Yes.  How else could we --

15             THE COURT:  Ms. Van Dornum, you don't want a miny

16   trial?

17             MS. VON DORNUM:  That's not what we're proposing at

18   all.  So why don't we put in a narrow briefing, and your Honor

19   can consider it.

20             THE COURT:  For the purposes of our discussion, that

21   person is not going to come today.

22             MR. MONTELEONI:  Correct.

23             MS. KIM:  Correct, your Honor.

24             MS. VON DORNUM:  We do have some objections at --

25             THE COURT:  Before you get to that -- oh, to some of

N1B6HAD1

1    the --

2              MS. VON DORNUM:  For people tomorrow, I'm going to

3    ask, should we hold those?

4              THE COURT:  No, let's see.  So you're in sync with

5    everybody who is coming today?

6              MS. VON DORNUM:  We've previously objected to Lozada,

7    but I know you've now granted the government's motion.

8              THE COURT:  I'm going to do it formally.

9              MS. VON DORNUM:  Yes.

10             THE COURT:  And so -- yeah.  Okay.

11             MS. VON DORNUM:  So.

12             THE COURT:  If that's done, then we're smooth sailing

13   for today.

14             MS. VON DORNUM:  For today.

15             THE COURT:  And maybe that takes us to 4:45 or maybe

16   not.

17             MS. VON DORNUM:  Right.

18             THE COURT:  Right.  And then you're okay if it's not,

19   it's shorter, it's okay with you?

20             MS. KIM:  Yes.

21             THE COURT:  And with you.  So then --

22             MS. VON DORNUM:  Then we can have the miny trial.

23             THE COURT:  You mean this afternoon?

24             MS. VON DORNUM:  Yeah.

25             THE COURT:  Yeah, okay.  Let me think about it.

N1B6HAD1

1          So then for tomorrow, we think who's coming tomorrow

2     and who is disputed?

3          MS. VON DORNUM:  So certainly the witness who will

4     testify under the name Charlotte Brookes, your Honor, and this

5     is the witness for whom we received medical records for the

6     very first time this week after two years.

7          THE COURT:  Okay.

8          MS. VON DORNUM:  And they previously represented

9     repeatedly that there were no medical records able to be found.

10    We then received the medical records this week.  There are less

11    than a hundred pages, but we've not been yet able to analyze

12    them because we're obviously getting government exhibit s,

13    3500, et cetera.

14         THE COURT:  Okay.

15         MS. VON DORNUM:  So I think this is a 413 witness.  I

16    think she would be the fifth or sixth 413 witness to testify

17    about additional abuse during the same time period.  She's not

18    an inducement person.  It's another abuse person, to allow yet

19    another person who we have no records for and aren't prepared

20    to confront, feels to me like really gets into a 403 problem.

21         THE COURT:  So what I'm going to suggest is that this

22    person now goes into the letter that you're going to ask me to

23    resolve today for tomorrow.

24         MS. VON DORNUM:  Yes, your Honor.

25         THE COURT:  And that would include Charlotte Brookes,

N1B6HAD1

1   and anybody else?

2              MS. KIM:  Yes.  For tomorrow on the list, we have

3   Gabriella Diaz, who is a victim.  We have --

4              MS. VON DORNUM:  She's another 413 victim.

5              THE COURT:  So do you oppose that too?

6              MS. VON DORNUM:  We object to her as well.  For her,

7   it's I think less severe, since we have had records for her,

8   and we have had notice of her.  But obviously on our ongoing

9   grounds, we object to her.

10             THE COURT:  So you'll put that in your letter brief

11  too?

12             MS. VON DORNUM:  Okay.

13             THE COURT:  Who else?

14             MS. KIM:  We have Willie Terry, our witness who's the

15  nurse.

16             THE COURT:  I'm likely to give you the green light on

17  that as well.

18             MS. KIM:  Great.

19             THE COURT:  Willie Terry would come tomorrow, and you

20  Ms. Van Dornum, would dispute it?

21             MS. VON DORNUM:  Very much so, as to Willie Terry.

22             THE COURT:  Okay.  And then we also have Jessica

23  Sell Chamberts.

24             MS. VON DORNUM:  Who's another 413 witness, your

25  Honor.

N1B6HAD1

1          THE COURT:  Okay.  Yep.

2          MS. KIM:  And then we have the court reporter, two

3    paralegals, one --

4          THE COURT:  The court reporter issue is the plea?

5          MS. KIM:  Yes.  Two paralegals.  One paralegal will be

6    reading the plea transcript, one may be doing summary charts,

7    and we may have one other custodian witness.

8          MS. VON DORNUM:  Just on the paralegal summary chart,

9    we have not yet received the summary charts.  We had an earlier

10   version of one of them that seem to have had a lot of

11   inaccuracies.  And we're waiting for a new version.  We haven't

12   received the second one at all.  So we might need time.

13         THE COURT:  To go over that?

14         MS. VON DORNUM:  To go over that and see if it's

15   accurate.  So far what we've received is not.

16         MS. KIM:  We will plan to send an updated version as

17   soon as we can.

18         One thing I would just note for Charlotte Brooks in

19   the medical records, your Honor, we produced those as soon as

20   we receive them from Columbia and New York Presbyterian.  They

21   are around 74 pages, and we'll write about this in our letter,

22   but we're happy to call her towards the end.

23         THE COURT:  I get that many pages every night from the

24   two of you.

25         MS. VON DORNUM:  And not handwritten.

N1B6HAD1

1              MS. KIM:  It's true.

2              MS. VON DORNUM:  I guess I'll put this in my letter,

3      your Honor.  But just to set the stage, some of this just goes

4      to our larger point, you know, now there are so many 413

5      witnesses, it's kind of swamping the indicted victims, and I

6      think as to some --

7              THE COURT:  413 is a pretty broad rule.  I mean --

8              MS. VON DORNUM:  It is a broad rule, but it's still

9      subject to 403.  And since we're not challenging the abuse,

10     we're not cross-examining these 413 witnesses, right, we're

11     asking them one question -- do you live in New York City -- you

12     know, we have days of trial taken up about people testifying

13     about a non-disputed part of the case.  And we'll put it in our

14     letter, but I'd ask you to think about, not under 413, but

15     under 403, which still applies.  At some point, I think a limit

16     has to be set.

17             THE COURT:  Would you be planning in your letter brief

18     to have a category that covers more than one witness that

19     argues --

20             MS. VON DORNUM:  We'll organize it that way.

21             THE COURT:  You can do it witness by witness.

22             MS. VON DORNUM:  I agree.  It's easier to do it

23     conceptually.

24             THE COURT:  Thank you.  And then the issue is when

25     these briefs would come in and how much notice do you need for

N1B6HAD1

1    people who would presumably testify tomorrow?  Are they coming
2    anyway, so to speak?
3              MS. KIM:  Can we have one minute, your Honor?
4              THE COURT:  Yes.
5              MS. KIM:  Your Honor the remaining witnesses who are
6    coming in from out of town are either on their way or coming in
7    tonight, so they will be prepared to testify tomorrow.
8              THE COURT:  So they are planning to, so you don't have
9    to call them up and say it's a go.  They think it's a go.
10             MS. KIM:  Yes.
11             THE COURT:  So that's not, as a practical matter, a
12   problem.  Coming back to the question of when we can do the
13   briefing by.
14             MS. KIM:  I think we can --
15             THE COURT:  Is it adversarial, or can it be done
16   simultaneously?
17             MS. VON DORNUM:  I think we all know each other's
18   arguments.
19             THE COURT:  Can you both submit them say --
20             MS. VON DORNUM:  We're conferring on it, so we can do
21   simultaneous.
22             THE COURT:  How about 7:00 o'clock?
23             MS. KIM:  Could we possibly send the letter in at 8:00
24   or 9:00?
25             THE COURT:  8:00.  Let's say 8:00.  I mean, really,

N1B6HAD1

1    you want to have a breathing judge for tomorrow.  And these are

2    issues, by the way, that we've been over before.

3              MS. VON DORNUM:  Yes.

4              THE COURT:  Including with some of the very same

5    people.

6              MS. KIM:  Yes.

7              MS. VON DORNUM:  We can summarize.

8              THE COURT:  So let's say 8:00 o'clock, letter briefs.

9    And we're good to go for today, pretty much, I think.  Good.

10   Let's see where things stand.

11             (Pause)

12             THE COURT:  We have a juror who's running a bit late.

13   I'm guessing that we won't start till 9:30.  You can start your

14   letters.

15             MS. KIM:  Your Honor.

16             THE COURT:  Yes.

17             MS. KIM:  In terms of, we understand that we are able

18   to call Rosalina Lozada, and the Court has indicated that the

19   Court is inclined to let us call Willie Terry.  We can have her

20   come to testify to take us -- to try to testify.  She is in

21   New York, and so we can try to make those --

22             THE COURT:  You mean to fill the gap?

23             MS. KIM:  To keep things moving.

24             THE COURT:  Might need that gap today, I'm thinking.

25             MS. KIM:  Okay.

1          THE COURT:  Let's see where we are, if she's that

2     flexible, and not make that decision till at least after the

3     lunch break.  How about that?  We'll see.

4          MS. KIM:  You know, I think it might -- just in terms

5     of trying to get her, I don't think she can come within

6     30 minutes.  I think it will be a little bit of a process.

7     We're fine --

8          THE COURT:  Let's do tomorrow.  Let's do tomorrow.

9          MS. KIM:  Okay.  That's fine.

10         MS. VON DORNUM:  We can raise it as to Willie Terry

11    for tomorrow.  If you'll remember, there's a sub-issue as to

12    her whether she can testify and then whether she can testify to

13    what her friend subsequently told her happened.  I don't think

14    you've ruled on that issue, but you'll let me know if I'm wrong

15    on the sub-issue.

16         THE COURT:  Yep.

17         MS. VON DORNUM:  Thank you, Judge.

18         THE COURT:  Okay.  So just for the record, the juror

19    who was ill called this morning and said just to tell everybody

20    that he's feeling fine.

21         MS. VON DORNUM:  Oh, good.

22         THE COURT:  And sends his regards.

23         MS. VON DORNUM:  He misses us.

24         THE COURT:  Didn't say that, but he said he sends his

25    regards.

N1B6HAD1

1           MS. VON DORNUM:  That's a responsible juror, to call

2     back.

3           THE COURT:  Isn't it?

4           MS. VON DORNUM:  Yes.

5           THE COURT:  I think we have everybody.  And if we can

6     call Ms. Anderson so we can put her on the stand?

7           MS. KIM:  Sure.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N1B6HAD1                            Anderson - Direct

1          (Jury present)

2          THE COURT:  Everyone be seated, and we'll begin with

3   Ms. Anderson's testimony.

4          DEPUTY CLERK:  Ma'am, I'd like to remind you you're

5   still under oath.

6   EMILY ANDERSON, resumed.

7   DIRECT EXAMINATION CONTINUED

8   BY MS. KIM:

9   Q.  Good morning, Ms. Anderson.

10  A.  Good morning.

11  Q.  At the end of the day yesterday, you testified about a

12  follow-up appointment that you had in March 2012 after your

13  fibroid procedure.  Before I continue with questions about your

14  appointments with Hadden, I'd like to direct your attention to

15  the binder in front of you, and on the left flap, there is an

16  exhibit marked as Government Exhibit 12-A, if you can please

17  take a minute to look at that.

18  A.  Okay.

19  Q.  Do you recognize that document?

20  A.  Yes.

21  Q.  What is it?

22  A.  It's an e-mail between myself and Robert Hadden.

23  Q.  Is that a fair and accurate copy of an e-mail chain with

24  Hadden that you had with Hadden?

25  A.  Yes.

1        MS. KIM:  Your Honor, the government offers Government

2   Exhibit 12A into evidence under seal.

3        THE COURT:  I'll allow it.

4        (Government's Exhibit 12A received in evidence)

5   BY MS. KIM:

6   Q.  Ms. Anderson, could you please turn to Government

7   Exhibit 12 in your binder, which is under -- it's an exhibit

8   under seal.

9   A.  Okay.

10  Q.  I asked you some questions about this e-mail yesterday.  Do

11  you remember that?

12  A.  Yes.

13  Q.  Do you remember how some of the letters in the e-mail

14  didn't show up on the printout?

15  A.  Yes.

16  Q.  Directing your attention to the middle of Government

17  Exhibit 12, the e-mail from Hadden, from September 15, 2008.

18  Do you see the second to last line where it says, okay to F/U?

19  A.  Yes.

20  Q.  Now, if you could please turn to Government Exhibit 12A?

21  A.  Okay.

22  Q.  At the bottom of Government Exhibit 12A, is this the same

23  e-mail message from Hadden from September 15, 2008, that's

24  reflected in Government Exhibit 12?

25  A.  I'm sorry, would you repeat that?

1  Q.  Sure.  At the bottom of Government Exhibit 12A, is that the

2  same e-mail message from Hadden from September 15, 2008, that

3  is also reflected in Government Exhibit 12?

4  A.  Yes.

5  Q.  And turning to Page 2 of Government Exhibit 12A, do you see

6  where it says some women are sensitive.  Call me if symptoms

7  persist, okay to F/U times 3MOS?

8  A.  Yes.

9  Q.  What did you understand that to mean, okay to F/U times

10  3MOS?

11  A.  That it would be okay to follow up in three months.

12        THE COURT:  I'm sorry, could you speak a little

13  louder.

14  A.  Sure, it would be okay for me to follow up in three months.

15  BY MS. KIM:

16  Q.  Okay.  So Ms. Anderson, I want to turn to your appointments

17  with Hadden, and before I turn to your March 2012 appointment,

18  I want to ask you one broader question.

19        You testified yesterday that Hadden conducted vaginal

20  exams at every visit.  Do you remember that?

21  A.  Yes.

22  Q.  When Hadden conducted vaginal exams, did you ever feel him

23  make contact with your clitoris during those exams?

24  A.  Not that I recall.

25  Q.  Okay.  I want to turn back to your --

1          THE COURT:  Excuse me.  Did you also say yesterday

2     that on visits with Dr. Hadden, there were two breast exams?

3          THE WITNESS:  Yes.

4          THE COURT:  Per visit?

5          THE WITNESS:  Yes.

6          THE COURT:  How often were there two?

7          THE WITNESS:  Every time.

8          THE COURT:  Every time?  So breast, vaginal, breast?

9          THE WITNESS:  No, breast exam lying down and the

10    breast exam sitting up.

11         THE COURT:  I see, got it.

12         MS. WOZENCROFT:  Your Honor, I'm having a little

13    trouble hearing the ones.  I don't know if the mic is on.

14         THE COURT:  It is.  I think if you bend it up

15    toward --

16         THE WITNESS:  Up towards me, is that better?

17         MS. WOZENCROFT:  Thank you.

18         THE COURT:  Or even if you take -- bend it down, I

19    think that would be better.

20         THE WITNESS:  Okay.

21    BY MS. KIM:

22    Q.  I want it turn back to your follow-up appointment in

23    March 2012 with Hadden after your fibroid procedure.  During

24    that follow-up appointment, what, if any, exams did Hadden

25    conduct at this visit?

1   A.   A breast exam and vaginal exam.

2   Q.   Other than you and Hadden, who else was present in the room

3   when he conducted the breast exam?

4   A.   Just -- just myself and Hadden.

5   Q.   Who else was present in the room other than you and Hadden

6   for the vaginal exam?

7   A.   There was a medical assistant or a nurse during some of it.

8   Q.   What, if anything, happened after Hadden conducted the

9   breast and vaginal exam?

10  A.   The medical assistant or the nurse went to leave the room

11  and Hadden went to leave the room with her, and then once she

12  had left, he stopped, and he said that there was something that

13  he did not check during the vaginal exam and that he needed to

14  recheck me.

15  Q.   Why did the nurse leave the room?

16  A.   Because she thought the exam was over and she had the

17  specimens to take out.

18  Q.   After the nurse left the room, what happened?

19  A.   I laid back down on the exam table, and put my legs up in

20  stirrups, and I had a sheet draped over my knees, and then

21  Hadden began another vaginal exam.

22  Q.   When Hadden began this vaginal exam, did you feel anything

23  unusual touch you?

24  A.   I felt his tongue touch.

25  Q.   And where did you feel his tongue touch?

N1B6HAD1                          Anderson - Direct

1   A.   On -- on my vagina.

2   Q.   Where on your vagina did you feel Hadden's tongue?

3   A.   On each side of my labia.

4   Q.   How long did you feel Hadden's tongue on each side of your

5   labia?

6   A.   Just for a couple seconds.

7   Q.   And when you say each side of your labia, did you feel

8   Hadden's tongue across your entire labia or a portion of it?

9   A.   It was like a -- upward motion on each side.

10  Q.   Ms. Anderson, how did you know that what you felt was

11  Hadden's tongue?

12  A.   Because I know what a tongue feels like.

13  Q.   And I'm sorry to ask, how do you know what a tongue feels

14  like?

15  A.   Because I've -- I've had a tongue -- I've felt it before in

16  consensual intercourse and...

17  Q.   What, if any, reaction did you have when you felt Hadden's

18  tongue on your vagina?

19  A.   I was shocked.

20  Q.   After you felt Hadden's tongue on your vagina, what

21  happened next?

22  A.   I got dressed and met him in his room -- his -- as I always

23  did.

24  Q.   When you say you met him in his room, are you referring to

25  his office?

N1B6HAD1                          Anderson - Direct

1  A.  I met him in his office, yes.

2  Q.  What, if anything, happened in his office?

3  A.  He told me to follow up, and I honestly -- I don't recall.

4  I mean, we -- he just told me after my surgery and what the

5  follow-up was going to be.

6         THE COURT:  He said what, if you recall, would the

7  follow-up be?

8         THE WITNESS:  I believe he told me three months.

9  BY MS. KIM:

10  Q.  Did Hadden ask you any questions about your fibroids and

11  how you were feeling?

12  A.  I told him that I could no longer feel the fibroid that I

13  was feeling when I was buttoning my pants before.

14  Q.  Did Hadden make any comments about your physical

15  appearance?

16  A.  Yes.  He mentioned that the reason that I could feel the

17  fibroid was because I was thin and that's why that -- you know,

18  I didn't really have -- I didn't have any fat to -- that's why

19  I could feel the fibroid when I was buttoning my pants.

20  Q.  You testified earlier that your fibroid follow-up when

21  Hadden put his tongue on your vagina was in 2012?

22  A.  Yes.

23  Q.  I want to ask you some questions from the 2011 time period

24  before that follow-up appointment.

25         Ms. Anderson, did you ever refer patients to Hadden?

N1B6HAD1                         Anderson - Direct

1    A.  Yes.

2    Q.  Who did you refer to Hadden?

3    A.  I referred a few friends, as well as earlier, before I had

4    left Columbia, when I worked at Columbia I referred quite a few

5    patients.

6    Q.  Did there come a time when you referred Laurie Kanyok to

7    Hadden?

8    A.  Yes.

9    Q.  How do you know Laurie Kanyok?

10   A.  She's my best friend from junior high.

11   Q.  Ms. Anderson, could you please turn to what's already in

12   evidence as Government Exhibit 408 in your binder?

13            And I'd ask the jurors as well to turn to tab 408.

14            Ms. Anderson, starting with the bottom e-mail where it

15   says Dr. Hadden, who sent this e-mail?

16   A.  I sent this e-mail.

17   Q.  Approximately when did you send this e-mail?

18   A.  September of 2011.

19   Q.  When did you send this e-mail in relation to your fibroid

20   surgery?

21   A.  A few months prior.

22   Q.  Directing your attention to the subject line at the top of

23   the page, could you please read the subject line out loud?

24   A.  Sure.  Referral-Laurie Kanyok.

25   Q.  Directing your attention to where you wrote, Dr. Hadden, I

1   hope this e-mail finds you well.  I wanted to let you know I

2   referred my best friend to you.  She and I have been friends

3   since 13.  She's a Broadway dancer, 39 years old, just found

4   out she's pregnant and having complications.

5           When you wrote this, who was the friend you were

6   referring to?

7   A.  Laurie Kanyok.

8   Q.  Directing your attention to where you wrote, I know we

9   can't discuss her care.  I just wanted to let you know.

10          What did you mean by that?

11  A.  That he wouldn't be able to tell me anything about her

12  pregnancy or any of her care, her medical care.

13  Q.  And why wouldn't Hadden be able to tell you anything about

14  his care, his medical care for Laurie Kanyok?

15  A.  Because there's HIPAA laws that protect patients.

16  Q.  You then wrote, I told her you are the best.

17          At the time, Ms. Anderson, was that your view of

18  Hadden?

19  A.  Yes.

20  Q.  Ms. Anderson, what, if any, reaction do you have to seeing

21  this e-mail today?

22  A.  I feel guilty for referring my friend.

23  Q.  Ms. Anderson, did there come a time when Laurie Kanyok

24  communicated with you during an appointment with Hadden?

25  A.  Yes.

N1B6HAD1                        Anderson - Direct

1   Q.   How did Ms. Kanyok communicate with you?

2   A.   She texted me.

3   Q.   When approximately was this?

4   A.   June of 2012.

5   Q.   What did Laurie say to you?

6   A.   She texted and said that Dr. Hadden had licked her vagina.

7                THE COURT:  I'm sorry.

8                THE WITNESS:  She said Dr. Hadden had licked my

9   vagina.

10  BY MS. KIM:

11  Q.   Did you respond to Ms. Kanyok's text message?

12  A.   Yes.

13  Q.   What did you say?

14  A.   STFU.

15  Q.   What did you mean by STFU?

16  A.   Shut the fuck up.

17  Q.   Did Ms. Kanyok tell you where she was when she was sending

18  the messages?

19  A.   I believe after that she told me she was in the bathroom.

20  Q.   In what state were you in when you received Ms. Kanyok's

21  text messages?

22  A.   I was in Nevada.

23  Q.   What, if any, reaction did you have when you read

24  Ms. Kanyok's text messages?

25  A.   I felt awful.  I instantly just -- I knew it had happened

1   because I knew it happened to me, and I -- I wanted to be there

2   to support her.

3           MS. KIM:  Mr. Hamill, can you please pull up

4   Government Exhibit 2R for the witness, the jury, the Court, and

5   counsel?

6   BY MS. KIM:

7   Q.  Ms. Anderson, directing your attention to Government

8   Exhibit 2R, are these text messages that you exchanged with

9   Laurie Kanyok on June 29, 2012?

10  A.  Yes.

11  Q.  Directing your attention to the top where it says, Hadden

12  just locked my vagina licked, and then you responded on the

13  left.

14          Are those your text messages that you sent in gray?

15  A.  Yes.

16  Q.  Where you wrote, you have to call me, why did you send that

17  text message?

18  A.  Because I wanted to speak to her to make sure she's okay.

19  Q.  Directing your attention to the next text messages, the

20  text messages on the right in blue, who sent those messages?

21  A.  Laurie.

22  Q.  Ms. Kanyok texts, I'm in the bathroom, don't know what to

23  do.  Directing your attention to your text in gray, where you

24  wrote, how do you know, are you sure, where's the nurse?

25          Why did you send those text messages?

N1B6HAD1                          Anderson - Direct

1   A.  Because I -- I had the questions that I just wanted -- I

2   wanted to also validate my own experience and make sure she was

3   okay.  And to see if the nurse was with her.

4           MS. KIM:   Thank you, Mr. Hamill.

5   BY MS. KIM:

6   Q.  After Ms. Kanyok texted you that Hadden had licked her

7   vagina, what did you do?

8   A.  I called her.

9   Q.  Did you speak with her?

10  A.  Yes, I did.

11  Q.  What, if anything, did she say?

12  A.  She said she was in the bathroom and she was crying and

13  that she had called her partner and I told her to get out.  I

14  told her to leave.

15  Q.  Did you speak to Ms. Kanyok again that day?

16  A.  Yes.  She was on the street.  She had left the office, and

17  she was waiting for her boyfriend to meet her, to pick her up.

18  Q.  What was Ms. Kanyok's demeanor on the phone with you?

19  A.  She was very upset and she was crying.

20  Q.  That day that Ms. Kanyok texted you that Hadden had licked

21  her vagina, did anyone else call you?

22  A.  Yes.

23  Q.  Who called you?

24  A.  Robert Hadden.

25  Q.  How many times did he call you?

1   A.   He called once and left a voicemail.

2   Q.   Did you pick up the call?

3   A.   No.

4   Q.   How did you know it was Hadden calling you?

5   A.   Because he had called me previously from his cell phone,

6   and it came up blocked, and I -- or private, and I don't have

7   many people who call from that number.  So...

8   Q.   And did you listen to the voicemail that Hadden left you?

9   A.   Yes.

10   Q.   What did Hadden say in the voicemail?

11                MS. WOZENCROFT:  Objection.

12                THE COURT:  Overruled.  Go ahead.

13                THE WITNESS:  Thank you.

14   A.   I don't remember word for word, but a paraphrase that he

15   said, Emily, this is Dr. Hadden, something happened -- strange

16   happened with your friend, Laurie.  I need you to call me right

17   away.

18                MS. KIM:  Your Honor, can I have one minute?

19                THE COURT:  Yes.

20                (Counsel confer)

21                MS. KIM:  Nothing further from the government, your

22   Honor.

23                THE COURT:  Thank you.

24                MS. VON DORNUM:  Can we have one minute, your Honor?

25                THE COURT:  Yes, sure.

N1B6HAD1                           Anderson - Cross

 1   CROSS-EXAMINATION

 2   BY MS. WOZENCROFT:

 3   Q.  Good morning.

 4   A.  Good morning.

 5   Q.  Just bear with me one moment.

 6   A.  Okay.

 7   Q.  Can you hear me?

 8   A.  I can.

 9   Q.  Okay.  Great.

10           So I just want to go back to some of the things you

11   had talked about yesterday with Ms. Kim.  So you let us know

12   that you first became a patient of Robert Hadden's in about --

13   the year 2000?

14   A.  I believe it was 1999, around there, yes.

15   Q.  At that time, you were a nurse, yourself, at Columbia?

16   A.  Yes.

17   Q.  You were working in the cardiology unit?

18   A.  Pediatric cardiology.

19   Q.  And you were about 27 years old?

20   A.  Yes.

21   Q.  You said you were looking for a new -- for a gynecologist?

22   A.  Yes.

23   Q.  And you were referred by coworkers?

24   A.  Friends and coworkers, yes.

25   Q.  Other nurses who worked at Columbia?

N1B6HAD1                           Anderson - Cross

1    A.   Yes.

2    Q.   So you got a referral for Robert Hadden, right?

3    A.   I did.

4    Q.   And you called and made an appointment with him?

5    A.   I did.

6    Q.   Fair to say you have a long history with Robert Hadden, it

7    spans a decade?

8    A.   As a patient, yes.

9    Q.   As a patient.

10          Sometimes as a patient, you would have to cancel

11   appointments you made because of various conflicts?

12   A.   Yes.

13   Q.   There were times that you were experiencing medical issues

14   where you saw Robert Hadden more often, right?

15   A.   Yes.

16   Q.   There were times when you were healthier, doing well, and

17   saw him less often, fair to say?

18   A.   Yes.

19   Q.   Now, until 2005, you remained working at Columbia?

20   A.   I -- I was not working at Columbia all that time.  I was in

21   New York City, though.

22   Q.   Okay.  So in 2005 you moved from New York City to

23   Las Vegas?

24   A.   Yes.

25   Q.   Come 2005, you had been seeing Robert Hadden for about six

1   years?

2   A.   Correct.

3   Q.   Now, at this point, you told us you felt comfortable with

4   him, right?

5   A.   Yes.

6   Q.   You had an established relationship with him?

7   A.   Yes.

8   Q.   You were happy at that point with the care you were

9   receiving?

10  A.   Yes.

11  Q.   You also told us yesterday that you had concerns about the

12  quality of healthcare in Nevada?

13  A.   Yes.

14  Q.   I believe in at least one of your e-mails you refer to it

15  as witchcraft?

16  A.   Yes.

17  Q.   Can you tell us a little bit more?  I may have missed it

18  yesterday, about what -- without telling us your employer in

19  Nevada, what were you doing in Nevada, what was your job?

20  A.   It -- when I moved there in 2005?

21  Q.   Yes.

22  A.   I believe at the time I worked for a small biotech company.

23  Q.   Okay.  And you had clients that you were traveling to in

24  New York; is that fair to say, for that company?

25  A.   Yes.

1    Q.  Okay.  Did that include Columbia?

2    A.  I don't recall at the time.

3    Q.  At some point after 2005, Columbia at one point was a

4    client of yours?

5    A.  Yes, I worked with them.

6    Q.  I'm sorry, I cut you off.

7    A.  No, I'm sorry, I worked with them in that capacity, yes.

8    Q.  Okay.  So part of your role while you were in Nevada was to

9    visit various clients, including at one point Columbia?

10   A.  Yes.

11   Q.  And as you told us, when you would travel to New York you

12   would sometimes seek clients or visit -- complete your work

13   duties and also see Robert Hadden?

14   A.  Yes.

15   Q.  When you were in Nevada, you actually kept your dentist in

16   New York as well, right?

17   A.  I did.

18   Q.  Okay.  Fair to say that's because you were happy with your

19   dentist in New York?

20   A.  Yes.

21   Q.  Okay.  And you were coming to New York anyway, so you were

22   able to see your dentist too.

23        You talked to us this morning about a visit in March

24   of 2012.  I'm not going to ask you about the details of that

25   visit, but the purpose of that visit was your follow-up or your

N1B6HAD1                        Anderson - Cross

```
1   postop visit immediately after your fibroid surgery; is that
2   right?
3   A.  That's correct.
4            MS. WOZENCROFT:  And I'm going to ask that the witness
5   be shown what I believe are premarked as Defense Exhibits HH
6   and II.  If these are entered, your Honor, they would be under
7   seal, so I have paper copies that I can provide to the
8   government, the witness, and the Court?
9            THE COURT:  Okay, sure.
10  BY MS. WOZENCROFT:
11  Q.  Ms. Anderson, you testified -- oh, I'm sorry, I thought it
12  was on your screen.
13           THE COURT:  HH is on my screen.  It would be good to
14  have a paper copy too.
15           MS. WOZENCROFT:  Certainly.  I can pass it up to your
16  Honor.
17  BY MS. WOZENCROFT:
18  Q.  Ms. Anderson, is your screen working?  You can see it?
19  A.  Yes.
20  Q.  Great.  I'm going to show you a series of e-mails.  I'm
21  just going to ask you to review what's on your screen.  Have
22  you had the opportunity to see it?
23  A.  I have, yes.
24  Q.  I ask we put up II for the witness and the parties only.
25           Just going to ask you to review that as well.
```

N1B6HAD1                         Anderson - Cross

1    A.   Okay.

2    Q.   Great.  So yesterday, you -- yesterday and today, you went

3    through several e-mail communications between yourself and

4    Robert Hadden.  Do you recognize the two e-mails I had just

5    shown you?

6    A.   Yes.

7    Q.   And those are e-mails between you and Robert Hadden as

8    well?

9    A.   Yes.

10   Q.   And those are fair and accurate depictions of the e-mail

11   that were sent at the time?

12   A.   Yes, I believe.

13           MS. WOZENCROFT:  I would ask that HH and II be moved

14   into evidence?

15           THE COURT:  Sure.

16           MS. KIM:  No objection.

17           (Defendant's Exhibits HH and II received in evidence)

18   Q.   So I ask that HH be shown to --

19           MS. VON DORNUM:  Your Honor, may we -- it can't be

20   shown on the screen to the jurors, because then it would be

21   shown to the public.

22           THE COURT:  Do you have copies?

23           MS. VON DORNUM:  We do have copies.

24           THE COURT:  Okay.  You can hand them out.

25           (Pause)

N1B6HAD1                    Anderson - Cross

1   BY MS. WOZENCROFT:

2   Q.  So Ms. Anderson, there's HH on the screen, right, and we'll

3   get to II later, but I just wanted to -- you had talked to us

4   yesterday about how you would e-mail Robert Hadden questions at

5   different points, right?

6   A.  Yes.

7   Q.  And this was a question that you had e-mailed him after

8   your fibroid follow-up appointment; is that correct?

9   A.  Yes.

10  Q.  Okay.  Am I correct your last visit with Robert Hadden was

11  on June 4th, 2012; is that right?

12  A.  I don't recall.

13  Q.  Okay.

14          MS. WOZENCROFT:  I'd ask that just the witness and the

15  parties be shown Government Exhibit 3023?

16          Your Honor, this is not yet in evidence.  I'm just

17  going to show the witness it to see if it refreshes her

18  recollection.

19          THE COURT:  Okay.

20  BY MS. WOZENCROFT:

21  Q.  Ms. Anderson, you didn't create this document?

22  A.  I did not.

23  Q.  Okay.  But reviewing it, did --

24          MS. WOZENCROFT:  Is it not on your screen?

25          (Counsel confer)

N1B6HAD1                          Anderson - Cross

1   BY MS. WOZENCROFT:

2   Q.  Reviewing the document in front of you, is it fair to say

3   that -- the last time you saw Robert Hadden was June 4th, 2012,

4   does that refresh your recollection?

5   A.  That's what this shows, yes.

6   Q.  Okay.

7           MS. WOZENCROFT:  We can take it down.

8   BY MS. WOZENCROFT:

9   Q.  So we talked yesterday about a fibroid surgery you had?

10  A.  Yes.

11  Q.  That Robert Hadden performed?

12  A.  Yes.

13  Q.  And you traveled to New York City for that surgery?

14  A.  I did.

15  Q.  At the time you were living in Nevada?

16  A.  Yes.

17  Q.  And in October of 2011, you saw a doctor in Las Vegas who

18  had suggested surgery?

19  A.  Yes.

20  Q.  And actually, if we could turn to what's in evidence as --

21  I believe in the binders as GX409?  Do you have it?

22  A.  I do.

23  Q.  Okay.  Great.

24          I'm referring to the e-mail you had sent Dr. Hadden at

25  the bottom of the page.  You say you saw your doctor in

N1B6HAD1                        Anderson - Cross

1    Las Vegas who's suggesting surgery; is that right?

2    A.  Yes.

3    Q.  And you say, of course, I would never have surgery in

4    Las Vegas, right?

5    A.  Correct.

6    Q.  And that you're hoping to come to New York City in the next

7    two weeks for an appointment with Robert Hadden?

8    A.  Yes.

9    Q.  Okay.  And then you also talked on direct about various

10   e-mails scheduling that surgery, right?

11   A.  Yes.

12   Q.  Okay.  And, in fact, in -- now if I can have one moment.

13              MS. WOZENCROFT:  If we can put defense Exhibit II up

14   on the screen for the witness and the parties, and I would ask

15   the jurors to turn to II.  That's one of the pages we recently

16   passed out.

17   BY MS. WOZENCROFT:

18   Q.  Ms. Anderson, this is an e-mail from you to Robert Hadden

19   in January of 2012, right?

20   A.  Yes.

21   Q.  And in that e-mail you say, Happy New Year, hope you had a

22   nice holiday, and enjoyed the time off.  Wanted to check

23   regarding a surgery date for February.  I'm open, so please

24   just let me know, hoping early February; is that right?

25   A.  Yes.

1    Q.  Thank you.  And that surgery was indeed scheduled in

2    February?

3    A.  Yes.

4    Q.  And, again, turning to Government Exhibit 414 in evidence.

5          Ms. Anderson, this is an email about a week, eight

6    days after the e-mail we just looked at.  You're checking it

7    again.  You say, Checking in to see if you have a date in mind

8    for my surgery.  And Robert Hadden says, Sorry to get back to

9    you so late.  How about Wednesday, February 1 or February 2; is

10   that right?

11   A.  Yes.

12   Q.  Just one moment.

13         After your fibroid surgery, Robert Hadden sent you a

14   picture or text message of the fibroids he removed, correct?

15   A.  Yes.

16   Q.  That was a text message from his phone to your cell phone,

17   right?

18   A.  Yes.

19   Q.  I'd ask that the witness -- I'd ask that the witness be

20   shown what will be marked as whatever Ms. Kissick will tell me

21   the next stamp number is, JJ?

22         MS. HOWARD:  Yes, JJ.

23         MS. WOZENCROFT:  And it's formerly Government

24   Exhibit -- just one moment.  705, an excerpt from what is

25   Government Exhibit 705.

1          And I ask it be shown to the witness and the parties.

2     And for clarity, I believe it's an excerpt from Government 705

3     at Page 11.

4          Your Honor, I would ask that this exhibit,

5     government -- sorry, Defense JJ be moved into evidence.  I

6     understand that there's no objection from the government.

7          MS. KIM:  No objection.

8          THE COURT:  I'll allow it.

9          MS. WOZENCROFT:  This will be a sealed exhibit.  We

10    don't have copies yet, but I'll question the witness about it,

11    and we'll provide them to the jury later.

12         THE COURT:  Okay.

13         MS. WOZENCROFT:  Sorry, technology.  Okay.  Great.

14    BY MS. WOZENCROFT:

15    Q.  Ms. Anderson, this is a -- from looking -- you didn't

16    create this document, right?

17    A.  I did not.

18    Q.  Okay.  It appears to be an AT&T record, correct?

19    A.  Yes.

20    Q.  And -- oh, please -- can we go to Page 11, please, that's

21    the only page in evidence.

22         MS. WOZENCROFT:  You know what, I'll move on and come

23    back to this.

24         THE COURT:  Okay.

25

N1B6HAD1                        Anderson - Cross

1    BY MS. WOZENCROFT:

2    Q.  So as we discussed earlier, there were times when you would

3    see Robert Hadden more frequently when you were having

4    gynecological issues?

5    A.  Yes.

6    Q.  Okay.  So similarly, there were periods of time between

7    2005 and 2012 when you were living in Nevada when you would see

8    him less frequently?

9    A.  Yes.

10   Q.  Okay.  So, for example, I just want to go through with you

11   a few appointments you had.

12           So if you can turn to Government Exhibit 11 in

13   evidence?  Let me know when everyone is there.  And I'm going

14   to refer you to the second page, the last paragraph at the

15   bottom of that page.

16   A.  Okay.

17   Q.  That is Robert Hadden writing to you in that last

18   paragraph, right?

19   A.  Yes.

20   Q.  Okay.  And I won't go through the whole paragraph, but he's

21   essentially saying that you've -- you had the regular test

22   results, and you need what's called a colposcopy, right?

23   A.  Yes.

24   Q.  And so that e-mail was sent in July of 2008, right?

25   A.  Yes.

N1B6HAD1                        Anderson - Cross

1    Q.  And in July of 2008, you saw Dr. Hadden and had a

2    colposcopy?

3    A.  Yes.

4    Q.  And now turning to Government Exhibit 12 or 12A -- we can

5    stay on Government Exhibit 12, this is a set of e-mails you

6    exchanged with Dr. Hadden after a LEEP procedure; is that

7    correct?

8    A.  Yes.

9    Q.  Okay.  So after -- just to fill in the gaps, after you had

10   your colposcopy, that procedure led to a test result that

11   required to you have a LEEP procedure, correct?

12   A.  I believe so.

13   Q.  Okay.  But in September -- looking at Government

14   Exhibit 12, in September of 2008, you were discussing with

15   Dr. Hadden various medical questions about what you could and

16   could not do after your LEEP procedure; is that correct?

17   A.  Yes.

18   Q.  And at the bottom of that page --

19           THE COURT:  This is 412?

20           MS. WOZENCROFT:  I'm at Government Exhibit 12, yes.

21   BY MS. WOZENCROFT:

22   Q.  Dr. Hadden writes to you, Sorry, HSIL, high grade

23   squamous -- I'm going to butcher this -- intraepithelial

24   legion, which is exactly what the biopsy has shown, so no

25   worse.  You should be cured.  So that's the result of your LEEP

1   procedure, right, and you were doing better?

2   A.  I believe so.

3   Q.  Sticking with that, on Government Exhibit 12, you say,

4   going to the top of that page, there's no way I can follow up

5   in a month, definitely the three month I can do.  Do you see

6   that?

7   A.  Yes.

8   Q.  That was in September of 2008, right?

9   A.  Yes.

10  Q.  After that, the next time you see Robert Hadden isn't until

11  July of 2010; is that correct?

12  A.  I don't recall.

13  Q.  Well, let me refer you to -- if you can turn to Government

14  Exhibit 13?  I'm just reading from the first entry on

15  Government Exhibit 13 in evidence.  Say, Happy New Year, hope

16  2010 is a great year for you.  I'm so sorry to bug you, but

17  I've called your office a few times, and I can't seem to get

18  help.  I had a rough year last year, majority of the year was

19  spent in PA with my father, he became ill in February and

20  passed in July so I let my own health go, sorry if I missed any

21  appointments.

22          So fair to say, at least as of January 2010, there had

23  been a period of time when you hadn't seen Robert Hadden?

24  A.  Correct.

25  Q.  And in that e-mail, you're asking him to send records to

N1B6HAD1                    Anderson - Cross

1   Nevada for you; is that correct?

2   A.  Yes.

3   Q.  And he says in part, in the e-mail below, that he will pull

4   all the pertinent records and fax them to you ASAP?

5   A.  Yes.

6   Q.  He doesn't say in that e-mail you need to come see me?

7   A.  No, he does not.

8   Q.  We will try this one more time.  I'm going to ask that the

9   Defense Exhibit JJ in evidence be pulled up for you.

10  A.  Okay.

11  Q.  What I was going to ask is this appears to be a page out of

12  your phone records from the date, February 16 of 2012; is that

13  fair to say?

14  A.  Yes.

15  Q.  Okay.  That was the date you had your fibroid surgery?

16  A.  I don't recall the exact date, but I know it was February

17  of 2012.

18  Q.  Okay.  And I'm not going to -- I'm not going to ask you to

19  read into the record your phone number, but do you recognize

20  your phone number on that sheet?

21  A.  I do.

22  Q.  Okay.  And referring to the third line down, that shows

23  a -- do you recognize the 201 phone number?

24  A.  I don't.

25  Q.  Okay.  At that time from that phone number, you receive

1    what's indicated to be a text and an image, right?

2    A.  Yes.

3            MS. WOZENCROFT:  Thank you.  I don't have much more.

4    One moment.

5            THE COURT:  It's okay.

6    BY MS. WOZENCROFT:

7    Q.  Now, you told us yesterday that that picture was also sent

8    to Laurie Kanyok?

9    A.  Yes.

10   Q.  When you talked to the government, in May of 2020, you said

11   Hadden may also have sent this photograph to Kanyok, but you're

12   not sure.

13           Is it right that you said that?

14   A.  I don't recall saying that.

15   Q.  Okay.  Would reviewing the notes from that meeting refresh

16   your recollection?

17   A.  Mm-hmm.

18   Q.  I would ask just the witness and the parties be shown

19   Ms. Anderson's -- or, document 353-4047 at Page 4.  And I'm

20   going to direct your attention to the last paragraph on that

21   page.  And I would just also -- oh -- it's 353-4047, Page 4,

22   and you don't have to zoom in, and I would just direct your

23   attention to the top of the page for the date.

24   A.  Okay.

25           THE COURT:  Could you zoom the paragraph again?

1              MS. WOZENCROFT:  Sure.

2    BY MS. WOZENCROFT:

3    Q.  And so as of May of 2020, you believe that Hadden may have

4    also sent the photograph to Kanyok, but you weren't sure?

5    A.  That's what this note says.

6    Q.  Okay.

7              MS. WOZENCROFT:  Thank you.  That can come down.

8    BY MS. WOZENCROFT:

9    Q.  So I just have a few more questions.  You would agree with

10   me that in the e-mails that we had been reviewing over the

11   past, course of the past two days, there were multiple times

12   that you e-mailed Robert Hadden to see if he could fit you in

13   for appointments, right?

14   A.  I e-mailed him regarding --

15   Q.  Scheduling?

16   A.  Scheduling or medical issues.

17   Q.  So just turning again to Government 11 in evidence.  And I

18   will refer your attention to the third page, the bottom of the

19   page.  This is an e-mail from June of 2008, right?

20   A.  Yes.

21   Q.  And that last sentence at the bottom of the page, you say,

22   I'm coming to New York City tomorrow only until Monday evening,

23   but I wasn't sure if I could be seen.

24   A.  Yes.

25   Q.  Okay.  And then I would refer to, staying on that exhibit,

1   the second page, the top e-mail on that page is an e-mail from

2   you to Dr. Hadden, right?

3   A.  Yes.

4   Q.  And the last full -- well, the last paragraph in that

5   e-mail reads, I was -- or second to last paragraph in that

6   e-mail reads, I was planning a trip to New York City July 18,

7   so maybe the 18th or the 21st.  That's referring to scheduling

8   as well, right?

9   A.  Yes.

10  Q.  And then if we can move to Government Exhibit 408 in your

11  binder?

12          That -- the second e-mail down on that page is an

13  e-mail from you to Dr. Hadden -- or from you to Robert Hadden,

14  correct?

15  A.  Yes.

16  Q.  And at the end of that e-mail, you write, Of course, I'll

17  see you in my next trip to New York City, right?

18  A.  Yes.

19  Q.  And then Government Exhibit 410, if we can move to that?

20          The last e-mail on that page is an e-mail from you to

21  Dr. Hadden, right?

22  A.  Yes.

23  Q.  And you write, at the bottom of that e-mail, Also I was

24  wondering if you have time to see me the week of November 7, I

25  am trying to plan a trip to New York City, right?

N1B6HAD1                        Anderson - Redirect

 1   A.  Yes.

 2   Q.  And then finally just turning to Government Exhibit 412?

 3   Fair to say it's another e-mail about scheduling, right?

 4   A.  Yes.

 5   Q.  And in that, the last e-mail on that page is an e-mail from

 6   you to Robert Hadden, and you say, I will be in New York City

 7   Tuesday a.m. I'm hoping you will be -- I'm hoping you will be

 8   able to squeeze me in.  I arrive at 6:00 a.m., so it can be at

 9   your office any time that will work for you, right?

10   A.  Yes.

11   Q.  Okay.  Just one moment.

12            MS. WOZENCROFT:  No further questions.

13            THE COURT:  Thank you.

14            MS. KIM:  Your Honor, I have a few questions on

15   redirect.

16            THE COURT:  Go ahead.

17   REDIRECT EXAMINATION

18   BY MS. KIM:

19   Q.  Ms. Anderson, you were asked questions on cross-examination

20   about traveling to New York.  Do you remember that?

21   A.  Yes.

22   Q.  Is it right that many of your trips that you scheduled to

23   come to New York were for the purpose of seeing Hadden?

24   A.  Yes.

25   Q.  When you lived in Nevada, why did you travel to New York to

N1B6HAD1                        Anderson - Redirect

1    see Robert Hadden?

2    A.   Because he was my doctor.

3    Q.   And you trusted him, right, as your doctor?

4    A.   I did.

5    Q.   Ms. Anderson, when you had to have fibroid surgery, who did

6    you want to do the surgery?

7    A.   Robert Hadden.

8    Q.   Why?

9    A.   Because he had been my physician for years, and I trusted

10   him.

11   Q.   And after the surgery, did you want Robert Hadden to

12   provide follow-up medical care?

13   A.   Yes.

14   Q.   Why?

15   A.   Because he performed the surgery and I needed follow-up

16   care.

17   Q.   And there were times, Ms. Anderson, when you e-mailed

18   Hadden for his availability for appointments, right?

19   A.   Yes.

20   Q.   But you were coming to New York to see Robert Hadden to

21   receive medical care; is that right?

22   A.   Yes.

23   Q.   Do you remember being asked questions on cross-examination

24   about e-mailing Hadden after your fibroid follow-up

25   appointment?

N1B6HAD1                      Anderson - Redirect

1    A.  Yes.

2    Q.  And so you sent an email -- you sent an e-mail after that

3    follow-up appointment in March of 2012; is it that right?

4    A.  Yes.

5    Q.  Ms. Anderson, when Hadden put his tongue on your vagina,

6    did you want to believe that your doctor of 12-plus years had

7    just sexual assaulted you?

8              MS. WOZENCROFT:  Objection.  Leading.

9              THE COURT:  Overruled.

10   A.  No.

11   BY MS. KIM:

12   Q.  Why not?

13   A.  Because he had been my doctor for ten plus years, plus a

14   colleague when I worked at Columbia, and I was embarrassed, and

15   I -- I was shocked, and I was horrified.

16   Q.  At the time your doctor of 12 plus years put his tongue on

17   your vagina, did you question what you had felt?

18             MS. WOZENCROFT:  Objection, leading.

19             THE COURT:  Overruled.

20   A.  I knew what I felt.  I knew that his tongue -- he had put

21   his tongue on my vagina.

22   BY MS. KIM:

23   Q.  After Hadden put his tongue on your vagina, did you tell

24   anyone about what he had done?

25   A.  No.

N1B6HAD1

1              MS. WOZENCROFT:  Objection, beyond the scope.

2              THE COURT:  Overruled.

3    BY MS. KIM:

4    Q.  Why didn't you tell anyone?

5    A.  Because I was embarrassed and scared, and I really didn't

6    think anyone would believe me.

7    Q.  Ms. Anderson, how, if at all, have you struggled to process

8    your experiences with Hadden?

9    A.  It's been extremely hard, because I'm in healthcare, and

10   it's had a major impact on my life, my personal life, and --

11   it's been 10 years, and it's -- it's still very present.

12             MS. KIM:  Nothing further from the government.

13             MS. WOZENCROFT:  Nothing further.

14             THE COURT:  Okay.  Thank you very much.  The witness

15   is excused.  And we'll have the next government witness.

16             (Witness excused)

17             MS. KIM:  Your Honor, the government calls Keyvan

18   Gabbay.

19             DEPUTY CLERK:  Sir, if you can step up here, please?

20   Remain standing by the chair.  And if you could raise your

21   right hand.

22    KEYVAN GABBAY,

23        called as a witness by the Government,

24        having been duly sworn, testified as follows:

25             DEPUTY CLERK:  Sir, can you please state and spell

1    your first and last name?

2              THE WITNESS:  My name is Keyvan Gabbay.  First name is

3    K-E-Y-V-A-N, last name is Gabbay, G-A-B-B-A-Y.

4              DEPUTY CLERK:  Thank you, sir.  You may be seated.

5    DIRECT EXAMINATION

6    BY MS. KIM:

7    Q.  Mr. Gabbay, do you spell your first name in any other ways?

8    A.  Yes.  K-A-Y-V-A-N as well.

9    Q.  How old are you?

10   A.  55.

11   Q.  In what city and state do you currently live?

12   A.  New York City.

13   Q.  Approximately how long have you lived in New York City?

14   A.  23 years.

15   Q.  How far did you go in school?

16   A.  Sophomore in college.

17   Q.  Are you currently employed?

18   A.  Yes.

19   Q.  What do you do for work?

20   A.  I am a textile importer and exporter.

21   Q.  Approximately how long have you been a textile importer?

22   A.  35 years.

23   Q.  Is your job stressful?

24   A.  At times.

25   Q.  How is it stressful?

N1B6HAD1                        Gabbay - Direct

1    A.  You're dealing with a lot of entities overseas, and it's

2    very delivery sensitive, and there's a lot of facets to what we

3    do.

4    Q.  And how, if at all, do you respond to that stress at work?

5    A.  I deal with it.  That's how I make my living.

6    Q.  Mr. Gabbay, what is your current cell phone number?

7    A.  (917)324-1092.

8    Q.  Approximately how long have you had that cell phone number?

9    A.  20 plus years.

10   Q.  Mr. Gabbay, are you familiar with an individual named

11   Laurie Kanyok?

12   A.  Yes, I am.

13   Q.  How do you know Laurie Kanyok?

14   A.  She is the mother of my child.

15   Q.  How many children do you have?

16   A.  One.

17   Q.  When was your child born?

18   A.  5/14/2012.

19   Q.  When approximately did you first meet Ms. Kanyok?

20   A.  About a year and a half before then.

21   Q.  Did there come a time when you began a romantic

22   relationship with Ms. Kanyok?

23   A.  Yes.

24   Q.  When approximately?

25   A.  Sometime in 2010.

1    Q.  After Ms. Kanyok became pregnant, how, if at all, did your

2    relationship change?

3    A.  Well, I mean, it got very serious.  We were having a -- we

4    were going to have a kid on the way, so...

5    Q.  Did there come a time when you started living together?

6    A.  Yes.

7    Q.  When approximately during the pregnancy did you start to

8    live together?

9    A.  Sometime after the first trimester or so.

10   Q.  How would you describe your relationship with Ms. Kanyok

11   now?

12   A.  Sometimes great, sometimes copasetic.

13   Q.  How often to you speak with Ms. Kanyok?

14   A.  A few times a week.

15   Q.  What do you talk about?

16   A.  Alexandra.

17   Q.  Is that your child?

18   A.  That's our daughter.

19   Q.  While Ms. Kanyok was pregnant, did she seek care from an

20   OB-GYN?

21   A.  Yes.

22   Q.  How do you know?

23   A.  Because I was involved in the whole thing.

24   Q.  Do you recall the name of Ms. Kanyok's OB-GYN?

25   A.  Yes, I do.

1    Q.   What was his name?

2    A.   Robert Hadden.

3    Q.   At the time of Ms. Kanyok's pregnancy, did you have an

4    understanding of where Hadden worked?

5    A.   Yes.

6    Q.   Where did he work?

7    A.   Columbia Presby.

8    Q.   Excuse me, what was that?

9    A.   Columbia Presby.

10   Q.   When you say presby, what do you mean?

11   A.   Presbyterian, I'm assuming it stands for.

12   Q.   Without stating any names, what is your understanding of

13   how Hadden came to be Ms. Kanyok's OB-GYN?

14   A.   Her friend referred her -- or referred him to Laurie.

15   Q.   At the time of Ms. Kanyok's pregnancy, what, if any,

16   impression did you have of Columbia's reputation for OB-GYN

17   care?

18   A.   Stellar.

19   Q.   What was that reputation based on?

20   A.   It's Columbia.  It was -- it was brought to our attention

21   as one of the best.

22   Q.   At the time of Ms. Kanyok's pregnancy, what, if any,

23   impression did you have of Hadden's reputation as an OB-GYN?

24   A.   That he was also stellar.  I know that on high-risk

25   pregnancies, he was one of the best.  I believe he had the --

N1B6HAD1                          Gabbay - Direct

1   just took care of a lady that was 57 some years old.

2           MS. WOZENCROFT:  Objection, move to strike.

3           THE COURT:  I'll strike that.

4   BY MS. KIM:

5   Q.   When you say high-risk pregnancy, what do you mean by that?

6   A.   Laurie was 38 years old and I was 44 at the time, so it was

7   considered to be high risk.

8   Q.   What, if any, concerns did you have about your age with

9   respect to the pregnancy?

10  A.   Mine, personally?

11  Q.   Your age or Laurie's age.

12  A.   I mean, we were older, by normal standards, to have a

13  child.

14  Q.   Mr. Gabbay, did you accompany Ms. Kanyok to any

15  appointments with Hadden?

16  A.   Yes, I did.

17  Q.   Did you accompany Ms. Kanyok to every appointment with

18  Hadden or some of her appointments with Hadden?

19  A.   Some of the appointments.

20  Q.   Did there come a time when Ms. Kanyok expressed concerns to

21  you about Hadden?

22  A.   Yes.

23  Q.   What did she say?

24  A.   She says that I sensed he would dismiss the nurse and come

25  back in and he would -- he would go down on me.

1   Q.  And when she said he would go down on them, what did you

2   understand that to mean?

3   A.  That he would lick her vagina.

4   Q.  When, approximately, did Ms. Kanyok express these concerns

5   to you?

6   A.  Middle of her pregnancy, after one particular appointment

7   that I was not present.

8   Q.  When Ms. Kanyok told you that you -- that she thinks he

9   goes down on them, was she referring to herself or to someone

10  else?

11  A.  Referring to herself.

12  Q.  And what was your understanding of what her statement was

13  based on?

14  A.  Can you rephrase what you mean by that?

15  Q.  When Ms. Kanyok said that she thinks he goes -- he goes

16  down on her, was she referring to her own experience?

17          MS. WOZENCROFT:  Objection.

18          THE COURT:  Overruled, if you know.

19          THE WITNESS:  Excuse me.

20          THE COURT:  If you know.

21  A.  100 percent, yes.

22  BY MS. KIM:

23  Q.  And who was the he Ms. Kanyok was referring to when she

24  told you this?

25  A.  Robert Hadden.

1    Q.  Mr. Gabbay, when Ms. Kanyok told you that she thought that

2    after the nurse left Hadden went down on her, what, if

3    anything, did you say in response?

4    A.  My response was that's just impossible in my mind.  You're

5    probably having some kind of pregnant brain, and I -- I could

6    not fathom the thought that a doctor, healthcare worker,

7    whatever name you want to put on this human being, would do

8    such a thing.

9    Q.  When Ms. Kanyok told you about her experiences, what, if

10   any, requests did she make of you?

11   A.  Would you accompany me to the rest of the meetings or

12   appointments with him.

13   Q.  After she asked if you could you accompany her to other

14   appointments, did you try to accompany her to other

15   appointments?

16   A.  Absolutely, yes.

17   Q.  Approximately how many appointments in total did you go to

18   with Ms. Kanyok?

19   A.  I can't give you the exact number, but I went to pretty

20   much all of them until Alexandra was born.

21   Q.  And during those appointments, did you observe Hadden

22   conducting any exams?

23   A.  Yes, I did.

24   Q.  What kind of exams?

25   A.  He did a breast exam in one particular one, and he did a

N1B6HAD1                          Gabbay - Direct

1    vaginal exam as well.

2              THE COURT:  You observed him giving the exam.

3              THE WITNESS:  Yes, your Honor.

4              THE COURT:  To your friend.

5              THE WITNESS:  Yes.

6              THE COURT:  You were in the --

7              THE WITNESS:  I was in the room.  I was sitting next

8    to her as she was lying on the gurney.

9    BY MS. KIM:

10   Q.  Did there come a time when you accompanied Ms. Kanyok to an

11   appointment with Hadden and you observed something out of the

12   ordinary?

13   A.  Yes.

14   Q.  Was this before or after Ms. Kanyok told you that she had

15   thought Hadden had gone down on her?

16   A.  After.

17   Q.  What did you observe?

18   A.  I felt the way he was examining her breasts was a bit

19   creepy.

20             MS. WOZENCROFT:  Objection.

21             THE COURT:  Overruled.

22   BY MS. KIM:

23   Q.  How was Hadden examining Ms. Kanyok's breasts?

24   A.  Just the way he did it, he pinched it, I recall that

25   vividly, and in my mind, it was kind of creepy.

1   Q.   And when you say pinched it, what are you referring to?

2   A.   Pinched her nipples.

3   Q.   Did you say anything to anyone about what you observed?

4   A.   I don't recall if we spoke about it or not.

5   Q.   Directing your attention to the summer of 2012, did there

6   come a time when Ms. Kanyok contacted you while she was at an

7   appointment with Hadden?

8   A.   Yes.

9   Q.   How did she contact you?

10  A.   First by text.

11  Q.   What did she text you?

12  A.   He did it again, something to that nature, I think he did

13  it again.

14          MS. KIM:   Mr. Hamill, can you please put up what's

15  been admitted into evidence as Government Exhibit 1?   That's

16  for the jury as well.

17          Thank you.

18  BY MS. KIM:

19  Q.   Mr. Gabbay, do you recognize these text messages?

20  A.   Yes, I do.

21  Q.   Are these text messages that you exchanged with Ms. Kanyok

22  on June 29, 2012?

23  A.   Yes, they are.

24  Q.   Walking through these messages, who sent the messages that

25  appear in blue?

1    A.  Laurie Kanyok.

2    Q.  Who sent the messages that appear in gray?

3    A.  I did.

4    Q.  Directing your attention to the top where Ms. Kanyok

5    texted, I'm down to 120 pounds, basically lost 30 in six weeks.

6    What did you understand that to mean?

7    A.  She was losing her pregnancy weight.

8    Q.  When Ms. Kanyok texted you, Dr. Hadden just licked my

9    vagina, I'm shaking and freaked out.  If you recall, where were

10   you when you read these messages?

11   A.  I was in my office.

12   Q.  Where did you work at the time?

13   A.  In the garment center, I had -- my office was on 38th

14   Street.

15   Q.  Was your office on 38th Street on the east side or the west

16   side?

17   A.  West side.

18   Q.  What, if any, reaction did you have when you read these

19   text messages from Ms. Kanyok?

20   A.  I got extremely nervous.  And realized that I had to go

21   take care of her.

22   Q.  When you received these text messages from Ms. Kanyok,

23   what, if anything, did you do?

24   A.  I went downstairs.  I tried to get a Yellow cab.  It was an

25   extremely hot day, I recall that.  And I couldn't find the

```
1    Yellow cab, so I found a black -- black car, a Lincoln, and I
2    asked the guy if he would take me there, and he said I'm not --
3    I'm not working.  And I offered him $50, and he took me there.
4    Q.  And if you know, was $50 more than the average cab fare?
5    A.  Oh, yeah, a hundred percent.
6    Q.  Where was Hadden's office?
7    A.  Midtown off of Madison.
8    Q.  Before you got into the black car, did you speak to
9    Ms. Kanyok by phone?
10   A.  Yes, I did.
11   Q.  What was Ms. Kanyok's demeanor when you spoke with her?
12   A.  She was panicking, freaking out, and had locked herself up
13   in the bathroom.
14   Q.  Was it your understanding that she was still in a bathroom
15   still in the medical offices?
16   A.  Yes.
17   Q.  What, if anything, did Ms. Kanyok say?
18   A.  She was just panicking, said he did it -- he did it again,
19   something to that nature.
20   Q.  What, if anything, did you say?
21   A.  I said get out of there, and I'm going to come pick you up.
22   Just get out of the building.
23   Q.  After you received the text messages from Ms. Kanyok, what
24   was your emotional state?
25   A.  Kind of similar to how I feel right now.  I was very
```

1   anxious and nervous and upset internally.

2   Q.  Did there come a time when you got to Hadden's office

3   location?

4   A.  Yes.

5   Q.  What, if anything, did you see when you arrived?

6   A.  She was standing outside of his building, very shaken up.

7   Q.  What was her demeanor?

8   A.  She --

9           MS. WOZENCROFT:  Objection.  Asked and answered.

10          THE COURT:  Overruled.

11  A.  She was scared and nervous.

12  BY MS. KIM:

13  Q.  Was she crying?

14  A.  Yes.

15  Q.  Once you got to Hadden's medical offices and you saw

16  Ms. Kanyok crying outside, what, if anything, did you do?

17  A.  I believe I just held her, and then I got a taxi to take

18  her home, to take her to a safer atmosphere.

19  Q.  When you got into the taxi with Ms. Kanyok, what, if

20  anything, did Laurie do?

21  A.  I think she texted one of her -- am I allowed to use names

22  or no?

23  Q.  If you could not use names for now and --

24  A.  She texted one of her friends, I believe.

25  Q.  Do you recall Ms. Kanyok making any calls?

N1B6HAD1                          Gabbay – Direct

1    A.  I don't.

2    Q.  What, if any, calls did you make?

3    A.  I called 9-1-1.

4               MS. KIM:  Your Honor, may I approach?

5               THE COURT:  Sure.

6               MS. WOZENCROFT:  Your Honor, we would just ask for a

7    sidebar before this next piece of evidence comes.

8               (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          MS. WOZENCROFT:  Your Honor, we would raise our

3    continuing objection to the playing of this call, as we believe

4    it's not only hearsay but embedded hearsay.

5          THE COURT:  It's not a continuing objection.  I

6    already ruled it.  And I said it would be allowed.  So I think

7    you're wasting your time.

8          MS. WOZENCROFT:  Certainly, but we did also just

9    wanted to note for the record we don't believe the people have

10   previously presented it to your Honor, and your Honor has

11   actually heard the call, and we think if your Honor heard the

12   call, that could have some impact on the --

13         THE COURT:  Well, I don't think so.

14         MS. VON DORNUM:  Just for the record -- I apologize.

15         THE COURT:  There's been a huge record on this very

16   issue, motions, oral argument, text, and I'm quite confident

17   that my ruling was correct.

18         MS. VON DORNUM:  Thank you, your Honor.  May I say one

19   thing just for the record?  My understanding, and we can submit

20   case law is that there's case law that specifically says it is

21   error for a court to admit evidence under the excited utterance

22   rule without having listened to it because one cannot determine

23   it is excited without having heard it.  To my knowledge, the

24   government --

25         THE COURT:  I will take that gamble.

N1B6HAD1                        Gabbay – Direct

1              MS. VON DORNUM:  All right.  Thank you.

2              THE COURT:  Yep.

3              (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N1B6HAD1                          Gabbay - Direct

1             (In open court)

2             MS. KIM:  May I proceed, your Honor?

3             THE COURT:  Go ahead.

4   BY MS. KIM:

5   Q.  I'm showing you a document that has been already admitted

6   into evidence as Government Exhibit 1501, R1 -- 1505 -- 15 --

7   sorry.  1205R1.

8             Do you see that in front of you, Mr. Gabbay?

9   A.  Yes, I do.

10  Q.  In the row that is numbered one, do you see the name of the

11  friend that you believe Ms. Kanyok communicated with?

12  A.  Yes, I do.

13  Q.  For purposes of this proceeding, we'd like to call her

14  Emily Anderson?

15  A.  No.

16  Q.  For purposes of this proceeding, may we call her Emily

17  Anderson?

18  A.  I'm like that's not her name.

19  Q.  For purposes of this proceeding we'll call her --

20  A.  First time at this, and hopefully last.  Yes.

21            THE COURT:  What, you're not having fun?

22            THE WITNESS:  Oh, yeah, awesome, your Honor.

23            THE COURT:  She testified under a pseudonym.

24            THE WITNESS:  I got it now.

25

1    BY MS. KIM:

2    Q.  I placed in front of you a CD that has been marked

3    Government Exhibit 52.  Do you recognize this CD?

4    A.  Yes, I do.

5    Q.  How do you recognize it?

6    A.  We listened to it with you.

7    Q.  And directing your attention to the initials marked on the

8    CD, it reads KG12, 2023, who put those initials there?

9    A.  I did.

10   Q.  When did you put those initials there?

11   A.  January 2.

12   Q.  Did you listen to the recording on the CD on that day?

13   A.  Yes, I did.

14   Q.  Was the recording a fair and accurate copy of a 9-1-1

15   called that you placed on or about June 29, 2012?

16   A.  Yes, it is.

17   Q.  So before we play the recording, I just want to ask you

18   some additional follow-up questions.

19           Mr. Gabbay, when you got the text messages from

20   Ms. Kanyok, between the time you received those text messages

21   and you went into the car to the medical offices, how soon

22   after did you leave to go to meet Ms. Kanyok?

23   A.  Pretty immediately.

24   Q.  And why did you leave immediately?

25   A.  It was an extreme urgent matter.  It had to be dealt with

N1B6HAD1                         Gabbay - Direct

1   right away.

2   Q.  And why did it have to be dealt with right away?

3   A.  She was abducted, raped.  I don't even know what is the --

4   you know, the language that you want to put on something like

5   this.  I had to go take care of Laurie.

6          MS. WOZENCROFT:  Objection, move to strike.

7          THE COURT:  Overruled.

8   BY MS. KIM:

9   Q.  How would you describe your level of stress, if you had any

10  stress, when you left your office immediately to go to see

11  Ms. Kanyok?

12  A.  A lot of anxiety, you know, nervousness, but I had to go

13  take care of this.

14         MS. KIM:  Mr. Hamill, can you please play Government

15  Exhibit 52?

16         (Audio played)

17         MS. KIM:  Thank you, Mr. Hamill.

18  BY MS. KIM:

19  Q.  Mr. Gabbay, I want to ask you a few questions about the

20  9-1-1 call.  Do you recognize any of the voices on the 9-1-1

21  call?

22  A.  That was my voice.

23  Q.  You mentioned a West 55th Street address on the 9-1-1 call.

24  What address was that at that time?

25  A.  That's my home.

N1B6HAD1                          Gabbay - Direct

1    Q.   Was that the home that you were living at with Ms. Kanyok?

2    A.   Yes.

3    Q.   The number that ends in 1092, who's known number was that?

4    A.   That's my telephone number.

5                   (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N1B1HAD2                         Gabbay - Direct

1    BY MS. KIM:

2    Q.  You stated on the 911 call, "My fiancée was at her OB-GYN

3    and he did something inappropriate to her.  I just went up

4    there and took her from there and I brought her home.  He

5    basically touched her orally."

6              When you said, "He basically touched her orally," what

7    did you mean by that?

8    A.  He licked her vagina.  I just didn't know how to verbalize

9    such a vile act for someone that I didn't know.

10   Q.  On the 911 call, you said that you had made a call, "they

11   wanted to send someone to that location, but I took her from

12   there."  When you said "they wanted to send someone to that

13   location," what did you mean by that?

14   A.  They wanted to send an officer to his office, but I had

15   already taken her away from that location.

16   Q.  Do you remember if you had made a previous call to the

17   police before the 911 call?

18   A.  I believe in the taxi I made a call, on the way home.

19   Q.  Do you remember where you were when you made this 911 call?

20   A.  This particular -- yes.

21   Q.  Where were you?

22   A.  I was home.

23   Q.  How would you describe your demeanor on the 911 call?

24   A.  Calm.

25   Q.  Did you feel calm at the time?

1    A.   Internally, absolutely not.

2    Q.   How did you feel internally?

3    A.   Like something super horrible has just happened, you know,

4    anxiety, scared.  I don't know.  Like -- I felt -- I felt

5    uncomfortable.

6    Q.   Mr. Gabbay, are you and Ms. Kanyok still in a romantic

7    relationship?

8    A.   No.

9    Q.   When did your relationship end?

10   A.   Five years ago.

11   Q.   What, if any, impact did Ms. Kanyok's experiences with

12   Hadden have on your relationship with her?

13              MS. WOZENCROFT:  Objection.

14              THE COURT:  Overruled.

15   A.   It did not help.  You're dealing with having a child and

16   then a horrendous act of this nature takes place.  It was not

17   good.  It was -- it was horrible.

18   Q.   Did there come a time, Mr. Gabbay, when you served

19   Ms. Kanyok with child custody papers?

20   A.   Yes.

21   Q.   Why did you serve her with those papers?

22   A.   Because we did not have a set schedule and I had gotten

23   counsel that pretty much the only way you're going to manage

24   this is to serve her.

25   Q.   How, if at all, was the lawsuit resolved?

N1B1HAD2

1          MS. WOZENCROFT:  Objection.

2          THE COURT:  Overruled.

3    A.  We went to court and I believe it was a couple of sessions

4    and it was resolved.  Outside of that, her and I actually went

5    to breakfast and we figured out a schedule that was comfortable

6    for both of us, and then we took it to court and they

7    technically "kosherized" it, as they said, so --

8    Q.  Mr. Gabbay, prior to testifying today, what, if any,

9    conversations have you had with Ms. Kanyok about the substance

10   of your testimony today?

11   A.  None.

12         MS. KIM:  Nothing further from the government.

13         THE COURT:  Counsel?

14         MS. WOZENCROFT:  In June of 2012 --

15         THE COURT:  Are you going to --

16         MS. WOZENCROFT:  I just have one question.

17         THE COURT:  Well, you could do it from there.

18         MS. WOZENCROFT:  Sure.

19   CROSS EXAMINATION

20   BY MS. WOZENCROFT:

21   Q.  In June of 2012 you and Ms. Kanyok were living in New York

22   City together, correct?

23   A.  Yes.

24         MS. WOZENCROFT:  Thank you.

25         MS. KIM:  No further questions.

N1B1HAD2

1          THE COURT:  Okay.  Thanks very much.

2          THE WITNESS:  Thank you, your Honor.

3          (Witness excused)

4          MR. MONTELEONI:  Your Honor, prior to our next witness

5     there's a legal issue that arose during the cross-examination

6     of Ms. Anderson that bears on the testimony of that witness, so

7     we wondered if we could have an opportunity to address that.

8          THE COURT:  Sure.

9          We're going to take a little break while I talk to the

10    lawyers, okay?

11         (Jury not present)

12         THE COURT:  Please be seated.

13         Yes.

14         MR. MONTELEONI:  So, your Honor, the government's next

15    witness is Dr. Rocchio, and if you recall, the Court --

16         THE COURT:  I thought that you had all met and

17    conferred and resolved any issues with respect to this next

18    witness.

19         MR. MONTELEONI:  That's right, your Honor.  With

20    respect to the new issues that were raised yesterday, we don't

21    plan to go into that at all.  We both agree there's no issue

22    with that.  But your ruling on the defense's prior motion

23    admitted her testimony on one subject, the relationship of

24    trust between doctor and patient and that role in facilitating

25    abuse, and affecting the patient's response to abuse, but

N1B1HAD2

1    reserved on the subject of delayed disclosure, and the defense,

2    you know, has pursued a strategy in which I think they would

3    argue that they have not gone into disclosure issues.  However,

4    both on the cross-examination of Ms. Taylor yesterday and now

5    quite pointedly on the cross-examination of Ms. Anderson, both

6    cases they brought up indications of continuing contact with

7    the defendant following the assault, and that type of, you

8    know -- I think that creates the suggestion that they're

9    attempting to impeach their account or their understanding of

10   what happened because of that conduct, and therefore we believe

11   that the issue that the Court reserved on, delayed disclosure,

12   that the door has been opened, and we intend to examine on

13   those issues, but we want to --

14           THE COURT:  Could you take ten minutes and find some

15   quotations from the transcripts to support your argument.

16           MS. KIM:  Yes, your Honor.

17           THE COURT:  Great.

18           And also, what was the date, if you remember, that I

19   resolved that?  Was that December 29?

20           MS. VON DORNUM:  Yes, it was December 29.

21           MR. MONTELEONI:  On Dr. Rocchio?

22           MS. VON DORNUM:  I thought so, because it was your

23   motion, right?

24           MR. MONTELEONI:  Dr. Rocchio was the issue that arose

25   during jury selection when --

1              MS. VON DORNUM:  But as to delayed disclosure, I think

2       you said it was contingent.  I believe that was on the 29th,

3       but I'll find it, your Honor.

4              MR. WEIL:  I have it.  It was on the first day of the

5       trial.  It was on -- it was on the 9th, your Honor.

6              MR. MONTELEONI:  Yes.  So we'll find the Court's

7       ruling and --

8              THE COURT:  You find that, and you can find where I

9       used the word "contingent."  I didn't recall that, but --

10             MR. WEIL:  It's on the January 9th transcript at

11      page 29.

12             THE COURT:  Okay.  Was it also on the December 29

13      ruling?

14             MR. WEIL:  No.  The issue came up right before the

15      trial when we --

16             THE COURT:  So if you could make a copy of the Q and A

17      there too.  Great.

18             MS. POMERANTZ:  Your Honor, I would just note that we

19      are happy to provide and go through, look for transcript cites

20      for Ms. Taylor.  I think because the testimony for Ms. Anderson

21      was today, we don't yet have a copy of the transcript.  We can

22      try to confer with the court reporters.

23             THE COURT:  So I have pretty good notes myself.  So I

24      might look and see.

25             Do you recall from today's cross-examination what was

N1B1HAD2

1    asked and what was answered?

2              MS. KIM:  So the first thing was, there was an email,

3    Defense Exhibit HH, that was sent after Ms. Anderson's

4    follow-up fibroid procedure, so it was sent on or about

5    March 8, 2012.  And so that would have been sent after her

6    March 5, 2012 appointment where Dr. Hadden licked her vagina.

7              MR. MONTELEONI:  Additionally, your Honor, there

8    was --

9              THE COURT:  So are you referring to today's carryover?

10              MS. KIM:  Yes.  So during cross-examination there were

11    certain questions and exhibits that were presented by the

12    defense to Ms. Anderson that questioned why she communicated

13    with the defendant after the defendant licked her vagina.

14              THE COURT:  Gotcha.

15              MS. KIM:  And why she returned for an appointment if

16    the defendant had licked her vagina.

17              THE COURT:  Gotcha.

18              MS. WOZENCROFT:  Just to clarify --

19              THE COURT:  Well, we'll see, because you're going to

20    find me the actual language that was used, and in particular,

21    the language of contingency.

22              MR. MONTELEONI:  Yes, your Honor.  But I don't think

23    we'll be in a position to provide you the language that was

24    used in the questioning.

25              THE COURT:  No.  I heard that.  I heard that.

1              MS. KIM:  I have the page of the transcript on

2       contingency, if that will be helpful.

3              THE COURT:  Okay.  Do you want to show it to them

4       before you show it to me.

5              MS. KIM:  Okay.

6              THE COURT:  But are you sure that Rocchio didn't come

7       up before the 9th of January?

8              MR. MONTELEONI:  Yes, your Honor, because we noticed

9       Dr. Rocchio initially in rebuttal to Dr. Goodsell.

10      Dr. Goodsell is the defense expert who was the subject of the

11      motion in limine briefing.

12             THE COURT:  Right.

13             MR. MONTELEONI:  Prior to -- after obtaining that

14      ruling that Dr. Goodsell could testify, the defense made the

15      decision then that they were -- they did not plan to ask him to

16      testify, and this occurred right before jury selection when we

17      were providing names to the Court, and so --

18             THE COURT:  I'm just trying to figure out, is there

19      anything in writing about --

20             MR. MONTELEONI:  Yes.  Sorry.  The defense filed a

21      motion on January 3rd, a letter motion on January 3rd.  We

22      responded on January 4th in the evening, after jury selection.

23             THE COURT:  And that concerns Rocchio.

24             MR. MONTELEONI:  Yes, right.  Those are the papers on

25      which the Court was ruling in the portion that --

```
1              THE COURT:  I need those too.

2              MR. MONTELEONI:  All right.

3              THE COURT:  Okay.  Thanks.

4              MS. POMERANTZ:  Would your Honor like us to print

5    copies of those and provide them now?

6              THE COURT:  Of?

7              MS. POMERANTZ:  Of the two --

8              MS. KIM:  Submissions.

9              MS. POMERANTZ:  -- submissions relating to

10   Dr. Rocchio?

11             THE COURT:  Sure.  But first I want to get what you

12   think was said that enables us to --

13             MS. POMERANTZ:  Yes, your Honor.

14             THE COURT:  Great.

15             (Recess)

16             (In open court; jury not present)

17             THE COURT:  So do you want to frame the issue briefly.

18             Incidentally, I think the record is crystal clear that

19   the expert can give the testimony based on this so-called

20   second prong, but go ahead.

21             MR. MONTELEONI:  Thank you, your Honor.

22             Yes.  With respect to Ms. Taylor, just to be clear

23   that the portion that we --

24             MS. WOZENCROFT:  Your Honor, I'm so sorry to cut you

25   off.  I would just ask to wait for Mr. Weil.  It's his witness,
```

1    so he should be here.

2              THE COURT:  Okay.  Sure.

3              (Pause)

4              THE COURT:  Okay.

5              MR. MONTELEONI:  So, your Honor, just to explain the

6    significance of the portions that I handed up, you know, to

7    remind the Court, the conduct that the defendant -- that the

8    victim, Ms. Taylor, testified about included inappropriate

9    conduct at the postpartum appointment, and then the defense

10   attempted to elicit the victim's going to another appointment

11   later that year, and we've also been in discussions with the

12   defense about medical records which are -- they I think intend

13   to offer, attempting to prove more appointments after that

14   date, and so again, we think the timing there with Ms. Taylor

15   and then as confirmed with the timing here with Ms. Anderson,

16   where they actually offered -- offered evidence, refreshed the

17   witness with a document all to prove these post-abuse contact

18   and appointments, render this relevant.

19             MS. WOZENCROFT:  Your Honor, we're going to jointly do

20   this, since I crossed the witness and Mr. Weil is --

21             My questioning, I specifically did not question

22   Ms. Anderson today regarding a delayed disclosure, with

23   conversations with Ms. Kanyok, about the timing of any of that,

24   and that certainly was a broad area I could have gone into.  I

25   asked two fairly discrete questions -- one, whether

1    Ms. Anderson emailed -- or I put into evidence an email that

2    postdated the appointment that Ms. Anderson spoke about abuse

3    at; and I also asked her if she saw Dr. Hadden on June 4th, to

4    which she did not remember.  I did not go any further.  I did

5    not ask her --

6             THE COURT:  Today?

7             MS. WOZENCROFT:  Correct.  Those I believe are the two

8    references that the government believes opens the door.  Those

9    questions --

10            THE COURT:  What about the redirect to which you did

11   not object?  You don't think there's anything in the redirect

12   that supports this?  My notes -- my notes unequivocally suggest

13   that they do.

14            MS. WOZENCROFT:  Your Honor, my understanding is

15   that --

16            THE COURT:  We're talking about redirect.

17            MS. WOZENCROFT:  Yes.  The government's redirect of

18   Ms. Anderson.

19            THE COURT:  Following your cross.

20            MS. WOZENCROFT:  Correct.

21            THE COURT:  To which you did not object to the

22   redirect.

23            MS. WOZENCROFT:  Correct.  But the government can't

24   open the door to additional topics for their own witness based

25   on questions they ask.

N1B1HAD2

1           THE COURT:  I don't understand what you're saying.

2           MS. WOZENCROFT:  Maybe I misunderstand your Honor.

3           THE COURT:  Well, here's what I think --

4           MS. WOZENCROFT:  Certainly.

5           THE COURT:  -- that the transcript will show.

6    Following your cross -- here's just one example, but -- at

7    approximately 10:35 this morning, redirect, the witness said --

8    she was explaining how she trusted Mr. Hadden, and then she

9    said, "I knew he put his tongue on my vagina," and then she

10   said, I think -- this is not a transcript but I took pretty

11   good notes, even in high school, so -- and she said, "I was

12   embarrassed and didn't tell anyone.  It's had a major impact on

13   my life, even after 10 years."  I think that's good enough for

14   me.

15          MS. WOZENCROFT:  Your Honor, if I may.

16          THE COURT:  But anyway, I don't want to make a big

17   deal of it.  You know, you can take it up with the Court of

18   Appeals.

19          MS. WOZENCROFT:  If I may, just two quick responses to

20   that.  First --

21          THE COURT:  I'm not looking for responses.

22          MS. VON DORNUM:  We just want to make sure we're

23   understanding the ruling, Judge.

24          MS. WOZENCROFT:  Because I believe your Honor noted

25   that I didn't object.  I did lodge an objection earlier on to

N1B1HAD2

1    beyond the scope, that the redirect was beyond the scope, which

2    it's still my position that those questions were beyond the

3    scope of the cross.  I also believe it is clear in the case law

4    that the government, by asking their own questions, cannot

5    expand --

6              THE COURT:  Listen, I understand your position.  I'm

7    just saying, I looked at my notes, because there is no

8    transcript.  I think that this same concept that I just read to

9    you is elsewhere throughout the transcripts of various

10   witnesses up until now.  So this is just one.  I was trying to

11   save you all a lot of trouble because I know you don't have the

12   transcript yet.  That concept that was explicitly stated —-

13   namely by this witness and by other witnesses —- is that they

14   were so shocked and embarrassed and stunned and didn't know

15   what to do and some people didn't -- just kept it in because

16   they were afraid that if they told other people, no one would

17   believe them or they -- or that they would think that they were

18   crazy or liars, this was all throughout.  And that concept is

19   the concept that I think supports my original ruling.  And my

20   original ruling, the way it's phrased, you need to look at.  We

21   do have the transcript there.  So it's not as if I said --

22   well, I'll read it and then --

23             MS. WOZENCROFT:  Thank you.

24             THE COURT:  Yes.  So it says, "And then the issue with

25   respect to expert testimony regarding delayed disclosure and/or

1   non-disclosure of I'll call it abuse will be admissible if the

2   defense challenges the alleged victims' credibility based on

3   their delayed disclosure or non-disclosure of the alleged

4   abuse, which I am assuming, incidentally, that there's going to

5   be such a challenge.  So that part is contingent.  The defense

6   motion is granted in part and denied in part."

7            MS. WOZENCROFT:  I can --

8            THE COURT:  I feel the record now is sufficient to

9   enable the expert to go beyond just the first prong.  And you

10  object and that's fine.

11           Okay.  Let's have the witness.

12           MS. WOZENCROFT:  One sentence?  Just in response to

13  that ruling.

14           I completely agree with what your Honor just read.  I

15  guess the part that was -- is concerning is that it's our

16  position that the defense -- your Honor ruled that the defense

17  would have to open the door to that --

18           THE COURT:  You're not listening to me.  I cited this

19  language and I said —- and I'll say it again —- that this

20  concept has permeated -- the transcripts are permeated with

21  this concept, not just with this witness on redirect or on

22  cross, etc., etc.  So there you have it.  It's a fine question,

23  but I'm saying this concept is not only found in the redirect

24  that I read to you but is found in the transcript and will be

25  found of other witnesses.  I'm comfortable that this meets the

1    criteria that I set forth in my ruling.  We discussed this on

2    the 9th and now again, and so the witness may testify.

3              MS. VON DORNUM:  I totally understand, your Honor, and

4    I'm sorry --

5              THE COURT:  Yes, I know you do, and your objection is

6    noted for the record.  No problem.

7              MS. VON DORNUM:  I totally understand, your Honor.

8    I'm sorry if I'm being slow, but it's my understanding that --

9    and I agree with you that that testimony has permeated it, but

10   from my reading of the transcripts each day, it has come out

11   only on direct, only by the government.

12             THE COURT:  All right.  So it's a fine question.  It's

13   a fine question for the Court of Appeals.

14             MS. VON DORNUM:  Okay.  Thank you, your Honor.

15             THE COURT:  Okay.  Let's have the witness.  And the

16   jury.

17             (Continued on next page)

18

19

20

21

22

23

24

25

 1                (Jury present)

 2                THE COURT:  Please be seated.

 3                MR. MONTELEONI:  The government calls Dr. Lisa

 4     Rocchio.

 5                (Witness sworn)

 6                THE DEPUTY CLERK:  Thank you.  Could you please state

 7     your full name for the record.

 8                THE WITNESS:  Lisa Marie Rocchio.

 9                THE COURT:  Could you spell your last name, please.

10                THE WITNESS:  R-O-C-C-H-I-O.

11                THE DEPUTY CLERK:  Thank you, ma'am.  You may be

12     seated.

13      LISA M. ROCCHIO PhD,

14           called as a witness by the Government,

15           having been duly sworn, testified as follows:

16     DIRECT EXAMINATION

17     BY MR. MONTELEONI:

18     Q.  Good morning.

19     A.  Good morning.

20     Q.  What is your profession?

21     A.  I'm a clinical and forensic psychologist.

22     Q.  And this is something that I struggle with also.  If I

23     could ask you to just make sure to speak directly into the

24     microphone.

25     A.  Sure.  Sorry.

N1B1HAD2                        Rocchio - Direct

1    Q.  What is -- so you said you're a clinical and forensic

2    psychologist.  What is clinical psychology?

3    A.  Clinical psychology is the study of human behavior, both

4    normal and abnormal.  We're trained in the assessment and

5    treatment of psychopathology, problems in living, as well as

6    the assessment of strengths and resources.

7    Q.  And you also mentioned you're a forensic psychologist.

8    What is forensic psychology?

9    A.  Forensic psychology is the practice of psychology at the

10   intersection of psychology and the law.  So as a forensic

11   psychologist, I'm called upon to assist the court when the

12   court is dealing with some sort of a psychological issue that

13   requires psychological expertise.

14   Q.  Dr. Rocchio, can you please describe your educational

15   background.

16   A.  Sure.  I have a bachelor's degree in both psychology and

17   English from Emory University; I hold a master's degree and a

18   doctoral degree in clinical psychology from the University of

19   Rhode Island; and as part of working toward that doctoral

20   degree, I completed a full year fellowship in psychology at the

21   Yale University School of Medicine.

22   Q.  So can you please describe your coursework and training in

23   connection with your master's and PhD degrees.

24   A.  I'm trained in basic areas of psychology, so perception,

25   cognitive psychology, clinical psychology, various treatment

1    and assessment techniques and methodology.  I also taught

2    classes under supervision specifically to learn how to provide

3    treatment and conduct assessments and do -- utilize a wide

4    variety of tests.  And then I also completed what are known as

5    externships, which are part-time, 20-hour-a-week placements in

6    clinical settings, where, again, I also worked under

7    supervision.  I completed a master's degree as well as a -- I'm

8    sorry -- a master's thesis as well as a doctoral dissertation.

9    And then during the year that I was at the Yale University

10   of -- School of Medicine I worked full time as a psychology

11   fellow in both outpatient day hospital and inpatient settings

12   with both adolescents and adults.

13   Q.  All right.  So during the course of your graduate studies

14   at the University of Rhode Island, what, if any, topics did you

15   focus on?

16   A.  In addition to the general area of clinical psychology, I

17   took courses and had training in forensic psychology.  My areas

18   of specialized expertise that were of particular interest and

19   study for me were traumatic stress and interpersonal violence.

20   I also have done a lot of work in the area of ethics, and

21   eating disorders.

22   Q.  So you mentioned that your studies included traumatic

23   stress.  What is traumatic stress?

24   A.  Traumatic stress is the psychological response to an

25   extreme or traumatic event in an individual's life.  It can be

1    a response to a stressor that ranges in terms of a continuum of

2    severity, but typically is -- when referred to as a trauma,

3    it's an extreme event that involves either experiencing or

4    witnessing attempted or completed sexual assault, sexual

5    violence, severe bodily injury, or death.

6    Q.  And now you also mentioned that your studies focused on

7    interpersonal violence.  What is interpersonal violence?

8    A.  Interpersonal violence refers specifically to violence

9    that's committed in -- in between individuals, and it

10   encompasses a broad area -- a number of areas, such as rape,

11   sexual assault, childhood sexual abuse, childhood physical

12   abuse, sexual harassment, physical violence between adults, and

13   intimate partner violence, for example.

14   Q.  So you mentioned the term "sexual assault" as a type of

15   interpersonal violence.  What do you mean when you use the term

16   "sexual assault"?

17   A.  Sexual assault refers to either contact or noncontact

18   sexual violations.  So for contact sexual assaults, it's when

19   one individual touches another in a sexual manner without the

20   individual's consent, either because the individual has not

21   given consent or if there's some reason because of age, for

22   example, or cognitive ability or drug impairment, that the

23   person is incapable of giving consent.

24   Q.  Now in connection with your master's and PhD degrees did

25   you perform clinical work with patients?

N1B1HAD2                        Rocchio - Direct

1    A.   I did.

2    Q.   Approximately how many patients did you work with during

3    your graduate studies?

4    A.   In order to attain the doctoral degree, I had to do

5    approximately a minimum of 2,000 hours of contact time, so it

6    would have been hundreds of patients that I worked with and

7    treated in a variety of settings.

8    Q.   Now you mentioned also a fellowship that you performed in

9    connection with the Yale University School of Medicine.  Was

10   that a fellowship before your PhD or after?

11   A.   So it was -- it's the pre -- it was my predoctoral

12   fellowship, so it was part of the requirements toward attaining

13   my doctoral degree.

14   Q.   And what's the kind of work that you did in your

15   predoctoral fellowship at Yale?

16   A.   I worked for six months at Yale New Haven hospital, where I

17   provided -- conducted group psychotherapy, individual

18   assessments, and individual treatment for adults who were

19   attending a partial hospital program, where they were being

20   treated for significant mental illness, and they would come in

21   each day during the week from about 8 in the morning until 3 in

22   the afternoon.

23            I also attended a seminar in psychiatry and the law.

24   And I did that for six months with adults.

25            And then I went over to the Yale Psychiatric

1    Institute, where I worked for an additional six months with

2    adolescents, and I worked with them, again, conducting

3    individual therapy, family therapy, assessment, running groups

4    in primarily partial hospital -- again, those day kinds of

5    programs, as well as in inpatient hospital setting.

6    Q.  Now after you received your PhD what did you do next in

7    your career?

8    A.  In order to become licensed as a psychologist, after

9    completing the doctoral degree, I had to complete another full

10   year of supervised clinical work in order to be eligible to sit

11   for the national licensing exam in psychology, so during that

12   year, I worked in an outpatient clinical practice, providing

13   treatment primarily to severely and chronically suicidal and

14   self-injurious women, most of whom had experienced childhood

15   abuse and neglect; I worked in a hospital setting, again, with

16   that same population of chronically and severely suicidal and

17   self-injurious women; I conducted research in the area of

18   eating disorders; and I taught several classes at the college

19   level.

20   Q.  And was that additional year after your doctoral degree

21   also a form of fellowship?

22   A.  It was.  It's called a postdoctoral fellowship, yes.

23   Q.  So after your postdoctoral fellowship what did you do next

24   in your career?

25   A.  I became licensed in the -- I sat for the licensing exam

1    and I became licensed as a psychologist, and I opened up an

2    independent -- an independent practice, where I began to

3    provide treatment on an outpatient basis to adolescents and

4    adults for various life difficulties, many of whom had

5    experienced some form of trauma and/or had eating disorders.

6              THE COURT:  What year was that that you opened that

7    practice?

8              THE WITNESS:  I became licensed in December of 1997,

9    so I opened the practice roughly January of 1998.

10             THE COURT:  And where was it located?

11             THE WITNESS:  It was located in Johnston, Rhode

12   Island.

13   BY MR. MONTELEONI:

14   Q.  What is your role in that practice?

15   A.  The practice has grown.  I'm currently the owner and

16   clinical director, and I now also have other therapists whom

17   I -- who work for me.  I employ -- I provide consultation, I

18   continue to maintain an active clinical practice, where I

19   provide treatment to patients, and I provide consultation and

20   supervision to my employees, and in addition, I maintain my

21   individual forensic practice.

22   Q.  So in your clinical practice, what do you focus on?

23   A.  I provide psychotherapy often to individuals who have

24   experienced some form of traumatic stress, many have

25   experienced some form of interpersonal violence, such as

childhood abuse, or adult rape or sexual assault, intimate

partner violence; but I also treat a number of first

responders, individuals who have been involved in motor vehicle

accidents; and traumatic grief.

Q.  Now you've mentioned that you also have an individual

forensic practice.  Your forensic practice, what sort of work

do you do?

A.  I work with -- in both criminal and civil settings.

Sometimes I come in as a general expert, such as here -- I am

here today.  In other circumstances I'm asked to conduct a

forensic psychological evaluation of an individual, for

example, to determine whether or not they are suffering from

any mental disorders or functional impairments, and, if so,

whether any of those difficulties are related partly or wholly

to some alleged or known event; or in a criminal setting, I

might be asked to evaluate someone's history for information

that might potentially be relevant to sentencing, once they've

been convicted of a crime, or to evaluate their mental status

at the time of a crime -- for example, in self-defense cases.

Q.  And approximately how many forensic evaluations of

individuals have you conducted?

A.  By this point, over a hundred.

Q.  Who hires you for forensic work, typically?

A.  I've been retained -- typically attorneys hire me, although

there was a period earlier in my career where I was hired by

1   the State of Rhode Island and I conducted a number of forensic

2   evaluations of teenagers.  But I -- I've been primarily

3   retained by attorneys.

4   Q.  In your career for approximately how many years have you

5   treated and assessed patients, or treated patients and

6   evaluated individuals?

7   A.  So it would be over 30 years because as part of my graduate

8   training, I began treating patients back in 1991, '92.  Since

9   becoming licensed as a psychologist, that would have been --

10  that's over 25 years.

11  Q.  And as a clinical psychologist, in your clinical psychology

12  practice, what issues or areas do you specialize in?

13  A.  Interpersonal violence, traumatic stress, professional

14  ethics.  I treat a number of individuals who are the victims of

15  some form of professional misconduct, sexual misconduct,

16  traumatic grief and bereavement, as well as anxiety disorders

17  and depression.

18  Q.  So for about what portion of your career have you focused

19  on traumatic stress and interpersonal violence?

20  A.  My entire career.

21  Q.  Over the course of your career have you treated and

22  evaluated individuals who have experienced or reported

23  experiencing sexual assault?

24  A.  Yes.

25  Q.  Approximately how many victims of sexual assault have you

1  evaluated or treated over your career?

2  A.  Hundreds upon hundreds.  Probably a thousand.

3  Q.  And broadly speaking, has your experience with evaluating

4  individuals in your forensic practice contributed to your

5  understanding of the issues you discuss in cases such as this?

6  A.  Yes.  My forensic work and my clinical work each complement

7  the other.

8  Q.  And how; in what ways do they complement the other?

9  A.  So when I'm working as a clinical psychologist and

10  providing treatment, I'm primarily taking whatever issue the

11  patient is presenting to me at face value and I'm working with

12  them from their experience and providing treatment on the

13  issues and goals that they've identified, based on my skills

14  and training and knowledge of the research literature.

15         When I'm working as a forensic psychologist, I'm not

16  taking anyone's words at face value.  It's much more of an

17  objective and investigatory role, so it involves comprehensive

18  review of a whole range of documents —— medical records,

19  sometimes criminal records, and certainly keeping up on the

20  literature.  So that literature informs my clinical work, and

21  in my clinical work, when issues arise that certainly raises

22  questions that I might go and research in the literature or

23  consult with colleagues about.  So it allows me to stay on top

24  of the —— the field in my areas of expertise.

25  Q.  So you mentioned that you would consult other materials

1   other than the patient's report when you conduct a -- or other

2   than the individual's report, rather, when conducting a

3   forensic evaluation.  Do those materials ever include findings

4   or admissions of guilt in court cases?

5   A.  Yes, they have.

6   Q.  Can you compare your observations and what you've learned

7   in cases where there's been a finding or an admission that

8   sexual abuse occurred with your observations and what you

9   learned from treating or evaluating individuals who described

10  sexual abuse but there's been no finding or admission that

11  abuse occurred?

12            MR. WEIL:  Objection, your Honor.

13            THE COURT:  Can you restate that question.

14            MR. WEIL:  Can we get a sidebar.

15            THE COURT:  No, thanks.

16  Q.  So you mentioned that in your clinical practice you take --

17  you've gained observations from the reports that patients give

18  you which you take at face value.

19  A.  Yes.

20  Q.  And in your forensic practice you conduct an investigation

21  which involves the consultation of other materials that

22  sometimes include findings and -- or admissions of guilt in

23  cases.

24  A.  Correct.

25  Q.  All right.  About how consistent or nonconsistent with your

1    observations from your forensic practice in cases where there

2    have been findings or admissions of guilt, and in your clinical

3    practice where you're just taking the patients' words at face

4    value?

5              MR. WEIL:  Objection.  Beyond the scope of the notice.

6              THE COURT:  I'll allow it.

7    A.   Extraordinarily consistent.

8    Q.   In addition to running a group practice, do you work

9    anywhere else?

10   A.   I do.

11   Q.   Where?  Where else do you work?

12   A.   I'm a clinical associate professor at the Brown University

13   Alpert School of Medicine.

14   Q.   And how long have you taught at the Alpert -- sorry -- the

15   Brown University Alpert School of Medicine?

16   A.   For I think about the last three years I've been working

17   there.

18   Q.   What are your current responsibilities there?

19   A.   I supervise forensic -- I'm sorry -- I supervise

20   psychiatric fellows and residents in the provision of

21   psychotherapy, so they're psychiatrists-in-training who have

22   completed medical school, and part of what they need to learn

23   how to do is provide psychotherapy, so I provide one-on-one

24   clinical supervision.  And then I come in several times a year

25   to provide lectures and training, specifically in the area of

1    assessment and treatment of trauma.

2    Q.   Do you teach any subject matter areas there other than the

3    assessment and treatment of trauma?

4    A.   At Brown?

5    Q.   Yes.

6    A.   Not specifically.

7    Q.   All right.

8    A.   The -- the supervision is much more broad.  So it -- it's

9    whatever issue the psychiatrists' patients are presenting with.

10   But when I come in and give lectures, they're typically,

11   currently, related to issues pertaining to trauma, although I

12   have given lectures there in the past on issues specific to

13   ethics.

14   Q.   Have you published articles on traumatic stress or

15   interpersonal violence?

16   A.   I have.

17   Q.   In what types of publications?

18   A.   Most recently I was a guest editor in a peer-reviewed

19   journal called Psychological Injury and Law, and it was a

20   special issue on the assessment and treatment of complex

21   trauma -- which is a form of interpersonal violence -- in

22   forensic settings, and in addition to co-authoring the

23   introduction to the special issue, I wrote a piece on ethical

24   and professional issues that can arise in the assessment of

25   such trauma in forensic settings.

1    Q.   And do you have any other types of involvement in

2    professional publications?

3    A.   I do.

4    Q.   What types of involvement?

5    A.   I am on the editorial board of the primary division of

6    trauma psychology, which is a subdivision of the American

7    Psychological Association; and in addition to serving as a

8    member of the editorial board, I'm also what's known as a ad

9    hoc, or as-needed, editor for a number of other peer-reviewed

10   journals.

11   Q.   Have you given any presentations in the areas of traumatic

12   stress and interpersonal violence?

13   A.   Yes, many.

14   Q.   How did you -- how do you come to give those presentations?

15   A.   So those are also typically peer reviewed in that there is

16   a professional conference and I would submit a proposal for a

17   talk that I would like to give, and then they are reviewed by

18   whoever is putting on the conference.  And then if my proposal

19   is accepted, then I'm -- I come in and I present.

20           There are also a number of other types of

21   presentations where I'm an invited speaker or giving a

22   presentation or talk as part of a leadership role.  For

23   example, I -- this past year I was the president of the trauma

24   division for the American Psychological Association and in that

25   role prepared and invited address.

1   Q.   Do you belong to any professional organizations?

2   A.   I do.

3   Q.   Do you hold any leadership positions in any professional

4   organizations?

5   A.   I do.

6   Q.   What leadership positions?

7   A.   So I just recently completed a term on the -- three-year

8   term on the ethics committee for the American Psychological

9   Association; I served for well over 25 years on the Rhode

10   Island Psychological Ethics Association; I've served as the

11   chair of that ethics committee; I've served as the president of

12   the Rhode Island Psychological Association; as I mentioned, I'm

13   the immediate past president of the division of trauma

14   psychology within the American Psychological Association; I've

15   also served in other roles for that organization, such as

16   treasurer and member-at-large; and I'm a founding member of

17   that division.

18   Q.   What is, by the way, the American Psychological

19   Association?

20   A.   It's the national organization for psychology within the

21   United States.

22   Q.   You mentioned you were a member of the ethics committee for

23   the American Psychological Association?

24   A.   Yes.

25   Q.   What were your duties and responsibilities in that role?

1    A.   In that role, we -- it's an elected position.  I served a

2    three-year term.  We provide education and consultation on

3    ethics matters.  We have an adjudication role, which means that

4    when someone has been sanctioned, for example, by their

5    licensing board for some -- or by their university for some

6    sort of an ethical issue, that comes before the American

7    Psychological Association's ethics committee to determine

8    whether or not they remain eligible to remain part of the

9    organization.  We review guidelines that are put out by the

10   organization so that we can provide input regarding ethical

11   issues, and we conduct trainings at the national convention on

12   an annual basis around some of the key issues in the area of

13   ethics.

14   Q.   So how, if at all, do you keep up to date on the subjects

15   in which you specialize?

16   A.   Certainly by reading the journals in -- the articles in

17   journals in the fields and in the topics in which I -- I

18   specialize; by providing treatment and then reviewing the

19   current literature on assessment and treatment issues; by

20   speaking with colleagues for consultation; by attending

21   continuing education programming and training; and through peer

22   consultation.

23            MR. MONTELEONI:  At this time the government moves to

24   qualify Dr. Rocchio as an expert in psychology with a

25   specialized expertise in traumatic stress and interpersonal

1    violence.

2                MR. WEIL:  No objection to her qualifications.  Just

3    renewing our prior objection.

4                THE COURT:  Okay.  Application is granted.

5    BY MR. MONTELEONI:

6    Q.  Dr. Rocchio, have you interviewed any witnesses in this

7    case?

8    A.  No, I have not.

9    Q.  Do you know --

10               THE COURT:  One second.  We can discuss it later, but

11   I'm not understanding what the prior objection was.  But --

12   BY MR. MONTELEONI:

13   Q.  Do you know, Dr. Rocchio, who the witnesses in this case

14   are?

15   A.  No, I do not.

16   Q.  Has the government provided you with any specific details

17   about this case?

18   A.  No.

19   Q.  Are you aware of press and news reporting relating to the

20   allegations of this case in general terms?

21   A.  In very general terms, yes.

22   Q.  Do you have any personal knowledge of the facts of this

23   case?

24   A.  No, I do not.

25   Q.  And to be clear, your testimony today, will that be based

N1B1HAD2                          Rocchio - Direct

1   on information from this specific case?

2   A.   No, it will not.

3   Q.   What, if any, compensation are you receiving for testifying

4   today?

5   A.   I'm receiving compensation for any time spent preparing to

6   testify and for the time I spend testifying.

7   Q.   Does the amount that you get paid depend in any way on the

8   outcome of this trial?

9   A.   No.   In fact, that's specifically ethically prohibited per

10  the guidelines of my profession.

11  Q.   Now I want to ask some questions based on your experience

12  as well as based on your research and training, focused on

13  adult victims of sexual assault.

14          Among instances of sexual assault, about how common is

15  it for the assault to be committed through physical force as

16  opposed to through non-violent means?

17  A.   The vast majority of sexual assaults and rapes are

18  committed through the use of deliberate psychological

19  manipulation, coercion, threats, and intimidation.   Only a

20  small minority —- maybe about 20 percent —- are committed

21  through the use of force.

22  Q.   Are most instances of sexual assault committed by strangers

23  or by people known to the victim?

24  A.   Again, the vast majority —- about 80 percent —- of sexual

25  assaults are committed by someone who is known to the victim.

1    Q.   What is that 80 percent statistic based on?

2    A.   So we -- in the field, there are a number of ways in which

3    data is collected.  The CDC, for example, does large interviews

4    of households.  It's a study called the National Intimate

5    Partner Sexual Violence Study.  And they interview 15,000

6    households and ask about a variety of experiences of violence,

7    sexual assault, rape.  And in the course of inquiring as to

8    those experiences, they'll also ask by whom the individual was

9    sexually assaulted.  Also, the Bureau of Justice maintains

10   national crime statistics on crimes of all types that are

11   committed across the United States.  And then there are

12   broad-scale studies that are done, interviewing specialized

13   populations -- for example, clinical patients or inmates in a

14   prison or college students -- and so we can use sampling

15   techniques to get a sense of overall prevalence rates, and in

16   the course of collecting that data, individuals are questioned

17   as to who the perpetrator was, or alleged perpetrator.

18   Q.   Now you just testified that most instances of sexual

19   assault are committed by people known to the victims.  In such

20   instances, what are the ways in which victims commonly respond

21   during sexual assault?

22   A.   Oftentimes what happens when someone is sexually assaulted

23   is their defense mechanisms, their defense brain circuitry will

24   take over, so many will report instances, for example, of

25   freezing, or they will fall back on their habits of ingrained

1    responses to power —— for example, attempting to please or

2    placate.  They may be silent and confused as to what's going

3    on.  They may be in shock.  So there can be a variety of

4    responses during an assault itself.  We know that a small

5    minority, for example —— about 15 percent —— may begin

6    screaming or fighting violently.  Only about 6 percent will use

7    more kinds of violent physical defenses like biting or kicking.

8    More often it's some form of immobilization, brief freezing,

9    not being able to think clearly, sometimes kind of a collapsing

10   if they feel that they can't get away.  But some sort of a fear

11   response.

12   Q.  Based on your experience and your research and training,

13   about how common is it for victims of sexual assault by people

14   known to them to recognize what happened to them as sexual

15   assault?

16   A.  So we know that about 60 percent of individuals who answer

17   yes to the question Have you ever experienced -- Have you ever

18   been forced to engage in sexual intercourse or has somebody

19   ever engaged in sexual contact with you against your will,

20   about 60 percent of individuals who answer yes to those

21   questions, if they're asked in the same survey or interview

22   later on, Have you ever been raped or sexually assaulted,

23   they'll say no.  So there's a really large, well-known issue in

24   the literature and in the field, and it's referred to as what's

25   called unacknowledged rape.  So it means that many individuals

1    who are raped or sexually assaulted will not label their

2    experience as such.

3    Q.  And what, if any, types of relationships between a

4    perpetrator and a victim make the victim less likely to

5    recognize what happened to them as sexual assault?

6    A.  So we know that the closer the relationship between the

7    victim and the perpetrator, the less likely the individual is

8    to be able to recognize that what has happened is a rape or

9    sexual assault and the less likely they are -- even if they do

10   recognize that something inappropriate happened, they're much

11   less likely to label it as an assault or as a rape.

12   Q.  When you described the close relationships, can you

13   describe the ways in which relationships can be close or that

14   have this effect on the victim's ability to recognize what

15   happened to them as sexual assault?

16   A.  Sure.  Typically that would refer to relationships in which

17   there's trust.  So you're talking about a family member or an

18   intimate partner, or someone that you have other reasons to

19   trust by virtue of their role, such as a teacher or a counselor

20   or a physician, a clergy member, for example.

21   Q.  So you testified that relationships of trust are types of

22   relationships in which a victim is less likely to recognize

23   what happened to them as sexual assault.  Why is that?

24   A.  Because when you trust an individual, you typically have

25   many ways in which you've come to know that person and rely on

N1B1HAD2                    Rocchio - Direct

that person in a variety of contexts, and typically the acts

that constitute sexual assault are -- are not -- they act in

many other ways that would build trust and show themselves to

be reliable or kind, and so it can become very confusing.  Why

is this person who, in all of these other situations, has been

trustworthy or nice or very positive, with whom I've had good

interactions or I know in these other ways, and then all of a

sudden this person is doing something that's not appropriate in

nature, and a combination of confusion as well as psychological

defense mechanisms and experiences of self-blame and shame can

kick in, all of which can make the individual less likely to

recognize that what's happened is sexual assault or to label it

as such.

Q.  Can you describe what you mean when you say "self-blame and

shame."

A.  When an individual is sexually assaulted, most -- one of

the most common reactions the victim experiences is a sense of

shame and self-blame, and it's particularly the case when they

are assaulted by someone that they know.  So there is --

there's this common myth or script that we have that rape and

sexual assault is most often perpetrated by a stranger, by

somebody who kind of jumps out of the bushes that you don't

know, who's extremely violent and who hurts you physically in

addition to the sexual assault.  So to the extent that an

individual's experience of being assaulted differs from that,

N1B1HAD2                          Rocchio - Direct

1    the more likely they are to blame themselves, to think that

2    they must be mistaken, to normalize the behavior, to make

3    excuses for the perpetrator, and to minimize what's happened.

4    Q.  Now what is the -- are you familiar with the concept of a

5    power differential as relevant to the sexual assault context?

6    A.  Yes.

7    Q.  What is the relevance of a power differential to sexual

8    assault?

9    A.  So rape and sexual assault are always about the abuse and

10   misuse of power, because one person is doing something to

11   someone else against their will, or without -- and/or without

12   their consent.  To the extent that there's a preexisting power

13   differential, we know that perpetrators exploit that power

14   differential in order to manipulate victims and in order to

15   isolate them and have greater opportunity to sexually abuse

16   them.

17   Q.  And how does that power differential give the perpetrator

18   the ability to do that?

19              MR. WEIL:  Objection, Judge.

20              THE COURT:  Overruled.

21              MR. WEIL:  Could I have one moment.

22              THE COURT:  In your opinion.

23              (Counsel conferring)

24              THE COURT:  Come on.

25   BY MR. MONTELEONI:

1   Q.  So how does the power differential -- sorry.

2          How does the power differential affect the victim's

3   ability to recognize what happens to them as sexual abuse?

4   A.  So the greater the power the individual has in a

5   relationship of trust, the more likely the individual is to

6   believe what the perpetrator is saying, to give them the

7   benefit of the doubt; the more vulnerable they are to being

8   exploited, and the less likely they are to be able to recognize

9   what's happened, the less likely they might be to speak out

10  even if they do recognize what's happened.

11  Q.  In the context of sexual assault occurring within

12  relationships of trust, about how common is ongoing contact by

13  the victim with the same perpetrator?

14  A.  It can be quite common, especially if someone doesn't

15  recognize that what's happening is in fact sexual assault or

16  wrong, and so if they don't recognize that they're being

17  harmed, they would have no reason to avoid ongoing contact and

18  therefore would be extremely -- at extremely high risk for

19  revictimization.

20  Q.  So you mentioned revictimization.  What are you referring

21  to?

22  A.  So in -- revictimization refers to being victimized a

23  second time, or more, and we know that for any victim of sexual

24  assault, they are at higher risk for revictimization, not only

25  by the perpetrator of the original assault, should they be in a

1    continued or ongoing relationship with them, but also they're

2    at higher risk for being sexually assaulted by others.

3    Q.  And why does a -- how does a relationship of trust

4    contribute to the victim's vulnerability to revictimization by

5    the same perpetrator?

6    A.  Well, as I mentioned, perhaps they -- they don't recognize

7    that what's happened is sexual assault so if they're trusting

8    that this individual is taking care of them or if they're

9    dependent on the individual in some way, they -- they may not

10   know that anything wrong is happening, which would increase

11   their vulnerability; but also, there are a variety of

12   psychological defenses and coping strategies that individuals

13   utilize when they're in ongoing relationships that can make

14   them less likely to absorb and understand the extent of harm or

15   what's been done to them.

16   Q.  I'd like to come back to the psychological defenses and

17   coping strategies you mentioned, but first I just want to ask

18   some specific questions about the doctor-patient relationship.

19        Are you familiar with situations in which patients are

20   abused during the course of medical treatment by their doctors?

21   A.  Yes, very.

22   Q.  Do you have specialized knowledge and training in the

23   context of abuse by health care professionals?

24   A.  I do.

25   Q.  How are you familiar with such situations?

1    A.   In my clinical practice I have treated a number of patients

2    who have been victims of sexual misconduct by former

3    psychotherapists or psychiatrists or health care professionals;

4    I have evaluated individuals who are health care professionals

5    and have had boundary violations of a sexual nature, and I've

6    been asked to evaluate those individuals and make

7    recommendations to their respective licensing boards for

8    rehabilitation, for example; and certainly in forensic

9    settings, I have evaluated victims of sexual abuse by health

10   care professionals and provided expert testimony as I am here

11   today in other situations in addition to today about abuse by a

12   health care professional -- sexual abuse by a health care

13   professional.

14   Q.   Now how, if at all, is the concept of a relationship of

15   trust relevant to the doctor-patient sexual abuse?

16   A.   It's very -- it's very relevant.

17   Q.   Can you explain.

18   A.   So when a patient goes to a doctor, they are help-seeking,

19   and the physician is in a role of providing help.  They have an

20   ethical and legal obligation and a duty that they owe to assist

21   that patient, to not exploit that patient, to not abuse their

22   role of power.  In fact, the ethics codes explicitly prohibit

23   sexual contact between a physician and a patient, and go so far

24   as to explain that the power differential is so great that even

25   if that sexual contact is initiated by the patient, it is the

physician's responsibility to be sure that those boundaries are

not crossed.  But patients in general, when they're coming to a

physician, typically they may be experiencing pain or fear or

distress.  They may be in a very vulnerable position of not

knowing what's going on.  They're turning over care of their

body to someone who's supposed to be an expert, who's supposed

to be using specialized skills and knowledge to help them.

They may -- it's one of the few settings where somebody who is

fully dressed will -- can appropriately ask you to undress and

touch your body in a very private, isolated setting.  And

there's the special doctor-patient relationship where, to the

extent that someone is providing healing and care and help,

that -- that not only makes you trust them but often increases

the sense of admiration, respect, and care by the patient for

the physician.

Q.  You mentioned the ethical and legal obligations on the

doctor.  How, if at all, does the existence of those

obligations affect the patient's trust of the doctor?

A.  Most patients have the awareness that physicians have some

sort of a code and responsibility to do the right thing and to

take care of them.  Even if they don't know the ins and outs of

the ethics code, they know that the doctor is supposed to do

right by them.  So they go in with the expectation that what

the doctor is doing and saying is going to be in their best

interest, and of course the doctor is in a position of

1    authority and often provides advice or instructions and tells

2    the patient what to do, and they're used to needing to comply

3    with what the doctor is telling them to do.

4    Q.   You also mentioned power differentials in relationships as

5    relevant to the sexual assault context.  How, if at all, is the

6    concept of power differential applicable to the doctor-patient

7    relationship?

8    A.   Extremely.  I mean, the physician in the role of

9    doctor-patient has an enormous amount of power.  They -- again,

10   they have access to -- to be able to touch and examine an

11   individual's body; they often have information either from a

12   medical record or from interviewing the patient, they can ask

13   patients questions that are very embarrassing or of an

14   extremely sensitive nature; they typically know far more about

15   the patient and the patient's history and circumstances than

16   the patient would know about their personal lives; and they

17   have an enormous amount of specialized skill and knowledge that

18   the patient does not have access to.

19   Q.   How, if at all, does the doctor's institutional affiliation

20   affect the power differential?

21   A.   So to the degree that an individual physician is affiliated

22   with a high-status institution or has a very high-level

23   reputation, or honors, recognitions, board certification, all

24   of those things function to increase the stature and status of

25   the physician in the patient's mind, and also increase the

1    likelihood that the individual is going to defer to what they

2    view as the physician's specialized knowledge and instruction.

3    Q.   You mentioned the concept of patients having

4    vulnerabilities by virtue of seeking medical care.  Can you

5    explain how that's relevant to the sexual assault context.

6    A.   So a patient may present to a physician as, you know,

7    anxious, distressed, in pain, hurting, worried about their own

8    health or the health of a loved one or their fetus if they're

9    pregnant, and they're -- that anxiety and that fear is

10   typically -- they're looking for information, they're looking

11   for the doctor to soothe, to help, to provide care.  So in

12   those particular kinds of situations, a patient is going to be

13   more vulnerable.  Any of us, when we're in distress, when we're

14   upset, when we're hurting, when we're in pain, we are more

15   vulnerable.  But also, if a physician has specialized personal

16   knowledge of our history and they know our circumstances, then

17   we're more vulnerable because the physician may be in a

18   position to exploit or to use that information in order to get

19   us to open up or get us to trust them more.  Again, also, a

20   physician can ask questions of a highly personal nature that

21   typically we wouldn't necessarily answer or disclose to just an

22   ordinary person.

23   Q.   Now how, if at all, does the specific type of care that the

24   doctor is providing impact this power differential?

25   A.   So what it -- what it can -- the type of care can impact

1    the power differential as well as the trust.  So for example,

2    to the degree that the frequency of visits, right, the more

3    often an individual is seeing the same doctor over time, the

4    more likely they are to come to trust, admire, respect that

5    physician, the more they are likely to feel known and cared for

6    by the physician.  Also, to whatever degree the care that's

7    being sought is of a more personal or intimate nature or to the

8    degree that the patient is more sick, more in pain, more

9    scared, has reason to be concerned, or things are happening to

10   their body that they don't know about, they become more

11   reliant, more dependent on the physician, and for the -- on the

12   physician's knowledge and skill, and specialized attention and

13   care.  So that's going to both maximize the power differential

14   and increase the likelihood that the individual continues to

15   trust and rely upon the doctor and the doctor's instruction and

16   care.

17   Q.  So you mentioned that a doctor's provision of care of a

18   more intimate nature can increase the effect of this power

19   differential on the patient.  Can you give some examples of the

20   more type of intimate or personal care that have that effect.

21   A.  I mean, sure.  I think -- I think most individuals who have

22   had an exam where the doctor is fully clothed and you're

23   undressed and the physician has reason to be examining genital

24   regions or —- for women, an internal vaginal exam, for men, a

25   prostate exam —- where something is being inserted into your

1   body, where there's reason for genitals, breasts, and buttocks

2   to be examined and explored, those certainly would be examples

3   where someone's going to be more vulnerable.  I think anyone

4   who's had any sort of a gynecological exam knows the kind of

5   exposure one might feel, you know, you're sitting -- your legs

6   are in stirrups, and you're exposed.

7   Q.  In the case of care of patients who are pregnant, what, if

8   any, relevance does a patient's pregnancy have to the power

9   relationship between the doctor and the patient?

10  A.  Oftentimes pregnancy is a time of anxiety.  It's a time

11  where a pregnant person is very concerned not only about their

12  own health and well-being but about the health and well-being

13  of the fetus.  Typically, in the course of a pregnancy, you're

14  seeing the same health care provider multiple times, and your

15  body is changing.  Unknown things are happening.  You're

16  relying upon that physician for information, not only about

17  what's happening to your own body but what to expect -- not

18  only what's happening to the development of the fetus but what

19  to expect at birth.  The nature of obstetrical care is that

20  oftentimes it involves a very invasive kind of internal exam

21  with instrumentation or with the physician's hands.  There may

22  be testing that is ordered and conducted, again, ultrasounds

23  that are performed, vaginal ultrasounds that are performed.  So

24  it's an ongoing relationship where oftentimes pregnant women

25  will talk at great length about needing to trust and like and

1    care for the physician they're choosing to see during their

2    pregnancy.

3              The other thing is that anyone who has had a prior

4    history of sexual violation or victimization, the act of being

5    pregnant can be -- and of having to have repeated gynecological

6    and obstetrical care can also trigger additional anxiety and

7    fear and concern.

8    Q.   Now does the power differential that you've been describing

9    between a doctor and a patient disappear if a patient has a

10   choice of which doctor to go to?

11   A.   No.   It's -- the power differential is about the role of

12   the physician regardless of who that physician is.

13   Q.   So you've testified about the power differential between

14   the doctor and patient and the relationship of trust between

15   the doctor and the patient.   How, if at all, do those factors

16   affect a patient's response to being sexually abused during the

17   course of an appointment?

18   A.   So I think oftentimes because of the nature of an exam, a

19   doctor can sexually abuse a patient without the patient even

20   being aware that that's what's happening.   Patients may not

21   know whether a particular type of touch or a particular type of

22   procedure is appropriate, and if they trust and respect the

23   doctor and the doctor says, hey, I need to insert my hand into

24   your vagina, hey, I need to have you roll over and insert my

25   finger into your rectum, I need you to disrobe again because I

have to do something else, the patient may believe that that's

part of the normal course of what is supposed to be done and

may not have any awareness that it's out of -- out of the norm

or that it's being done for purposes of sexual gratification.

        Also, as I had referred to earlier, even if a patient

feels like something maybe is off or doesn't feel quite right

and those questions do arise in their mind, they're far more

likely to be dismissed because of a variety of psychological

defenses and coping strategies.

Q.  Could you explain what you mean by psychological defenses

and coping strategies.  First, in general, what are

psychological defenses and coping strategies?

A.  So in terms of psychological defenses, we all have ways in

which we respond to stressful, difficult situations, either of

an interpersonal nature or of any kind of stress or trauma.  So

maybe you -- you're somebody who tends to avoid conflict; maybe

you're somebody who tends to blame yourself often; maybe you're

someone who tends to minimize what happens to you; or you tend

to make excuses for people who have harmed you, or be

dismissive of it; maybe you tend to use denial so that you kind

of automatically push something out of your head and -- as a

way to protect yourself from some painful event or experience,

it literally just gets suppressed unconsciously automatically;

or maybe you're somebody who intentionally tries to kind of put

difficult things out of your mind.  And these are not -- these

1    are not necessarily maladaptive.  I mean, if you have a fight

2    with your spouse and you know you have to get a job done at

3    work, you're going to intentionally try to put that out of your

4    mind to focus on your work.  Or if you have a really difficult

5    day at work, you might need to try to deliberately put that

6    aside so that you can enjoy your family.  Sometimes, though, it

7    can come out anyway; like you've had a bad day at work, you

8    come home and you maybe are much more impatient or frustrated

9    with your children, but you have no idea that it's been --

10   related to what happened at work.

11             So those are some of the ways, in a general sense,

12   that we can see psychological defenses working.

13   Q.  What is a term to describe this process of intentionally

14   putting something away so that you can focus on something else

15   that you just mentioned?

16   A.  It's generally referred to as directed forgetting or

17   suppression, thought suppression, or compartmentalization.

18   Those are some of the terms that are used to describe that.

19   Q.  Okay.  And you mentioned the concept of minimizing, of

20   minimizing something.  What is minimization?

21   A.  Minimization is simply telling yourself that -- and often

22   believing that whatever has happened was less than what it was,

23   and usually -- and what happens is you're either minimizing the

24   event itself -- in other words, this thing was no big deal --

25   or you're minimizing its impact.  Yeah, that person was, you

know, did a bad thing but, you know, I'm over it, it's no big

deal.  I'm -- it's not -- it's not a problem.  So it's a way to

protect yourself.  If you're minimizing that someone has harmed

you, it's a way to allow you to maintain a relationship with

someone that you trust, all right, because it kind of keeps you

from being aware that they've hurt you or to the degree to

which they've hurt you.  And that allows you to maintain that

relationship.  And it also can help you to put away painful,

difficult feelings and allow you to continue to function

without having to absorb the full impact of a traumatic event,

for example.

Q.  Can you give some examples of how a victim of sexual

assault might use minimizing language to think about or talk

about the assault.

A.  So this goes right back to what I was saying earlier when I

was talking about unacknowledged rape or sexual assault.  Rape

and sexual assault are big, scary words.  And we know most

people don't use them even if they acknowledge that they've

experienced something that might meet that definition.  So if a

patient comes in, they may talk about an unwanted experience,

or a difficult thing, or, This guy did something, he's not a

good guy; it was creepy, it was weird, it was uncomfortable.  I

didn't want it.  I said no and he did it anyway.  So they're

kind of talking around the issue without using those big scary

words.  They're minimizing it.  Or they're saying, I'm over it,

1    it didn't affect me, or they're not aware.  You know, a lot of

2    times I'll see an adult who's had horrific history of abuse,

3    and maybe they've had difficulties with substances, and every

4    relationship, you know, in their adult life has been highly

5    problematic, or they're depressed, or anxious, and they may

6    have no idea that there's any potential connection between the

7    difficulties they're currently having and their prior abuse,

8    because they've kind of minimized it in their mind and put it

9    out, pushed it out of their thoughts.

10   Q.  And you've mentioned this concept of thought suppression.

11   What is thought suppression?

12   A.  Deliberately attempting to push thoughts out of your mind,

13   trying not to think about something else.

14   Q.  You also mentioned the term "denial."  What is denial?

15   A.  Denial is, in the psychological context, when we're talking

16   about it as a defense, it's -- refers to literally not knowing.

17   So you're denying to yourself that something has happened.  And

18   it's an unconscious, automatic response, so you're completely

19   unaware that something has happened or that you've done

20   something.

21   Q.  So how do these defenses or mechanisms, how do they help

22   the person who's using them deal with the sexual assault?

23   A.  They help provide a distance between the experience of

24   sexual assault and the trauma that is associated with sexual

25   assault, so it's a distancing technique because if you can act

N1B1HAD2                         Rocchio - Direct

1    and talk as if this horrible, horrible experience hasn't

2    happened, then you can kind of pretend that it didn't, and

3    protect yourself from the pain, the fear, the shame, the guilt,

4    the trauma of what did happen.

5          MR. MONTELEONI:  Your Honor, this might be a good time

6    for a break.

7          THE COURT:  Sure.  So it's quarter to 1.  Why don't we

8    get back here at quarter to 2.  Thanks, everybody.

9          (Jury not present)

10         THE COURT:  Have a good lunch, unless you have any

11   questions.

12         MS. VON DORNUM:  Thank you.

13         MR. MONTELEONI:  Thank you.

14         (Luncheon recess)

15

16

17

18

19

20

21

22

23

24

25

1                          AFTERNOON SESSION

2                             1:55 p.m.

3              (Jury present)

4              THE COURT:  Please be seated, everyone.

5              We'll continue with our examination of the witness.

6              THE COURT:  Go ahead.

7              DEPUTY CLERK:  No, Judge.  We're still waiting.

8              THE COURT:  I see.

9              (Pause)

10             DEPUTY CLERK:  Ma'am, before you begin, I'd like to

11     remind you you're still under oath.

12             THE WITNESS:  Yes, thank you.

13             THE COURT:  Counsel, you may continue.

14     BY MR. MONTELEONI:

15     Q.  Good afternoon, Dr. Rocchio.  Before the break, we were

16     discussing several psychological defenses or coping mechanisms

17     used by victims of sexual assault.

18             How, if at all, does the relationship of trust between

19     the victim and the perpetrator interact with the victim's use

20     of such coping mechanisms or psychological defenses?

21     A.  So we know -- because we know that the closer the

22     relationship and the more trust that exists between the victim

23     and the perpetrator, the less likely the individual is to

24     identify and label what has happened as sexual assault or

25     sexual abuse.

1          We have all -- there's also been research done looking

2     at the differences between those who have recognized and

3     labeled their experiences as abuse and those who have not.  We

4     know that, for example, those who are in a relationship of

5     trust and who are not labeling what has been a sexual abuse as

6     such are more likely to experience shame and self-blame.  We

7     know that confusion and therefore minimization, normalization,

8     rationalization, and denial are also more likely in the -- when

9     the abuse happens in the context of a relationship of trust and

10    a power differential.

11          THE COURT:  Can I interrupt for one second?

12          You used a word this morning several times,

13    "freezing."  You're not talking about the temperature, I don't

14    think.  Can you explain what you mean by freezing?

15          THE WITNESS:  Sure.

16          When human beings are in a -- and animals, any animal,

17    actually -- is in a fear response, there's a series of

18    mechanisms that take over called the defense circuitry of the

19    brain.  And in response to fear, it's typically fight, flight,

20    or freeze when you're talking about animals.

21          When you're talking about humans, there can also be

22    that falling back on habit.  So it's referred to as fawning,

23    trying to placate or please or convince the perpetrator to

24    leave or to leave you alone.

25          So the freeze response can be something that is

1   momentary.  When the defense mechanisms, the defense circuitry

2   of the brain take over and the person's body and brain responds

3   to being sexual assaulted, it can be associated with just kind

4   of momentarily because the defense circuitry pulls attention

5   away from the prefrontal cortex where the thinking happens.

6   People can describe their minds going blank.

7          The freezing is typically very quick in more extreme

8   instances, in the animal kingdom, for example, we see something

9   that's referred to as tonic immobility, where there's just this

10  almost -- you'll see an animal kind of playing dead, having

11  completely collapsed, and the human analogy of that might be a

12  more extreme fear response.

13         In addition to the freeze, individuals will describe

14  the sense of not having their voice, of being immobile, of

15  being numb, of feeling nothing, or of disassociating, being

16  outside their body.  All of those things are associated with

17  the defense response.  But in that context, I'm using defense

18  circuitry as a physiological, neurological basis which is

19  different than the psychological defenses I'm referring to

20  here.

21         THE COURT:  And freezing, you said, typically is short

22  term, but it can also evolve into a longer-term reaction?

23         THE WITNESS:  So freezing is typically a short-term

24  reaction in the moment of fear and then can evolve into kind of

25  a sort of immobility of collapsing inward or kind of an extreme

1    kind of acquiescence to just giving up.

2    BY MR. MONTELEONI:

3    Q.   Okay.  And in focusing on these longer-term psychological

4    defenses and coping mechanisms, what behaviors do you expect to

5    see from someone who is using these type of defenses after a

6    sexual assault?

7    A.   They may be acting as if nothing has happened, either

8    because they've convinced themselves that nothing has happened

9    or because they are deliberately trying to put it out of their

10   head.

11         Often, if we're trying to mask our emotions and will

12   present kind of a different presentation to the outside world

13   so as not to appear sad or frightened or upset, and the more

14   you kind of push those emotions aside and act as if everything

15   is okay, the more it can actually make you appear as if

16   everything is okay.  And the reason it's a defense is because

17   it can actually also help you to feel as if things aren't as

18   bad as they really are.

19   Q.   And how, if at all, do those behaviors play out in the

20   doctor/patient abuse context?

21   A.   So, again, we know that in a doctor/patient abuse context,

22   you're more likely to make use of these defenses, less likely

23   to be aware that what has happened is abuse; so therefore, to

24   the degree that you are either truly unaware that what's

25   happened is abuse, because you've been deliberately misled, for

1   example, or to the extent that, as a psychological defense,

2   you've pushed the knowledge out of awareness, then you're going

3   to continue your relationship as if the abuse had not happened.

4   If you don't have awareness of something, then you're not going

5   to be able to act on that information.

6   Q.  So, then, what effect do the use of these coping mechanisms

7   or psychological defenses have on the likelihood of a victim's

8   maintaining ongoing contact with the same perpetrator?

9   A.  They're likely to maintain contact because what they're

10  going to -- in an ongoing relationship -- remember, even a

11  physician who is abusing a patient is not always behaving in an

12  abusive manner.

13          You have an -- in any sort of abusive dynamic of a

14  trust relationship, you have the experiences of abuse are

15  interspersed with neutral or positive moments, which function

16  to keep the connection and the trust intact.  So the individual

17  is likely to be paying more attention to the kindness or the

18  care that they believe they're receiving and not paying

19  attention to anything that feels uncomfortable or abusive, to

20  the extent that they're aware of it.

21          MR. MONTELEONI:  No further questions.

22          THE WITNESS:  Thank you.

23          MR. WEIL:  No questions.

24          THE COURT:  Thanks very much.

25          (Witness excused)

1              MR. MONTELEONI:  The government calls Rosalina Lozada.

2              DEPUTY CLERK:  Ma'am, if you could step up here,

3      please.

4              If you could step up to the chair and raise your right

5      hand, please?

6       ROSALINA LOZADA,

7           called as a witness by the Government,

8           having been duly sworn, testified as follows:

9              DEPUTY CLERK:  Thank you, ma'am.  You may be seated.

10     DIRECT EXAMINATION

11     BY MR. MONTELEONI:

12     Q.  Good afternoon.

13     A.  Good afternoon.

14     Q.  How old are you?

15     A.  I'm 55.

16     Q.  What is your highest educational degree?

17     A.  I have a master's degree.

18     Q.  In what?

19     A.  In the science of nursing and midwifery.

20     Q.  When did you receive your master's degree in the science of

21     nursing and midwifery?

22     A.  1998.

23     Q.  Are you currently employed?

24     A.  I am.

25     Q.  What is your occupation?

1   A.  I am a midwife.

2   Q.  Where are you employed?

3   A.  I work for New York Presbyterian and for the Northern

4   Manhattan Perinatal Partnership.

5   Q.  What is New York Presbyterian?

6   A.  It's a private not-for-profit hospital.

7   Q.  Is the New York Presbyterian Hospital affiliated with any

8   educational institution?

9   A.  Yes.

10  Q.  Which institution?

11  A.  Columbia University.

12  Q.  When did you first begin to work at New York Presbyterian?

13  A.  I first started in the end of 1989 as a student nurse.

14  Q.  Did you work continuously at New York Presbyterian from

15  then until now, or were there any breaks?

16  A.  No, there were breaks.

17  Q.  How many breaks?

18  A.  There was one break.

19  Q.  When did that break start?

20  A.  In about January 1999.

21  Q.  And what did you do in general terms during that break?

22  A.  After?

23  Q.  Yes.  Once you left New York Presbyterian and you were on

24  the break, before coming back to it, what did you do in

25  between?

1    A.   I worked as a midwife, I got married, I moved, lived

2    overseas.

3    Q.   When did you return to New York Presbyterian?

4    A.   In 2010.

5    Q.   So now directing your attention to the time before the

6    break, which I believe you indicated would be from the late

7    1980s to 1999, what was your primary work assignment at

8    New York Presbyterian initially?

9    A.   So initially when I worked as a student extern, I was there

10   for about a year as a student nurse until December 1990, and

11   once I graduated nursing school, I was then hired in one of the

12   medical units in January 1991 to get my foundation in medicine.

13   And I then was there for about 18 months.  I then returned to

14   the labor room in August of 1992.

15   Q.   What is the labor room?

16   A.   Labor and delivery is where women go to deliver their

17   babies.

18   Q.   So you mentioned that you had started as a student nurse.

19   By the time you returned to the labor room in 1992, what was

20   your position?

21   A.   A staff nurse.

22   Q.   And so now I'd like to focus my questions during the time

23   when you were at New York Presbyterian Hospital in the labor

24   room as a staff nurse, so from the early 1990s to the late

25   1990s.

1          During that time period, what were your duties and

2     responsibilities?

3     A.  So we would bring in patients who needed to be triaged as

4     to what reasons they were in the labor room.  We would coach

5     the women who were in labor.  Epidurals were not as popular as

6     they are now.  So you had to coach the women through the pain

7     of labor.  You assisted in operative deliveries, whether it was

8     a vacuum or forceps delivery.

9          You circulated, you were the circulating nurse in the

10    operating for cesarean deliveries.  You were also the scrub

11    nurse in the same -- in the cesarean delivers as well.  You

12    were the circulating nurse when there were tubal ligations that

13    were performed.  And you took care of women that were high

14    risk, whether they were in preterm labor or if they were -- had

15    severe preeclampsia, whether it was during pregnancy or whether

16    they were postpartum.

17    Q.  Now, were there any types of examinations on patients

18    performed in the labor room that you had responsibilities to be

19    present for?

20    A.  The vaginal exams to check for cervical dilatation.

21    Q.  What was your understanding of why you were supposed to be

22    present?

23    A.  To document the exam on the fetal heart rate, tracing, and

24    to document it in the nursing note.

25    Q.  And who performed these exams to check for cervical

N16BHAD3                        Lozada - Direct

1    dilation?

2    A.   Either the resident, the attending physician, or one of the

3    midwives.

4    Q.   What is a resident?

5    A.   A resident is a physician who's graduated from the

6    four-year medical school and has chosen a medical field, and

7    that's his -- his or her -- they have to go through a training.

8    So the residency is their training.  It's either four years or

9    seven years, depending on what field it is.

10   Q.   So you mentioned that attending physicians also performed

11   these vaginal examinations for cervical dilation.  What is an

12   attending physician?

13   A.   An attending physician is a physician who's completed his

14   residency.

15   Q.   How frequently would these vaginal examinations be

16   conducted for patients in the labor room?

17   A.   If it -- it would depend, but if a woman was in labor, it

18   would generally occur anywhere from two to three to two to

19   four -- every two to three to two to four hours.

20   Q.   So about how many of this sort of vaginal examination were

21   you present for?

22   A.   In a year?

23   Q.   Sure.

24   A.   Thousands.  I mean...

25              THE COURT:  I'm sorry.  Did exams take place during

1    labor?

2                 THE WITNESS:  Yes.

3                 THE COURT:  Exclusively?

4                 THE WITNESS:  Yes.

5    BY MR. MONTELEONI:

6    Q.  Do labor room beds have any type of stirrups or other type

7    of foot rests?

8    A.  They have -- there's footrests, and some do have stirrups

9    underneath that are -- the footrests are used the most, but

10   it's usually during the actual delivery where the bed is

11   broken.

12   Q.  And why are they usually only used during delivery when the

13   bed is broken instead of every vaginal examination?

14   A.  It's just -- it's cumbersome.  It's not practical to

15   break -- to break the bed and use the footrest for a simple --

16   for a simple vaginal exam.

17   Q.  If the footrests are not used, what position is the

18   patient's legs in during these vaginal examinations to check

19   for cervical dilation?

20   A.  Her feet are either flat on the bed or they are placed

21   together and then her knees are out to the side, sort of like

22   her legs are frogs or butterflied.

23   Q.  Based on your experience, how were these type of

24   examinations typically conducted by doctors in the labor room?

25   A.  Well, the person doing the exam would put on their gloves

1   and use a lubricant, and more often than not, they would sit on
2   the bed, since the beds weren't broken, and there's no
3   examining table.  And then they would either separate the
4   patient's labia, either one hand in or with two hands and then
5   perform the exam.
6   Q.  So can you describe the method that they used to separate
7   the patient's labia with two hands?
8   A.  If it's with two hands, they would separate the labia and
9   then they would -- they would introduce -- it's the index
10  finger and the middle finger into the introitus and into the
11  vaginal canal to then reach, and then reach the cervix to find
12  out what the dilatation is.
13  Q.  And for the benefit of the court reporter, I'm going to try
14  to describe what I saw you gesture, and please let me know if I
15  described it correctly.
16          So you used one hand and had the thumb and finger
17  spread for one hand when you gestured that the labia would be
18  spread, and then two fingers together from the other hand would
19  then be inserted into the vaginal canal; is that right?
20  A.  Correct.
21  Q.  And can you please describe the one-handed method of
22  conducting the dilation check?
23  A.  So if it's one handed, you would use your thumb to separate
24  the -- both the inner and outer labia, and it can be -- it's a
25  combination of different things.  You would use either your

1  ring and pinky finger or your middle finger and separate the

2  inner and outer labia of the other side and then introduce your

3  middle finger and then follow it with your middle finger and go

4  in.

5  Q.  About how long does this whole process take?

6  A.  Under a minute.  It's just seconds.

7  Q.  Have you ever heard of an individual named Robert Hadden?

8  A.  Yes.

9  Q.  Who is Robert Hadden?

10  A.  Robert Hadden was an attending obstetric-gynecologist that

11  worked at New York Presbyterian.

12  Q.  Did you ever come to work with him while he was an

13  attending obstetrician-gynecologist?

14  A.  Yes.

15  Q.  What time was that, what time period?

16  A.  Well, I met him when he was a chief in 1990, when he was a

17  chief resident.  And then I worked with him more closely and

18  did deliveries with him once I returned to the labor room in

19  1992.

20  Q.  So when he was chief resident, what was your position at

21  the time?

22  A.  I was a student nurse.

23  Q.  All right.  And when he was an attending physician, what

24  was your position at that time?

25  A.  I was a staff nurse.

1    Q.  All right.  So focusing on your time as a staff nurse while

2    he was an attending physician in the labor room at New York

3    Presbyterian, did you ever attend any of Hadden's vaginal

4    examinations of patients?

5    A.  Yes, I did.

6    Q.  About how often?

7    A.  Maybe once or twice a month, maybe less frequently, once

8    every two to three months.  It would vary.

9    Q.  In total, over the years, about how many would you say?

10   A.  In a year -- it's hard to say because of the attending call

11   schedule and the assignment, the nursing assignment schedule.

12   Maybe six, five, six, seven.

13   Q.  Now, did there come a time when you observed Hadden

14   conducting a vaginal examination that was different from the

15   other vaginal examinations you had been present for?

16   A.  Yes.

17   Q.  Did that happen once or more than once?

18   A.  Once I became aware of how he performed the exam, it was

19   every exam I witnessed him performing, this is how he did his

20   exams.

21   Q.  All right.  And so directing your attention to that first

22   time when you became aware, about when was that?

23   A.  It was about mid-1993.

24   Q.  Was that the first time you had attended a vaginal

25   examination with Hadden, or had you attended others previously?

```
1    A.  No.  I had attended others, but it was the first time that
2    I actually saw exactly what he was doing.
3    Q.  And if this is something that you saw him do repeatedly,
4    how is it that you only saw it after attending several exams
5    with him previously?
6    A.  Because when I -- when I returned as a registered nurse, it
7    wasn't until then in 1993 after my orientation process that I
8    then became, at that time, comfortable enough in my role as a
9    labor room nurse to not be so eager to await what the physician
10   or the midwife was telling me the exam was at the monitor, what
11   the exam was with my clipboard ready to write down the exam.
12   So I was able to step back into the room and observe and see
13   what was happening.  So that's when I was able to notice.
14   Q.  And what did you notice that time?
15   A.  Well, after I -- you know, I had gotten his gloves and the
16   vaginal lubricant or the Surgilube, as we call it, was there,
17   and the patient was positioned and I stepped back, it was how
18   he introduced his fingers into the patient's vagina that I
19   found inappropriate.
20   Q.  How did you observe him introduce fingers into the
21   patient's vagina?
22   A.  So if this is the patient's labia and these are his
23   fingers, he went like this and then went in.
24   Q.  All right.  So I'm going to try to describe the gestures
25   that you made for the benefit of the court reporter, and please
```

1   let me know if I'm describing it correctly.

2          So with one hand, you put two fingers together to

3   indicate the patient's labia.  With the other hand, you used

4   two fingers together and then rubbed them up and down the

5   length of the fingers representing the labia several times

6   before inserting them through the fingers representing the

7   labia; is that correct?

8   A.   Yes.

9   Q.   Where were you positioned when you observed Hadden using

10  his fingers to rub up and down the labia several times?

11  A.   So I was -- I would say I was maybe 3 -- maybe 3 feet back

12  at the side of the bed.  You know, the bed was there, and I was

13  about 3 feet back when I noticed that.

14  Q.   What was your reaction when you noticed that?

15  A.   I, to myself, was in shock.  I was, like -- like, what the

16  hell.  Like, what is he doing.

17  Q.   Why did you think, what the hell?

18  A.   I thought that because, like, I've watched porn and I've

19  had sex, and it just seemed sexual to me.  I know what it's

20  like when you are about to be fingered.  It's the only way that

21  I thought in my mind.  That is what that seemed to me.

22  Q.   Did you say anything at the time that you witnessed it?

23  A.   No.

24  Q.   Okay.  Now, to what extent, if at all, did that first

25  incident that you were describing stand out to you?

N16BHAD3                        Lozada - Direct

1   A.  Can you repeat the question?

2   Q.  So how unusual or not unusual was this, this incident that

3   you observed?

4   A.  Well, it was unusual because I had never seen anyone

5   separate -- attempt to separate a patient's labia in that

6   manner.

7           THE COURT:  And just to recall, when did this happen

8   that you had that observation?

9           THE WITNESS:  This was mid 1993.

10          THE COURT:  Mid-1993.

11  BY MR. MONTELEONI:

12  Q.  Following that observation, can you remind the jury about

13  how often after that you observed Hadden rub his fingers up and

14  down the patient's labia prior to inserting them into the

15  patient's vagina when conducting this examination?

16  A.  How many times?

17  Q.  No.  How often compared to each vaginal examination that he

18  was conducting, how often did he do that?

19  A.  I don't understand the question.

20  Q.  Let me try to ask a better question.

21          (Counsel confer)

22          MR. MONTELEONI:  Thank you, Ms. Van Dornum.

23  BY MR. MONTELEONI:

24  Q.  How many times after that did you see Mr. Hadden do that?

25  A.  Oh, every time he did a vaginal exam that I was in the room

1    with him.

2    Q.  Now, did you ever make any type of formal report or

3    complaint to New York Presbyterian or Columbia that Hadden

4    rubbed his fingers up and down a patient's labia?

5    A.  No.

6    Q.  Why not?

7    A.  Because historically, there has always been a hierarchy

8    between physicians and nurses, and I felt that I didn't have a

9    voice.

10   Q.  What did you think would happen if you did make a report?

11   A.  That I would be ostracized.

12   Q.  What did you think would happen with respect to Hadden if

13   you made a report?

14   A.  Nothing.

15   Q.  You testified that you observed thousands of these vaginal

16   exams a year in the labor room.  How many years did you work in

17   the labor room as a registered nurse before the break?

18   A.  Until 1999.  So '93 -- so it was about -- it was when I

19   returned.  It was eight years.

20   Q.  So during that entire time period, out of all of the

21   doctors in the practice, how many of them did you ever see rub

22   their fingers up and down a patient's labia prior to inserting

23   their fingers into a patient's vagina the way that Hadden did?

24   A.  Only him.

25            MR. MONTELEONI:  No further questions.

N16BHAD3                        Lozada - Cross

1    CROSS-EXAMINATION

2    BY MS. VON DORNUM:

3    Q.   Good afternoon, Ms. Lozada.  How are you?

4    A.   Good.  How are you?

5    Q.   I want to make sure I'm understanding the bigger context, I

6    guess.

7                What you observed occurred in the labor and delivery

8    room?

9    A.   Yes.

10   Q.   And am I right that unlike a private exam room where one

11   might have a gynecological exam, in the labor and delivery

12   room, more people are around and in and out; is that correct?

13   A.   What do you mean?

14   Q.   I mean, it's not just the doctor, the patient, and the

15   nurse, right?

16   A.   You mean inside the room?

17   Q.   In the labor and delivery room.

18   A.   It's -- there's usually a partner or a family member in the

19   room, but it's usually -- it's usually the nurse that's going

20   in and out.

21   Q.   Who is coming and go?

22   A.   That's coming and going.

23   Q.   Okay.  And usually in the labor and delivery room, the door

24   is open and the nurse comes in and out?

25   A.   It's closed.

1   Q.  It's closed?

2   A.  It's usually closed.

3   Q.  But the nurse is the one coming and going?

4   A.  Yes.

5   Q.  And then the partner is there, or family member?

6   A.  Yes.

7   Q.  Okay.  Great.  I think you said in order to check for

8   dilation of the cervix, you have to part the labia, right?

9   A.  Correct.

10   Q.  So what you observed Mr. Hadden doing was a different way

11   of parting the labia that you thought was inappropriate?

12   A.  Correct.

13   Q.  And in order to then check for dilation after parting the

14   labia, the doctor has to insert his fingers in the vagina,

15   right?

16   A.  Yes, of course.

17   Q.  I just want to make sure I'm getting it.

18   A.  Yes.

19   Q.  And you said when you observed this, Mr. Hadden's hand was

20   gloved, right?

21   A.  Yes.

22   Q.  And he had put, or you had helped him put, lubricant on the

23   gloved hand?

24   A.  Yes.

25   Q.  Okay.  And he would take the gloved hand with the lubricant

1    and rub it up and down the labia several times before inserting

2    his finger, right?

3    A.  Correct.

4    Q.  And he did this, you said, with every patient once you

5    started noticing, right?

6    A.  Yes.

7    Q.  And he did it with partners in the room?

8    A.  Yes.

9    Q.  He did it with you standing right behind him watching?

10   A.  Yes.

11   Q.  And at the time he did it -- I know you said it seemed

12   sexual to you.

13   A.  Yes.

14   Q.  Based on your own experiences, right?

15   A.  Correct.

16   Q.  You didn't see him make any contact with the clitoris?

17   A.  No.

18   Q.  You didn't hear him say anything inappropriate?

19   A.  No.

20   Q.  He didn't look stimulated or odd in any way?

21   A.  No.

22   Q.  And the rubbing up and down lasted a few seconds?

23   A.  Yes.

24   Q.  And you don't know, sitting here today, who any of these

25   patients were that you saw him do these exams on, right?

1    A.  No.

2    Q.  And you don't know where they lived?

3    A.  No.

4                MS. VON DORNUM:  Okay.  Thank you.

5                MR. MONTELEONI:  Nothing further.  Thank you.

6                THE COURT:  Thanks very much.  Witness is excused.

7                (Witness excused)

8                MS. KIM:  Your Honor, the government calls the witness

9    testifying under the name Sara Stein.

10               DEPUTY CLERK:  Ma'am, if you could step up here,

11   please?

12               If you could step up to the chair and remain standing

13   for a moment and raise your right hand?

14               Thank you.

15    SARA STEIN,

16        called as a witness by the Government,

17        having been duly sworn, testified as follows:

18               DEPUTY CLERK:  And, ma'am, it's my understanding you

19   will be testifying under the name Sara Stein; is that correct?

20               THE WITNESS:  Yes.

21               DEPUTY CLERK:  Ma'am, thank you.  You may be seated.

22               MS. KIM:  May I proceed, your Honor?

23   DIRECT EXAMINATION

24   BY MS. KIM:

25   Q.  Are you testifying under the name Sara Stein today?

1    A.   Yes.

2    Q.   Leading up to this trial, did you ask to testify under a

3    different name to protect your privacy?

4    A.   Yes.

5    Q.   Ms. Stein, could you please turn to what is in front of you

6    and marked as Government Exhibit 103A?

7    A.   Yes.

8    Q.   Do you recognize this document?

9    A.   Yes.

10   Q.   What is it?

11   A.   It's my driver's license.

12   Q.   Is this a fair and accurate copy of your driver's license?

13   A.   Yes.

14         MS. KIM:  Your Honor, the government offers Government

15   Exhibit 103A into evidence under seal.

16         THE COURT:  I'll allow it.

17         (Government's Exhibit 103A received in evidence)

18         MS. KIM:  Can the jurors please turn to tab Government

19   Exhibit 103A.

20   Q.   And, Ms. Stein, can you be sure to speak into the

21   microphone?  You can move it closer to you if it's easier.

22   A.   Is that good?

23   Q.   Yes, thank you.

24         Directing your attention to Government Exhibit 103A,

25   your driver's license.  Without saying the name out loud, do

N16BHAD3                          Stein - Direct

1   you see your name listed on your driver's license?

2   A.   Yes.

3   Q.   Is that your current legal name?

4   A.   Yes.

5   Q.   And without saying the date of birth, do you see a date of

6   birth listed on the license?

7   A.   Yes.

8   Q.   Is that your date of birth?

9   A.   Yes.

10  Q.   Without saying the name, Ms. Stein, have you gone by any

11  other names?

12  A.   Yes.

13  Q.   The next document in front of you is a document that is

14  already in evidence under seal, Government Exhibit 1205-R2.

15           Directing your attention to the second column on this

16  row where you see the name listed after "formerly known as,"

17  have you used that name before?

18  A.   Yes, yes.

19  Q.   Was that your married name?

20  A.   Yes.

21  Q.   Ms. Stein, how old are you?

22  A.   49.

23  Q.   What state do you live in now?

24  A.   New Jersey.

25  Q.   How far did you go in school?

N16BHAD3                          Stein - Direct

1   A.   I have a bachelor's degree in studio art.

2   Q.   Where did you go to high school?

3   A.   In New York State.

4   Q.   What kind of high school did you go to?

5   A.   I went to an all girls' Jewish orthodox high school.

6   Q.   Are you an orthodox Jew?

7   A.   Yes.

8   Q.   Do you have any experience working in the field of

9   education?

10  A.   Yes.

11  Q.   What experience do you have working in education?

12  A.   I taught computer science and art.

13  Q.   For approximately how many years did you teach art and

14  computer science?

15  A.   Approximately 12 years.

16  Q.   In what city did you principally work as a teacher?

17  A.   New York City.

18  Q.   What kind of school did you teach at?

19  A.   An orthodox Jewish high school.

20  Q.   Where did you teach in New York City?

21  A.   In New York City.

22  Q.   Where in New York City?

23  A.   On the Upper East Side.

24  Q.   Ms. Stein, could you please place the documents to the

25  side?

1    A.  Yes.

2    Q.  Thank you.

3           During approximately what time period were you a

4    teacher in New York City?

5    A.  From 1998 until 2009.

6    Q.  And as a teacher, did you work year round?

7    A.  No.

8    Q.  During what portion of the year did you teach?

9    A.  I taught from September till June.

10   Q.  And what grades did you teach?

11   A.  Middle school and mostly high school.

12   Q.  Ms. Stein, do you have any children?

13   A.  Yes.

14   Q.  How many?

15   A.  Two.

16   Q.  When were they born?

17   A.  1999 and 2003.

18   Q.  What month in 1999 was one of your --

19   A.  January, January 1999 and October 2003.

20   Q.  When you had summers off as a teacher, how did you spend

21   your time?

22   A.  I was home with my kids.

23   Q.  Are you presently employed?

24   A.  No.

25   Q.  What was the last job you had?

1   A.  I was editing Jewish books.

2   Q.  Until approximately when were you editing books?

3   A.  About three and a half weeks ago.

4   Q.  Ms. Stein, have you ever been married?

5   A.  Yes.

6   Q.  From approximately when to when were you married?

7   A.  I got married in December of '97 and until February --

8   January 2006.

9   Q.  Are you familiar with an individual named Robert Hadden?

10  A.  Yes.

11  Q.  How do you know him?

12  A.  He was my OB-GYN.

13  Q.  Do you think you'd be able to recognize Hadden if you saw

14  him today?

15  A.  Yes.

16  Q.  Could you please look around the courtroom and let us know

17  if you see Robert Hadden?

18  A.  Yes.

19  Q.  Could you please identify Robert Hadden by where he is

20  sitting and an item of clothing he's wearing?

21  A.  He has a blue mask sitting at that table over there, the

22  back table.

23  Q.  And by back table, do you mean the table next to that door?

24  A.  Yes.

25           MS. KIM:  Let the record reflect that the witness has

1   identified the defendant, Robert Hadden.

2           THE COURT:  The record will so reflect.

3   BY MS. KIM:

4   Q.  Ms. Stein, during approximately what time period was Hadden

5   your OB-GYN?

6   A.  I met him when I got pregnant in 1998 until about 2010.

7   Q.  Approximately how old were you in 1998?

8   A.  I was 25.

9   Q.  How did you come to be a patient of the defendant?

10  A.  People -- members of my family were patients of

11  Dr. McCaffrey, and I had originally gone to see him as a

12  gynecologist once before I got pregnant.  When I got pregnant,

13  I had made an appointment to see Dr. McCaffrey, and he told me

14  he was no longer doing obstetrics, and he was giving his

15  practice over to Hadden, and he introduced me to him.

16  Q.  What institution, if any, was Dr. McCaffrey affiliated

17  with?

18  A.  Columbia University Hospital.

19  Q.  In or about 1998, what institutions, if any, was Hadden

20  affiliated with?

21  A.  Columbia.

22  Q.  When you became a patient of Hadden, what was your

23  understanding of Columbia's reputation in the field of OB-GYN?

24  A.  In my community, Columbia doctors were the best doctors.

25  Q.  When you first became a patient of Hadden, was there a

1    specific reason you wanted to see an OB-GYN?

2    A.  I was pregnant.

3    Q.  Was this your first pregnancy?

4    A.  Yes.

5    Q.  If you could turn, please, to the third document in front

6    of you, it's a document marked Government Exhibit 103, and just

7    let me know when you've gotten to that?

8    A.  Okay.

9    Q.  Do you recognize this document?

10   A.  Yes.

11   Q.  What is it?

12   A.  It's a picture of me in the hospital in 2003 before I was

13   giving birth to my child.

14   Q.  Is this a fair and accurate depiction of your physical

15   appearance when you were a patient of Hadden?

16   A.  Yes.

17           MS. KIM:  The government offers Government Exhibit 103

18   into evidence under seal.

19           THE COURT:  I'll allow it.

20           (Government's Exhibit 103 received in evidence)

21           MS. KIM:  And, your Honor, could the jurors please

22   turn to tab Government Exhibit 103 in their binders?

23           THE COURT:  Sure.

24           MS. KIM:  Thank you.

25

1   BY MS. KIM:

2   Q.  Ms. Stein, you stated you have a background in art and

3   teaching.  Do you have a medical degree?

4   A.  No.

5   Q.  Do you have any medical training in obstetrics or

6   gynecology?

7   A.  No.

8   Q.  Prior to 1998, you mentioned that you had seen a

9   gynecologist named Dr. McCaffrey.  Apologies.  You had

10  mentioned you had seen a gynecologist named Dr. McCaffrey in or

11  about 1998.  How many times did you see Dr. McCaffrey?

12  A.  I saw him once in '97, I believe, and then once in '98.

13  Q.  Apart from Dr. McCaffrey, how many gynecologists, if any,

14  did you see before Hadden?

15  A.  None.

16  Q.  Was Hadden the first gynecologist you saw regularly?

17  A.  Yes.

18  Q.  Prior to seeing Hadden, approximately how many breast exams

19  had you received?

20  A.  Two, I believe.

21  Q.  Prior to seeing Hadden, approximately how many vaginal

22  exams had you received?

23  A.  One.

24  Q.  Had you seen any OB-GYNs since Hadden?

25  A.  Yes.

1    Q.  Approximately how many?

2    A.  Six or seven.

3    Q.  Since Hadden, have you received breast exams from other

4    OB-GYNs?

5    A.  Yes.

6            Do you mind slowing down a little bit?

7    Q.  Sure, sure.  Sorry about that.

8            Since Hadden, had you received vaginal exams from

9    other OB-GYNs?

10   A.  Yes.

11   Q.  Ms. Stein, you told us earlier that you are an orthodox

12   Jew.  Did you grow up in an orthodox Jewish family?

13   A.  Yes.

14   Q.  Growing up, what, if any conversations did you have with

15   your family about female body parts?

16   A.  Very little.  Mostly when we were very young in terms of

17   like bathroom issues, things like that.

18   Q.  Growing up, what, if any, conversations did you have with

19   your family about menstruation?

20   A.  Very little.  My mom gave me a book.

21   Q.  Growing up, what, if any, conversations did you have with

22   your family about sex?

23   A.  I also got a book and no conversations.

24   Q.  Growing up, how would you describe your family's approach

25   to talking about female body parts?

1    A.  In general, it was a closed, cold, kind of family.  We

2    didn't really talk about things like that in my family.

3    Q.  Growing up, how did your family approach topics relating to

4    health issues?

5    A.  They were very guarded.  We didn't talk about anything bad

6    that was going on with anybody.  Or sick, health-related

7    things.

8    Q.  How, if at all, has that impacted your comfort level in

9    talking about gynecological visits and the female body?

10   A.  It's made me very uncomfortable.  I'm not used to ever

11   talking about it at all.

12   Q.  I'd like to ask you some questions about where you lived

13   when you were a patient of Hadden.

14          While you were a patient of Hadden from around 1998 to

15   2010, what county and state did you live in?

16   A.  Rockland County, New York.

17   Q.  Did you live in Rockland County for the entire time you

18   were a patient of Hadden?

19   A.  Yes.

20   Q.  Was that always in one town or in more than one town in

21   Rockland County?

22   A.  Two, two towns.

23   Q.  Ms. Stein, if you could please turn to the next document.

24   I apologize, the first document, your license, what's already

25   been offered into evidence as Government Exhibit 103A.  Do you

1    see a town in New York reflected on your license?

2    A.   Yes.

3    Q.   Is that one of the towns in Rockland County that you lived

4    in while you were a patient of Hadden?

5    A.   Yes.

6    Q.   The second town in Rockland County that you lived in while

7    you were a patient of Hadden, where was that town in relation

8    to the town listed on your license?

9    A.   A few blocks away.

10   Q.   You said earlier that you were a teacher from around 1998

11   to 2009.  From around 2009 through 2010, were you working?

12   A.   No.

13   Q.   I want to ask you some questions now about how you got to

14   appointments with Hadden.

15            When you had appointments with Hadden, in what city

16   were those appointments?

17   A.   New York City.

18   Q.   Where in New York City?

19   A.   Mostly uptown in Washington Heights and occasionally in

20   midtown.

21   Q.   Did you go to just one or both of these locations?

22   A.   I went to both.

23   Q.   From the time period from 2009 through 2010 when you were

24   not working, how did you get to appointments with Hadden?

25   A.   I drove.

1    Q.  Where did you drive from?

2    A.  I drove from my home in Rockland County into New York City.

3    Q.  During that time period in 2009 and 2010 when you were not

4    working, did you travel into Manhattan for any purpose other

5    than to see Hadden?

6    A.  On the days I made appointments?  Yeah -- no, no.  Only

7    for -- only to see him.  I don't really go into the city for

8    other reasons.

9    Q.  You said a minute ago that as a teacher you had summers

10   off.  When you did not have to work as a teacher, how did you

11   get to appointments with Hadden?

12   A.  I drove.

13   Q.  Where did you drive from?

14   A.  I drove from Rockland County over the George Washington

15   Bridge via the Palisades Parkway or Route 17 and Route 4 into

16   Manhattan, back into Manhattan.

17   Q.  And, again, when you had summers off and you weren't

18   working as a teacher, did you drive into Manhattan for any

19   other purpose than to see Hadden when you had appointments?

20   A.  When I had appointments, no, I would just go in to see --

21   to have the appointment and come back.

22   Q.  From approximately 1998 to 2002, how did you get into

23   Manhattan for appointments with Hadden?

24   A.  Could you repeat that question, please?

25   Q.  Sure.  From approximately 1998 to 2002, how did you get

1    into Manhattan for appointments with Hadden?

2    A.  I was taking a commuter bus.  And if I was working, I would

3    take the commuter bus into Manhattan, and I would take a train

4    or a bus uptown or midtown wherever I was seeing him.  If I was

5    not working, I would drive.

6    Q.  And what route did the commuter bus take?

7    A.  The commuter bus went through the Lincoln Tunnel, so it

8    went from New York into New Jersey, back into downtown

9    New York.

10   Q.  And after in or about 2002 or 2003 until 2010, how did you

11   get into Manhattan for appointments with Hadden?

12   A.  I drove.

13   Q.  And what, if anything, changed in 2002 or 2003?

14   A.  We got a second car.

15   Q.  You stated that from around 1998 to 2002 when you took the

16   commuter bus into Manhattan, it went through the Lincoln

17   Tunnel.  Do you know where the Lincoln Tunnel starts and ends?

18   A.  It starts in New Jersey and ends in New York.

19   Q.  And a minute ago you said that when you would drive from

20   Rockland County into appointments with Hadden in New York, you

21   would take either the Palisades Parkway or you would take

22   Route 17 and Route 4.

23   A.  Correct.

24   Q.  In what state are Route 4 and Route 17 located?

25   A.  In New Jersey.

N16BHAD3                          Stein - Direct

1    Q.  And in what state or states is the Palisades Parkway

2    located?

3    A.   It starts in New York and ends in New Jersey to the George

4    Washington Bridge.

5    Q.  I want to ask you some more questions about driving from

6    Rockland County into Manhattan.  In your lifetime, how many

7    times have you driven from Rockland County to Manhattan?

8    A.   Countless times.

9    Q.  When you drive from Rockland County to Manhattan, do you

10   need a GPS?

11   A.   No.

12   Q.  While you were a patient of the defendant, when you drive

13   from Rockland County to Manhattan, did you use a GPS?

14   A.   No.

15   Q.  How did you know what route to take?

16   A.   It was a route that I had driven many, many, many times.

17   Q.  For the route that you took on Palisades Parkway from

18   Rockland County on Palisades Parkway into Manhattan, where did

19   you cross over from New Jersey to New York?

20   A.   When I drove on the Palisades, when did I cross from

21   New York into New Jersey?  Is that what the question is?

22   Q.  I apologize.  I'll withdraw that and ask that again in a

23   minute with some exhibits.

24        Ms. Stein, are you aware of any other driving routes

25   between Rockland County and Manhattan that do not go through

1    New Jersey?

2    A.   Yes.

3    Q.   What routes?

4    A.   Going over the Tappan Zee Bridge.

5    Q.   Did you ever drive on the Tappan Zee Bridge when you drove

6    from Rockland County to appointments with Hadden?

7    A.   No.

8    Q.   So I'd like to direct your attention to should be three

9    exhibits up there, 902, 903, and 906.  And there are three

10   documents.  If we could start with Government Exhibit 902,

11   what's been marked as Government Exhibit 902.  Do you recognize

12   this document?

13   A.   Yes.

14   Q.   What is it?

15   A.   It's a map of directions from where I used to live to

16   Columbia hospital.

17   Q.   Have you reviewed this map in preparing to testify today?

18   A.   Yes, I've seen it before.

19   Q.   Does this map accurately depict the main driving route that

20   you took from Rockland County to Manhattan, New York for

21   appointments with Hadden?

22   A.   Yes, it does.

23        MS. KIM:  The government offers Government Exhibit 902

24   into evidence under seal.

25        THE COURT:  I'll allow it.

N16BHAD3                          Stein - Direct

1              (Government's Exhibit 902 received in evidence).

2              MS. KIM:  And if the jurors could please turn to tab

3      Government Exhibit 902?

4      BY MS. KIM:

5      Q.  Ms. Stein, looking at Government Exhibit 902, could you

6      please explain the route that you took when driving to

7      appointments with Hadden as reflected on this exhibit?

8      A.  It's leaving Rockland County, crossing -- going down to

9      the -- get on the exit for the Palisades Parkway, crossing over

10     to into New Jersey, and then going over the George Washington

11     Bridge into New York.

12     Q.  Could you please turn to the next document?  It's the

13     document marked Government Exhibit 903?

14             And we just ask that for now just the witness turn to

15     Government Exhibit 903.

16             Do you recognize this document?

17     A.  Yes.

18     Q.  What is it?

19     A.  It's a map of another route that I would have taken from

20     Rockland County down Route 17 to Route 4 through New Jersey

21     over the George Washington Bridge into Manhattan.

22     Q.  So just to clarify, does this map accurately depict another

23     driving route that you took from Rockland County to Manhattan,

24     New York for appointments with Hadden?

25     A.  Yes.

1          MS. KIM:   The government offers Government Exhibit 903

2    into evidence under seal?

3          THE COURT:   I'll allow it.

4          (Government's Exhibit 903 received in evidence)

5          MS. KIM:   And if the jurors could please turn to tab

6    Government Exhibit 903.

7    BY MS. KIM:

8    Q.   Ms. Stein, looking at Government Exhibits 902 and 903,

9    could you please remind us which route was your primary route

10   from Rockland County to New Jersey -- sorry, Rockland County to

11   Manhattan for appointments with the defendant?

12   A.   Primarily it was 902, going down the Palisades Parkway.

13   Q.   And under what circumstances would you take the route

14   that's reflected in 903?

15   A.   If the weather was very bad, like if it was rainy or foggy

16   or snowy.

17   Q.   And can you please describe for the jury where the route

18   takes you on Government Exhibit 903?

19   A.   It takes -- starting from Rockland County, it crosses over

20   into New Jersey, and then I get onto Route 17, and then from

21   there to Route 4 to the George Washington Bridge, and then back

22   into New York, or into New York City.

23   Q.   Thank you.   You can set those aside.

24          When you traveled from Rockland County to New Jersey

25   to Manhattan for appointments with the defendant, how was the

1    traffic?

2    A.   Sometimes it was okay, and sometimes there was a lot of

3    traffic.

4    Q.   What, if anything, did you discuss with Hadden about your

5    drive into Manhattan?

6    A.   We discussed the town that I was living in, where I came,

7    how I came to appointments, like, which route I took.  If I

8    came over the bridge, was there traffic, where did you park,

9    did you drive, did someone take you.  Me -- rather.

10   Q.   When you say that you talked, you talked to Hadden about

11   where you were coming from and where you lived, did you discuss

12   with Hadden the town and the community that you lived in?

13   A.   He asked me if I had lived in a community -- he mentioned

14   orthodox Jews and maybe Hasidic Jews, and I said -- I assumed

15   he meant a town that I did not live in that had mostly Hasidic

16   Hasidic Jews.  I remember having a conversation about that.

17   Q.   And you said that he asked you where you were coming from.

18   Did you tell him where you were coming from when you went into

19   appointments with him?

20   A.   Yes.  And he knew on my file where I lived, so...

21   Q.   What, if anything, did Hadden say about the town that you

22   lived in in Rockland County?

23   A.   He'd ask me about it being orthodox.  He asked me -- or

24   rather he told me he knew about the mikvah, which is something

25   that orthodox Jewish women use when they're married.

1    Q.  And the town that was listed on your license, does that
2    town have a large orthodox Jewish population?
3    A.  Yes.
4    Q.  You mentioned that you discussed with Hadden the route that
5    you took from Rockland County to Manhattan for appointments
6    with him, and I think you mentioned the bridge.  When you
7    mentioned the bridge, what bridge were you referring to?
8    A.  The George Washington Bridge.
9    Q.  Did you talk to him at all about the Palisades Parkway?
10   A.  Yes.
11   Q.  You also mentioned that you talked to him about the traffic
12   and where you would park.  Where did you park when you had
13   appointments with Hadden?
14   A.  There was a lot across from the hospital.
15   Q.  Ms. Stein, did anyone accompany you to appointments with
16   Hadden?
17   A.  When I was pregnant, my husband accompanied me, then.
18   Q.  Did your husband meet Hadden?
19   A.  Yes.
20   Q.  At the time you were a patient of Hadden, was your husband
21   at the time also an orthodox Jew?
22   A.  Yes.
23   Q.  What did he wear to appointments typically?
24   A.  When he met -- when he met him, I believe it was my first
25   child that I was pregnant with, he was probably wearing slacks

1    and a button-down shirt and kippah on his head.

2    Q.   What is a kippah?

3    A.   It's a head covering that many Jewish men wear.

4    Q.   And how is Hadden typically dressed for appointments?

5    A.   He had a lab coat on over his clothes.

6    Q.   When you had appointments with Hadden, where would you meet

7    with him?

8    A.   Can you -- from where?

9    Q.   Let me ask that again.

10            When you had appointments with Hadden, we talked about

11   the locations that you went to.  At those locations, what types

12   of rooms did you meet with him in?

13   A.   We would typically meet in, like in the exam room, and then

14   usually after the appointment, I would meet him in his office.

15   Occasionally before the appointment, I would meet him in his

16   office.

17   Q.   You mentioned that you became pregnant in 1998 and then

18   again in 2003.  Was Hadden your doctor for both of these

19   pregnancies?

20   A.   Yes.

21   Q.   Was he your first obstetrician?

22   A.   Yes.

23   Q.   Did he deliver either of your children?

24   A.   No.

25   Q.   I want to talk now about appointments with Hadden.

1         Approximately how often did you have appointments with

2    Hadden?

3    A.   When I was pregnant, it was about every month.  When I was

4    on birth control, it was every six months.  And then when I

5    stopped taking birth control, I believe it was yearly, but that

6    was at the end of, so maybe just -- maybe just two or three

7    years I saw him.

8    Q.   When you were not on birth control, just to clarify, that

9    was for approximately the last two or three years that you were

10   a patient of Hadden?

11   A.   Yeah, I think so, yeah.

12   Q.   For appointments with Hadden, how did you know when to come

13   back for an appointment?

14   A.   He would tell me when to come back.

15   Q.   When would Hadden tell you when to return for your next

16   appointment?

17   A.   Usually at the end of the appointment in his office or in

18   the exam room.

19   Q.   And if Hadden had told you to come back in two weeks for an

20   appointment, what, if anything, would you have done?

21   A.   I would have come back.

22   Q.   Why?

23   A.   He's my doctor, I trusted him.  If he said I needed to come

24   back, I need to come back.

25   Q.   Would you have ever shown up at Hadden's offices to see him

1   without an appointment?

2   A.  No.

3   Q.  Did you ever rearrange your personal schedule to make it to

4   an appointment that Hadden had scheduled?

5   A.  That I had scheduled with him?  Yes.

6   Q.  If Hadden had called and said, I'm not available anymore

7   for your appointment, would you have rescheduled your

8   appointment with Hadden or would you have gone to another

9   doctor?

10              MS. WOZENCROFT:  Objection.

11              THE COURT:  Overruled.

12  A.  What does that mean?

13              MS. KIM:  You can answer the question.

14  A.  Sorry.  I would have rescheduled with him unless it was

15  imperative that I needed to see a doctor in that time frame.

16  BY MS. KIM:

17  Q.  And why would you have rescheduled your appointment to be

18  sure to see Hadden?

19  A.  He was my doctor, I trusted him, and I only wanted to see

20  him.

21  Q.  During appointments with Hadden, did he conduct any exams?

22  A.  Yes.

23  Q.  What kind of exams?

24  A.  Vaginal, a rectal, and breast exams.

25  Q.  Other than you and Hadden, who, if anyone else, was present

1   during exams?

2   A.  Occasionally a nurse would come in for a very short amount

3   of time.

4   Q.  So I want to ask you some questions about breast exams.

5   Approximately how often did Hadden conduct breast exams?

6   A.  In one appointment, he would usually give me two breast

7   exams.

8   Q.  And across all the appointments that you had with Hadden,

9   approximately how often did he conduct breast exams?

10  A.  Almost always.

11  Q.  You testified that you were pregnant in 1998 and then again

12  in 2003.  When you were pregnant before the birth of your first

13  child in January 1999, did Hadden conduct breast exams during

14  your appointments?

15  A.  I'm sorry, can I just say something?

16  Q.  Am I talking too fast?

17  A.  No, the last question, do you mind asking me the last

18  question again, please?

19  Q.  Sure.  The question was at approximately how many

20  appointments or approximately how often did Hadden conduct

21  breast exams?

22  A.  So in the beginning when I saw him when I was pregnant, I

23  believe that there was a point where he was doing one breast

24  exam, and then it turned to two breast exams, and that's how it

25  was for the remainder of the time.  That was in my first

1    pregnancy.  So it was within those nine months or right after I

2    gave birth, about that time, when started giving me two breast

3    exams.

4    Q.  And while you were pregnant before the birth of your first

5    child in January 1999, while you were pregnant, did Hadden

6    conduct breast exams during your appointments?

7    A.  Yes.

8    Q.  And, again, during approximately how many appointments

9    while you were pregnant did he conduct breast exams?

10   A.  I believe it was every appointment.

11   Q.  And when you were pregnant before the birth of your second

12   child in 2003, did Hadden conduct breast exams during

13   appointments?

14   A.  Yes.

15   Q.  During approximately how many appointments?

16   A.  All of them.

17   Q.  You mentioned that there came a time when Hadden began

18   conducting two breast exams within one appointment.  When

19   Hadden conducted two breast exams within one appointment, when

20   would he conduct the first breast exam?

21   A.  So there was usually one in the beginning of the exam and

22   then one after the pelvic exam.

23   Q.  And how --

24            THE COURT:  Sorry, after what?

25            THE WITNESS:  After the pelvic exam, the vaginal exam.

1           THE COURT:  Yeah.

2     BY MS. KIM:

3     Q.   And how, if at all, were you dressed when Hadden conducted

4     breast exams?

5     A.   I was wearing the gown with no clothes underneath.

6     Q.   How were you positioned for breast exams?

7     A.   The first one was usually lying down, and the second one

8     was sitting up.

9     Q.   Other than you and Hadden, was anyone else in the room

10    during any part of the breast exam?

11    A.   Like I said before, there was a nurse that would come in

12    occasionally.  Sometimes she'd come in by the breast exam.

13    Sometimes she'd come in by the vaginal exam.  So occasionally

14    she -- somebody else -- a nurse was there for a very short

15    amount of time.

16    Q.   Did Hadden ever comment on your breasts during

17    appointments?

18    A.   He made a comment one time that made me uncomfortable.

19    Something about I had nice breasts or he said they were nice

20    healthy breasts, but the way he said it, made me uncomfortable,

21    that was it.

22    Q.   You testified earlier that you have seen other OB-GYNs

23    since your last appointment with Hadden.  How did the breast

24    exams that Hadden conducted, how did those exams compare with

25    the breast exams that you've received from other OB-GYNs?

1    A.  For other OB-GYNs I've had since, and I've had several,

2    there's always at least one person in the room -- I'm sorry,

3    one other person, either a nurse or two nurses or I don't know

4    if it's they're both nurses or not, but there's usually more

5    than -- not just the doctor in the room throughout the entire

6    exam.  It took, like, not even a minute, a few seconds.  She

7    would -- I didn't always even take off my gown.  She would put

8    her hand on my breast, and she would walk her fingers around

9    it, ask me if I ever felt anything, where I felt anything, and

10   then that was it.  It was barely, you know, a minute for both

11   breasts.

12            And with Hadden, they were much longer.  They were --

13   you had two of them.  I never had two breast exams with anyone

14   else.  We would have conversations while he was feeling my

15   breasts.  Sometimes he would use two hands.  I don't remember

16   him having gloves on.  He had his bare hands on my breasts.  He

17   would -- he would go around, like, in a, in the concentric

18   circles like you're supposed to, I believe.  He would walk his

19   fingers, but he would also press, he would rub them, he often

20   cupped my breasts, and with his other hand squeeze my nipples

21   several times, and they lasted several minutes, these exams.

22   We would have conversations.  It wasn't just a minute.

23   Q.  You mentioned earlier that when Hadden conducted breast

24   exams he would rub your breasts and he would cup your breasts.

25   Would he ever squeeze or massage your breasts?

1   A.  He was pressing them and he was -- looking back now, yes,

2   at the time, I just, whatever he was doing, I trusted what he

3   was doing.  But, yeah, he was.

4   Q.  And when you say that Hadden squeezed your nipples, how

5   many times within one appointment did Hadden squeeze each

6   nipple?

7   A.  It could be between one and three or four times.  I

8   remember once it was -- he did it a few times.

9   Q.  While you were a patient of Hadden, did you ever have any

10  issues with your nipples?

11  A.  With my first child, I had a breast infection.  That was

12  the only time I had an issue.

13  Q.  Apart from that time, did you ever express concern to

14  Hadden about your nipples?

15  A.  No.

16  Q.  After that infection, did Hadden continue to squeeze your

17  nipples during exams?

18  A.  Yes, I believe that might be when it started that he

19  started to do the two breast exams, yeah.

20  Q.  And after that -- after that appointment, did he continue

21  to squeeze your nipples even when you were not pregnant?

22  A.  Oh, yes.

23  Q.  You testified earlier that Hadden conducted rectal exams at

24  appointments.  How often did Hadden conduct rectal exams?

25  A.  I remember two.

1   Q.  How were you positioned when Hadden conducted rectal exams?

2   A.  Once I was on the table and once I was -- he had me stand

3   up and bend over to touch my toes.

4   Q.  And how did you know that you needed to stand up and bend

5   over and touch your toes?

6   A.  He told me how to position myself.

7   Q.  And when you stood up, bent over, and touched your toes,

8   how, if at all, were you dressed?

9   A.  I was wearing a gown with no clothes underneath.

10  Q.  And when you bent over to touch your toes, what, if any,

11  parts of your body were exposed?

12  A.  Well, I think the gown was open -- I don't know, the gown

13  was open, but I was bent over, so the gown was basically

14  covering my head, so everything was exposed pretty much.

15  Q.  I want to ask you some questions about vaginal exams.

16  Approximately how often did Hadden conduct vaginal exams?

17  A.  At every appointment.

18  Q.  About how often -- and when you say every appointment, does

19  that include appointments when you were pregnant?

20  A.  Yes.

21  Q.  How were you dressed during vaginal exams?

22  A.  I had a gown on with no clothes on underneath.

23  Q.  How were you positioned for vaginal exams?

24  A.  I was laying down on the table with my knees up in the

25  stirrups with a sheet over my knees.

1   Q.  Other than you and Hadden, was anyone else in the room for

2   any part of the vaginal exam?

3   A.  Same thing, a nurse would come in at some point, it seemed

4   almost random to me.  She would come in, she would fiddle with

5   something in the cabinets, and then she would leave.

6   Q.  During vaginal exams, did Hadden touch your vagina?

7   A.  Yes.

8   Q.  Where did he touch your vagina?

9   A.  All over my vagina.  The inside of my vagina.  Around it.

10  Q.  I'd like to direct your attention to what's already been

11  offered into evidence as Government Exhibit 801.  There should

12  be two copies of 801 in front of you.  It's a diagram of a

13  vagina.

14          Ms. Stein, have you seen this diagram before?

15  A.  Yes.

16  Q.  Will this diagram assist in your ability to describe your

17  experiences to the jury?

18  A.  Yes.

19  Q.  Ms. Stein, I believe there's a blue marker up there as

20  well.

21          Using Government Exhibit 801, could you please show

22  the jury where Hadden touched your vagina during vaginal exams?

23  A.  Yes.

24          MS. KIM:  Your Honor, may I approach?

25          THE COURT:  Sure.

N16BHAD3                        Stein - Direct

1   BY MS. KIM:

2   Q.  Ms. Stein, do you see this diagram on the screen?

3   A.  Yes.

4   Q.  The blue marks that are on this diagram, did you make those

5   blue marks?

6   A.  Yes.

7   Q.  Do those blue marks, are those a fair and accurate

8   depiction of where Hadden touched you during your -- during

9   vaginal exams?

10  A.  Yes, with the exception of inside.  But I didn't mark that.

11  Q.  So it's this and also inside the vagina?

12  A.  Yes, yes.

13          MS. KIM:  Your Honor, the government would like to

14  offer Government Exhibit 801A.

15          THE COURT:  That's the one that contains her markings?

16          MS. KIM:  Yes.

17          THE COURT:  Sure, I'll allow it.

18          (Government's Exhibit 801A received in evidence)

19  BY MS. KIM:

20  Q.  Ms. Stein, just based on Government Exhibit 801A that you

21  marked just now, fair to say that Hadden during vaginal exams

22  touched your clitoris, the inside of your labia minora, all

23  around, and then also the outer edge of your labia minora, all

24  around your vagina?

25  A.  Yes.

1    Q.  Ms. Stein, setting aside your last appointment with Hadden,

2    while you were a patient of Hadden, during approximately how

3    many appointments did you feel Hadden touch your labia minora

4    and clitoris?

5    A.  Well, he would -- he would touch the outer part of my

6    vagina like in those areas almost all the time.  But usually

7    not for a lengthy period of time, so it -- I didn't necessarily

8    notice it.  Or rather, I noticed it.  It didn't stick out as

9    being uncomfortable or out of place or inappropriate.

10   Q.  I want to talk now about your last appointment with the

11   defendant.  Do you remember the exact date of your last

12   appointment with Hadden?

13   A.  No, I don't.

14   Q.  In approximately what year was your last appointment with

15   Hadden?

16   A.  I think it was around 2010.

17   Q.  During that last appointment, did Hadden conduct any exams?

18   A.  Yes.

19   Q.  What exams?

20   A.  He did a vaginal exam and breast exams.

21   Q.  When Hadden conducted the vaginal exam, how were you

22   positioned?

23   A.  I was on the table laying down with my feet up in the

24   stirrups with the sheet over my legs.

25   Q.  When Hadden conducted the vaginal exam, was there anyone

1    else in the room other than you and Hadden?

2    A.   Probably a nurse came in for a short period of time at the

3    beginning at some point.

4    Q.   During that vaginal exam, what, if anything, happened?

5    A.   At one point, he licked me on the inside of my vagina, or

6    around my vagina.  And then he -- at a later point was rubbing

7    my clitoris for a very lengthy period of time.

8    Q.   There's another copy of Government Exhibit 801 in front of

9    you.  If you could please use the marker in front of you and

10   mark on that exhibit where you felt Hadden lick your vagina.

11   A.   Okay.

12         MS. KIM:  And this is just for the parties and the

13   Court and the witness.

14   BY MS. KIM:

15   Q.   Ms. Stein, the blue X that is on this version of Government

16   Exhibit 801, which I will now mark as Government Exhibit 801B.

17         Did you just make that marking?

18   A.   Yes.

19   Q.   Does that marking fairly and accurately reflect the part of

20   your vagina that Hadden licked?

21   A.   Yes.

22         MS. KIM:  Your Honor, the government offers Government

23   Exhibit 801B?

24         THE COURT:  I'll allow it.

25         (Government's Exhibit 801B received in evidence)

1          MS. KIM:  Permission to publish to the jury, your

2     Honor?

3          THE COURT:  Sure.

4     BY MS. KIM:

5     Q.  So here, it looks like on this Exhibit 801B, that the X is

6     on the inside of the labia minora, on the right side of the

7     diagram, so it would have been your left side; is that right?

8     A.  Yes.

9          MS. KIM:  Your Honor, permission to publish for the

10    jury, Government Exhibit 801A?

11         THE COURT:  Sure.

12    BY MS. KIM:

13    Q.  And, Ms. Stein, you had testified earlier that at

14    appointments, Hadden touched you on the places that are marked

15    on this exhibit in blue; is that right?

16    A.  Yes.

17    Q.  Ms. Stein, when Hadden licked your vagina, how long did it

18    feel to you that he had his tongue on your vagina?

19    A.  A few seconds.

20    Q.  How did you know that it was Hadden's tongue on your

21    vagina?

22    A.  I know what oral sex feels like.

23    Q.  When you felt Hadden lick your vagina, how, if at all, did

24    you react?

25    A.  So, my body kind of froze and like jumped a little bit.

1    And I just, like, was laying there, trying to figure out what

2    just happened.  He went quiet.  My -- I was having this like

3    conversation in my head, of, like, what just happened, what

4    just happened, and my brain is like, oh, it must have been a

5    metal button on his jacket or a pen in his pocket or something

6    like that, you know, something touched you, and I just kept

7    thinking that, thinking that in my head, and then I was like, I

8    guess I just accepted that, oh, it must have been a button, and

9    I kind of just laid there.  I was just basically frozen.

10   Q.  You mentioned earlier that Hadden also touched your

11   clitoris.  Did he touch your clitoris before or after he licked

12   you?

13   A.  After.  He continued with the exam, and then he -- while he

14   had fingers inside me, he was rubbing my clitoris for several

15   minutes.

16   Q.  What, if anything, did it feel like Hadden was doing when

17   he was rubbing your clitoris?

18   A.  It felt like he was trying to arouse me sexually.

19   Q.  What type of motion did Hadden make when he was rubbing

20   your clitoris?

21   A.  It was back and forth.

22   Q.  Was it a single motion or was it repeated?

23   A.  It was repeated.

24   Q.  After Hadden rubbed your clitoris, what, if anything, did

25   he do next?

1    A.  After that, the exam became over, I guess, and he had me

2    sit up and did another breast exam.  During -- yeah, had

3    another breast exam.

4    Q.  And to clarify, was this the second breast exam?

5    A.  Yes.

6    Q.  Was this the last appointment that you had with Hadden?

7    A.  I think so.

8    Q.  Ms. Stein, you testified earlier that you are an orthodox

9    Jew.  What, if any, significance does a woman's hair have for

10   an orthodox Jew?

11   A.  Married women, many orthodox women cover their hair after

12   they're married.  It is a spiritual and physical symbol that

13   she's married and she -- she conducts her life in a different

14   way as if she -- than she wasn't married, and other people

15   regard her differently as well.

16   Q.  When you were a patient of Hadden, did you cover your hair

17   when you went to appointments?

18   A.  Yes.

19   Q.  Why?

20   A.  I was married, and after I was divorced, also many orthodox

21   women, even though they're not married anymore, some still

22   cover their hair, and I was at that time still covering my hair

23   even though I was no longer married.

24   Q.  Apart from your hair, what did you typically wear to

25   appointments with Hadden?

1    A.   I dressed mostly usually at that point, I think I was -- I

2    only wore skirts and dresses, you know, to appointments and

3    everyday life, usually.  So I was wearing a skirt or a dress

4    and a sweater or top.

5    Q.   What, if any, significance did wearing a skirt or a dress

6    have?

7    A.   That's what is usually acceptable in many orthodox

8    communities for women to wear only skirts and dresses.

9    Q.   During appointments with Hadden, did Hadden see you with

10   your hair covered and with a skirt on?

11   A.   Yes.

12   Q.   When during appointments did Hadden see you with your hair

13   covered and a skirt on?

14   A.   My hair was always covered, even in the appointments.  And

15   I would wear, and then after the appointment, when I would meet

16   him in his office either prior or after the exam, I'd have my

17   clothes on.

18   Q.   You testified earlier that you're no longer married.  Do

19   you currently cover your hair?

20   A.   No.

21   Q.   Are you wearing a scarf over your hair today?

22   A.   Yes.

23   Q.   If you don't normally cover your hair, why are you wearing

24   a scarf over your head today?

25             MS. WOZENCROFT:  Objection.

N16BHAD3                           Stein - Direct

1              THE COURT:  Overruled.

2    A.  It was a part of my body that he had never seen, my hair.

3    And I wanted to keep it that way.

4              MS. KIM:  No further questions, your Honor.

5              MS. VON DORNUM:  Can we have a moment?

6              (Counsel confer)

7              THE COURT:  Counsel, we're contemplating a break.

8    Should we do it now or after your cross?

9              MS. VON DORNUM:  I think that makes sense.  I have

10   more than a couple of questions.

11             THE COURT:  Okay.  So let's take a short break, 10, 15

12   minutes, and then we'll resume at 25 to 4:00.

13             MS. KIM:  Your Honor, may the witness step down and go

14   to the witness room?

15             THE COURT:  Yes.

16

17

18

19

20

21

22

23

24

25

1           (Jury not present)

2           THE COURT:  Could we talk calendar for just a minute?

3           Please be seated.

4           So cross, 15?

5           MS. WOZENCROFT:  Yeah, definitely under 30 minutes,

6   probably closer to 15 or 20.

7           THE COURT:  Okay.  And then after that?

8           MS. KIM:  Your Honor, I think after that, for today,

9   we don't have any additional witnesses.  The rest of the

10  witnesses are either custodians or pending rulings from the

11  Court.

12          THE COURT:  And are they here?  Is that something that

13  you need to get out of the way?

14          MS. KIM:  Your Honor, the other witnesses we've told

15  to come tomorrow.

16          THE COURT:  Okay.

17          MS. VON DORNUM:  And, your Honor, I think we have a

18  joint proposal as to the larger schedule going forward.  Can I

19  give that to you for your consideration?

20          THE COURT:  Sure.

21          MS. VON DORNUM:  So it's my understanding depending on

22  your Honor's rulings, of course, that the government is likely

23  to rest tomorrow at some point.  I think then we'll have a

24  relatively short defense case Friday morning, maybe going into

25  early afternoon, but Friday morning.  So I think the parties

1   would jointly propose that we then let the jury go and do the

2   charge conference.  As I think you know, the charge in this

3   case is more complicated than in some.  And then do closings

4   Tuesday morning, followed immediately by your charge, so that

5   we don't have to separate closings in the charge or try to do

6   closings on a Friday afternoon when everyone is going to want

7   to get out of here.

8           If that's okay with you, I think we've made great

9   progress.  I think that would work for us well.

10          THE COURT:  So let me see.  So we'll finish probably

11  4:00ish I guess, today or however?

12          MS. VON DORNUM:  Yes.

13          THE COURT:  However much time you need.  And then

14  tomorrow, we'll have the government witnesses, and will that

15  take a full day, you think, or are you guesstimating?

16          MS. KIM:  It's possible, your Honor.  I think probably

17  at some point between lunch and the end of the day.

18          THE COURT:  Okay.  So whenever that is, we'll adjourn,

19  and then we'll have the defense on Friday.

20          MS. VON DORNUM:  Yes, your Honor.

21          THE COURT:  You think that will --

22          MS. VON DORNUM:  Maybe about half the day, maybe a

23  little less.

24          THE COURT:  And this, the submissions, are they

25  affected by this schedule?

1            MS. VON DORNUM:  No, your Honor.

2            THE COURT:  Do we have everything that we need?

3            MS. VON DORNUM:  Yes, so we had agreed we would put in

4    our submissions at a reasonable time tonight.  I think your

5    thinking was that you would try to -- excuse me -- rule tonight

6    or tomorrow morning before court, depending on your rulings,

7    that might reduce the number of government witnesses, but it

8    wouldn't affect our plan.

9            THE COURT:  Got it.  Okay.

10           MS. KIM:  Your Honor, just one thing to note.  We do

11   have to send the Court the parties' joint proposal, and we need

12   to send an updated request to charge and verdict sheet, just

13   changing the victim numbers.

14           MS. VON DORNUM:  And taking out some counts, right?

15           MS. KIM:  Yes.  So we'll do that.

16           THE COURT:  Okay.  I think that's great.  Yep.  See

17   you in a couple of minutes.

18           (Recess)

19

20

21

22

23

24

25

N1B1HAD4                              Stein – Cross

```
 1                    (In open court; jury present)
 2                    THE COURT:  Please be seated.
 3                    THE DEPUTY CLERK:  Ma'am, before we begin, I'd like to
 4      remind you you're still under oath.
 5                    THE WITNESS:  Yes.
 6      CROSS EXAMINATION
 7      BY MS. WOZENCROFT:
 8      Q.  Good afternoon, Ms. Stein.
 9      A.  Hi.
10      Q.  So you told us this afternoon that you first became a
11      patient of Robert Hadden's around 1998.
12      A.  Yes, when I became pregnant.
13      Q.  I'm sorry.  Could you -- yeah, exactly.
14      A.  Yes.
15      Q.  And you were four months' pregnant at the time?
16      A.  No, I had just -- I had gotten a pregnancy test with
17      Dr. McCaffrey, and then he handed me over to Dr. Hadden.
18      Q.  Okay.  So you were early on in your pregnancy at the time.
19      A.  When I met Dr. Hadden, yes.  Hadden.  Mr. Hadden.
20      Q.  And as you just said, Dr. McCaffrey was your previous
21      gynecologist.
22      A.  Yes, I had --
23                    THE COURT:  I think it was less than four months is
24      what --
25      Q.  It was early in your pregnancy.
```

N1B1HAD4                        Stein - Cross

| | |
|---|---|
| 1 | THE COURT:  Yeah. |
| 2 | A.  It was like weeks into my pregnancy, yeah. |
| 3 | Q.  Okay.  Dr. McCaffrey had seen you previously. |
| 4 | A.  I saw him once before I was pregnant. |
| 5 | Q.  Correct.  And I believe you then testified on direct that |
| 6 | you saw him once you were pregnant and he informed you that he |
| 7 | is no longer practicing obstetrics; is that right? |
| 8 | A.  Yeah, yes. |
| 9 | Q.  Okay.  So Dr. McCaffrey confirmed the pregnancy and told |
| 10 | you he -- he referred you to another doctor because you were |
| 11 | pregnant. |
| 12 | A.  He told me that Hadden was taking over his practice. |
| 13 | That's what I understood.  And he introduced me to him. |
| 14 | Q.  Now you told us also on direct that you talked about |
| 15 | Columbia and how it was your impression that the doctors at |
| 16 | Columbia were the best, right? |
| 17 | A.  That's what was -- yes, yes. |
| 18 | Q.  Okay.  And I believe you said in your community that was |
| 19 | widely believed. |
| 20 | A.  Yes, and in my family as well. |
| 21 | Q.  And in fact, Dr. McCaffrey was also your mother's doctor, |
| 22 | right? |
| 23 | A.  Yes. |
| 24 | Q.  Okay.  Am I right, Dr. McCaffrey actually delivered you? |
| 25 | A.  Yes. |

1   Q.  Okay.  So your family had a long history with the

2   obstetrics and gynecology department at Columbia; fair to say?

3   A.  Yes, yes.

4   Q.  You also told us that in 1998 you worked as a seventh and

5   eighth grade teacher at a school in Manhattan.

6   A.  I was -- it was seventh and eighth grade but also high

7   school, so it was seventh, eighth, ninth, tenth, eleventh.

8   Q.  You were a teacher in Manhattan at that time.

9   A.  Yes.

10  Q.  The school was on the upper east side of Manhattan?

11  A.  Yes.

12  Q.  You would travel from your home in Rockland County for work

13  on the days you worked.

14  A.  Yes.

15  Q.  And you worked at that school in Manhattan until 2009?

16  A.  Yes.

17  Q.  In the course of the over a decade that you were Robert

18  Hadden's patient, you saw him at both of his office locations,

19  right?

20  A.  Yes.

21  Q.  So Fort Washington area, right?

22  A.  Yes.

23  Q.  And the -- in midtown.

24  A.  Yes.

25  Q.  You also told us I believe that during each of your

1   pregnancies you saw Robert Hadden approximately monthly.

2   A.  Yes.

3   Q.  And as you got to the end of your pregnancy, around 28, 30

4   weeks, you would start to see him biweekly -- or, I'm sorry --

5   every other week.

6   A.  I don't remember that, but if it's in my records, then yes.

7   Q.  You also saw him between pregnancies.

8   A.  Yes.

9   Q.  And after your second pregnancy.

10  A.  Yes.

11  Q.  When you were not pregnant, there were times that you were

12  on birth control, right?

13  A.  Yes.

14  Q.  And at those times you would see him every six months?

15  A.  Yes.

16  Q.  And when you -- and I believe you said when you were not on

17  birth control, you'd see him approximately yearly.

18  A.  Yes.

19  Q.  And that was the last several years that you were seeing

20  him, up through 2010.

21  A.  It was only a couple years; maybe two, maybe three.

22  Q.  Until 2010.

23  A.  Yes.

24  Q.  So as we just talked about, the last time you had an

25  appointment with Robert Hadden was 2010.

N1B1HAD4                        Stein - Cross

 1   A.  I believe so.

 2   Q.  In 2012 you saw a Dr. Shin, right?

 3   A.  Yes.

 4   Q.  Dr. Shin is an OB-GYN?

 5   A.  Yes.

 6   Q.  And he is a doctor at -- affiliated with Columbia as well?

 7   A.  Yeah, he's in the same practice.

 8   Q.  Okay.  So he's in the same practice meaning same practice

 9   as Robert Hadden --

10   A.  Yes.

11   Q.  -- was.

12   A.  Yes.

13   Q.  Same office locations.

14   A.  I saw Dr. Shin at a different location.

15   Q.  Okay.  But ColumbiaDoctors, Columbia OB-GYN.

16   A.  Yes.

17   Q.  I just want to talk to you briefly about how you made

18   appointments with Robert Hadden.

19   A.  Okay.

20   Q.  So if you were in the office for an appointment, after that

21   appointment, after the appointment was concluded, you would go

22   to the front desk, to the receptionist, and you could schedule

23   the next appointment?

24   A.  Yes.

25   Q.  Okay.  If you didn't do that, you could also call and

1   schedule an appointment, right?

2   A.  Yes.

3   Q.  Okay.  And if you needed to change your appointment for any

4   reason, you knew there was a number you could call and you

5   would change the appointment?

6   A.  Yes.

7   Q.  And when you scheduled at the front desk, you scheduled

8   with a receptionist, right?

9   A.  To make the appointment, I scheduled with the -- with the

10  scheduler.

11  Q.  Okay.  With the scheduler.

12  A.  Yes.

13  Q.  And same thing if you called on the phone.

14  A.  Yeah.

15  Q.  And Robert Hadden himself never contacted you by phone.

16  A.  I don't necessarily remember him contacting me by phone.

17  For what reason, you mean, to make an appointment?  Or for any

18  reason?

19  Q.  Yeah.  He didn't call you regarding appointment scheduling.

20  A.  He didn't have to.  He told me when to schedule the

21  appointment at the last visit.

22  Q.  Right.  And he didn't contact you by email.

23  A.  I don't believe so.

24  Q.  Okay.  Or by text message.

25  A.  No.

1          THE COURT:  Or?

2          MS. WOZENCROFT:  By text message.

3          THE COURT:  Text?

4    Q.  And you said no, right?

5    A.  I said no.

6    Q.  One of the things you remember about being Robert Hadden's

7    patient is that there would often be a very long wait to see

8    him.

9    A.  Yes.

10   Q.  Okay.  And he always appeared sort of behind schedule.

11   A.  I wouldn't say always, but several times, yes.

12         THE COURT:  Does that mean of the day of, it was later

13   than the time, or another day?

14         THE WITNESS:  I'm sorry.  I don't understand what

15   you're saying.

16         THE COURT:  Well, you said he was behind schedule.

17         THE WITNESS:  I waited often in the -- often I waited

18   in the waiting room for a long, lengthy period of time;

19   sometimes it was very long and sometimes it was like, you know,

20   regular.

21         THE COURT:  Got it.

22         MS. WOZENCROFT:  Okay.  If we could turn to what is in

23   evidence, Government Exhibit 902, which is a sealed exhibit.

24   Should be in the binders.

25         And your Honor, I believe the jurors can turn to this

N1B1HAD4                          Stein - Cross

1   as well because it's in evidence.

2              THE COURT:  Okay.  You said 902, did you?

3              MS. WOZENCROFT:  Yes, please.

4   BY MS. WOZENCROFT:

5   Q.  Ms. Stein, you mentioned on direct that this is a map of

6   one of the routes you can travel from your home in Rockland

7   County to -- to New York City, to Columbia University, right?

8   A.  This is the map that I did often travel, yes.

9   Q.  Okay.  This is the most common route you took --

10  A.  Yes.

11  Q.  -- to go to appointments at Columbia.

12  A.  Yes.

13  Q.  Okay.  And just turning to Government Exhibit 903, which is

14  the next exhibit.

15  A.  Yes.

16  Q.  This is an alternative route that you would occasionally

17  take.

18  A.  Yes.

19  Q.  Okay.  I believe you said when there was inclement weather,

20  you would sometimes take this route.

21  A.  Yes.

22  Q.  And you can see on the map that there's a little icon that

23  says 45 minutes, 25.4 miles?

24  A.  Yes.

25  Q.  You would agree with me that it's hard to predict exactly

1   how long it will take in part because there's different traffic

2   levels at different times of the day.

3   A.  Yes.

4   Q.  Okay.  So even if you took the same route all the time,

5   sometimes it would be faster, sometimes it could take longer.

6   A.  Yes.

7   Q.  I'm going to show you what has been pre --

8            MS. WOZENCROFT:  And I'd ask that what had been

9   premarked as Defense Exhibit V be shown to the witness and the

10  parties.

11  Q.  Ms. Stein, I'm going to ask you to look at your screen.

12  Did something pop up there for you?

13  A.  Yes.

14  Q.  Okay.  Great.

15           This is another map which depicts the area we were

16  just looking at on Exhibits 902 and 903, right, roughly?

17  A.  Yes.  Yeah.

18  Q.  Okay.  And this map depicts an alternative route from your

19  home to Columbia University at Irving Plaza; is that correct?

20  A.  Yes.

21  Q.  Okay.  Is this map a fair and accurate depiction of an

22  alternate route?  I understand it's not the route you took.

23  A.  Yes.

24  Q.  But it's a fair and accurate depiction of that route?

25  A.  I think so, yes.

1          MS. WOZENCROFT:  Okay.  I'd ask that Defense Exhibit V

2     be moved into evidence.

3          THE COURT:  I'll allow it.

4          (Defendant's Exhibit V received in evidence)

5          MS. WOZENCROFT:  And your Honor, I would just ask if

6     we can pass it to the jurors since it's a sealed exhibit.

7          THE COURT:  Okay.

8     BY MS. WOZENCROFT:

9     Q.  Ms. Stein, so now that everyone can see the map, I just

10    want to go over it again.

11         We were just discussing that this map depicts a route

12    from Rockland County to Columbia University Irving Medical

13    Center, right?

14    A.  Yes.

15    Q.  Correct?  And I understand that this is not the route you

16    took, but it's an alternate route.

17    A.  Yes.

18    Q.  Okay.  And through this route, you don't cross through New

19    Jersey; is that correct?

20    A.  Correct.

21    Q.  This route crosses over the Tappan Zee Bridge; is that

22    right?

23    A.  It looks like it, yes.

24    Q.  Okay.  Okay.  So a moment ago --

25         MS. WOZENCROFT:  We can take that down.  Thank you.

1   Q.   A moment ago we discussed Dr. Shin, who is a doctor you saw

2   after Dr. Hadden, right?

3   A.   Yes.  I saw him once.

4   Q.   Okay.  And you've seen other doctors associated with

5   Columbia University in the course of your health care, right?

6   A.   You mean like generally.

7   Q.   Yes.

8   A.   Yes.

9   Q.   Okay.  So without going into specifics, but for example,

10  you've seen an orthopedic surgeon at Columbia, correct?

11  A.   Yes.

12  Q.   Okay.  Dr. Tang?

13  A.   Yes.

14  Q.   And you've seen an orthopedist named Dr. Redler?

15  A.   I think so, yeah.

16  Q.   Okay.  And those doctors also have offices in New York

17  City, correct?

18  A.   I'm not sure.  I don't remember where I saw them.  I may

19  have seen one in New Jersey or may -- I think I saw one of them

20  actually in New Jersey, but maybe the other one -- I don't

21  remember, so --

22  Q.   Okay.  Those doctors are associated with Columbia

23  University, right?

24  A.   Okay.

25  Q.   Okay.  I'm asking you.

N1B1HAD4                         Stein - Cross

1    A.  Oh.  I -- I think so, yes.

2    Q.  Okay.  And when you would -- when you went to see Dr. Shin,

3    you traveled through New Jersey to see Dr. Shin, correct?

4    A.  I believe I saw him in Orangeburg, which is still New York.

5    I don't think that I saw him in the city.  I think he had -- I

6    remember it being in Orangeburg, which is New York, so I went

7    down the Palisades, so whatever exit Orangeburg is.

8    Q.  Okay.  If I can have one moment.

9    A.  I think.

10             THE COURT:  Did you say you saw him one time?

11             THE WITNESS:  Yes.  I met him in the course of my

12   pregnancies, but he -- I went to visit him -- I had an

13   appointment with him after the last one with Hadden.  So I

14   think it was 2012.

15   Q.  Okay.  And when you had your appointment with

16   Dr. McCaffrey, you traveled through New Jersey to see

17   Dr. McCaffrey as well.

18   A.  Yes.

19   Q.  Okay.

20             THE WITNESS:  Can I ask a question?  No?  Okay.

21   Q.  Now when you would have appointments with Robert Hadden,

22   during those appointments, he would talk to you about more than

23   medical information, right?

24   A.  Yes.

25   Q.  Okay.  So you'd -- for lack of a better word, you'd have

1    small talk with him.

2    A.   Yes.

3    Q.   Okay.  So he might ask you about your family, right?

4    A.   Yes.

5    Q.   Or your children?

6    A.   Yes.

7    Q.   Okay.  By the way, you mentioned on direct, you said Robert

8    Hadden didn't deliver either of your children, right?

9    A.   Correct.

10   Q.   I assume that's because he was not on call when you went

11   into labor, right?

12   A.   Correct.

13   Q.   Okay.  So just for everyone's understanding, your

14   understanding was that Robert Hadden was part of a larger

15   OB-GYN practice, right?

16   A.   Yes.

17   Q.   And there are multiple doctors within that practice, right?

18   A.   Yes.

19   Q.   And they cover each other; they cover each other's patients

20   if they go into labor, right?

21   A.   However their practice works, but yeah.

22   Q.   Okay.  So you understood that when you went into labor, if

23   Robert Hadden wasn't on call, one of his partners would be

24   available to deliver your child.

25   A.   Well, I believe he told me on both occasions that he would

1   not be there, or the first one he told me he was not going to

2   be there, I knew; and the second one, he came on call right

3   after I delivered.

4   Q.  Okay.  So —— sorry —— getting back to small talk, so you

5   said, you know, sometimes you would talk -- he would talk --

6   ask about your family or your children, right?

7   A.  Yes.

8   Q.  And I think you mentioned on direct sometimes you'd talk

9   about travel, right?

10   A.  Yes.

11   Q.  Meaning your travel to his office.

12   A.  Yes.

13   Q.  Okay.  So you remember him saying things like, there was --

14   asking if there was traffic on the bridge --

15   A.  Yes.

16   Q.  -- right?  Or he would ask if parking was hard.

17   A.  I don't remember exactly what he asked, but I discussed

18   parking with him at some point.

19   Q.  Okay.  It was part of sort of casual small talk as the exam

20   was going on.

21   A.  Yes.

22   Q.  You don't -- as you sit here today, you can't tell us which

23   appointments you had what small talk at, right?

24   A.  No.

25   Q.  Okay.  And just with regard to Defense Exhibit V, which we

1    spoke about a moment ago, which was the New York route --

2    A.   Mm-hmm.

3    Q.   -- you'd agree with me that you still have to take a bridge

4    to get into New York City in that route, right?

5    A.   In that route, yeah.

6    Q.   Okay.  And that's another driving route, meaning you'd have

7    to drive your car that route.

8    A.   Or take a bus, yes, yeah.

9    Q.   Or take a bus.  And it would -- it could also involve

10   parking, for example.

11   A.   Yes.

12   Q.   Okay.

13   A.   Yes.

14   Q.   And as a result of the experiences you testified about

15   today, you were part of a civil claim with regards to Robert

16   Hadden, right?

17   A.   With regards to Columbia, yes.

18   Q.   Okay.  And you were compensated through that settlement,

19   correct?

20   A.   I have not yet been compensated, but I will be.

21   Q.   Okay.  And you expect to receive about $2.5 million; is

22   that right?

23   A.   Approximately, yes.

24          MS. WOZENCROFT:  Okay.  I have no other questions.

25   Thank you.

N1B1HAD4                              Stein - Redirect

1              THE COURT:  Great.

2              MS. KIM:  Your Honor, could I just have one minute.

3    REDIRECT EXAMINATION

4    BY MS. KIM:

5    Q.  Ms. Stein, I'd like to direct your attention to what is in

6    front of you and marked as Government Exhibit 906.

7    A.  Yes.

8    Q.  Do you recognize what's depicted on this document?

9    A.  Yes.

10   Q.  What is depicted in blue on this document?

11   A.  This is the route I would have taken had I left Rockland

12   County going over the Palisades -- going down the Palisades

13   Parkway over the George Washington Bridge into Manhattan.

14   Q.  And then in gray, do you see another route on this map?

15   A.  Yes.

16   Q.  Does this map -- is this map a fair and accurate depiction

17   that shows the route that you would take from Rockland County

18   to appointments with Hadden in Manhattan in blue?

19   A.  I'm sorry.  Can you repeat that?

20   Q.  Yeah.  Does this map fairly and accurately depict in blue

21   the route that you would take from Rockland County into

22   Manhattan for appointments with Hadden?

23   A.  Yes.

24              MS. KIM:  And your Honor, the government offers

25   Government Exhibit 906.

1              MS. WOZENCROFT:  No objection.

2              THE COURT:  I'll allow it.

3              (Government's Exhibit 906 received in evidence)

4              MS. KIM:  And we'd ask that the jurors be permitted to

5    turn to Tab Government Exhibit 906.

6              THE COURT:  Sure.

7    BY MS. KIM:

8    Q.  And do you see the route that's highlighted in blue?

9    A.  Yes.

10   Q.  Approximately how long is the estimate for driving time on

11   that route?

12   A.  It says here about 30 minutes.

13   Q.  And the route that's highlighted in gray, approximately how

14   long is the driving time there?

15   A.  Here it says 35 minutes.

16   Q.  And then what about the gray on the right?  The route

17   that's in gray on the right.

18   A.  It says 35 minutes.

19   Q.  Do you see a box on the right side of the map?

20   A.  Oh, I'm sorry.  I'm looking at the wrong thing.  Over

21   there, it says between 35 and 45 minutes.

22   Q.  Okay.  We can set that exhibit to the side.

23              When you talked to Hadden at appointments, you

24   testified on direct examination that you talked to him about

25   the George Washington Bridge; is that right?

1    A.   Yes.

2    Q.   Did you talk specifically about the George Washington

3    Bridge traffic?

4    A.   Yes.

5    Q.   Not the Tappan Zee Bridge, right?

6    A.   No.

7    Q.   And that's because the route that you took into Manhattan

8    for appointments with Hadden was over the George Washington

9    Bridge; is that right?

10   A.   Yes.

11           MS. WOZENCROFT:  Objection, leading.

12           THE COURT:  I'll allow it.

13   Q.   Growing up, Ms. Stein -- sorry.  Taking a step back.

14           Ms. Stein, approximately when did you start living in

15   Rockland County?

16           MS. WOZENCROFT:  Objection.  Beyond the scope.

17           THE COURT:  Overruled.

18   A.   About 1983.

19   Q.   When did you stop, approximately, living in Rockland

20   County?

21   A.   About 2017.

22   Q.   So for approximately how many years did you live in

23   Rockland County?

24   A.   I think it's 34 years.

25   Q.   And growing up, did your family drive into Manhattan from

1    Rockland County?

2    A.   Yes.

3              MS. WOZENCROFT:  Objection.

4              THE COURT:  Overruled.

5    Q.   When you would drive into Manhattan with your family from

6    Rockland County, what route did you take?

7    A.   Down the Palisades Parkway.

8    Q.   Approximately how many times did you take that route down

9    the Palisades Parkway with your family?

10   A.   Probably almost all the time.

11   Q.   And --

12   A.   Almost all the time.

13   Q.   And in that route down the Palisades Parkway into

14   Manhattan, how did you cross over the Hudson River, if at all?

15   A.   We went over the George Washington Bridge.

16   Q.   As an adult, how many times have you driven into Manhattan

17   from Rockland County?

18   A.   Countless times.

19   Q.   What route do you take?

20   A.   I take -- I would have taken -- going down the Palisades

21   Parkway is always the primary, the quickest; and then at one

22   point where I was not so confident on the road, I would take

23   the Route 17-Route 4 way.

24   Q.   And do you need a map to take those routes?

25   A.   No.

N1B1HAD4                          Stein - Redirect

1    Q.  Why not?

2    A.  Because I've gone many, many times.  I know how to get

3    there.

4    Q.  When you were a patient of Hadden, did you use a map to

5    drive into Manhattan --

6    A.  No.

7    Q.  -- from Rockland County?

8    A.  No.

9    Q.  Did you use a GPS?

10   A.  No.

11   Q.  While you were a patient of Hadden, if you had to drive to

12   an appointment, and you had had to take the Tappan Zee Bridge,

13   would you even know where to go?

14   A.  No.

15   Q.  During appointments with Hadden, did there come a time when

16   you learned where Hadden lived?

17           MS. WOZENCROFT:  Objection.

18           THE COURT:  Overruled.

19   A.  Yeah.  In the course of some of our conversations, he had

20   mentioned that he lives -- somewhere in Bergen County.

21   Q.  I'm sorry.  What was that?

22   A.  I'm sorry.  Somewhere in Bergen County, New Jersey.

23   Q.  You were asked on cross-examination about a civil suit.  Do

24   you remember that?

25   A.  Yes.

N1B1HAD4                         Stein - Recross

1   Q.   What is the status of that matter?

2   A.   It's -- it's finished but at the -- the -- the settlement

3   has not been disbursed yet.

4   Q.   And again, how much money do you expect to receive in

5   connection with that case?

6   A.   Approximately $2½ million.

7   Q.   Is that the gross amount?

8   A.   No, that's the -- after all the -- the fees.

9   Q.   And what is the gross amount?

10  A.   A little over $4 million.

11  Q.   Will the outcome of this trial in any way change your

12  settlement?

13  A.   No.

14  Q.   Ms. Stein, would you give all of that money back if it

15  meant you had never met Hadden?

16          MS. WOZENCROFT:  Objection.

17  A.   Yes.

18          THE COURT:  Overruled.

19          The answer is yes.

20          THE WITNESS:  Yes.

21          MS. KIM:  Nothing further, your Honor.

22          MS. WOZENCROFT:  Just briefly?

23          THE COURT:  Yes.

24  RECROSS EXAMINATION

25  BY MS. WOZENCROFT:

N1B1HAD4                     Stein - Recross

1    Q.  Ms. Stein, in preparing -- in connection to this case, you

2    met with the government several times, correct?

3    A.  Yes.

4    Q.  Okay.  Sometimes it was over -- it was virtual, it was over

5    the web?

6    A.  Yes.

7    Q.  And when you met with the government, your civil lawyer

8    appeared with you in those meetings, right?

9    A.  Only a couple in the beginning.

10   Q.  Okay.  He's the one who connected you with the government.

11   A.  Yes.

12   Q.  His name is Anthony DiPietro.

13   A.  Yes.

14   Q.  And you understood that he was communicating to the

15   government at times on your behalf.

16   A.  I don't know if he was -- I don't really understand what

17   you're trying -- I don't really understand the question.  What

18   do you mean?

19   Q.  He represents you, correct, in the civil -- he represented

20   you in the civil case.

21   A.  Yes.

22   Q.  Okay.  And you understood that he sometimes would have

23   conversations with the government on your behalf.

24   A.  I think it was more like he asked me if I wanted to be part

25   of this case and so he kind of transitioned me over to them.  I

N1B1HAD4                       Stein - Recross

```
1    don't know about conversations he had with them without me.  If

2    he asked my permission, he got my permission; if he didn't, he

3    didn't.

4    Q.  He sometimes asked you about information --

5             MS. KIM:  Objection.  Privileged.

6             THE COURT:  Ask the question and then we'll know.

7    Q.  He sometimes asked you information related to what the

8    government needed from you?

9             MS. KIM:  Objection.  Privileged.

10            THE COURT:  Sustained.

11            MS. WOZENCROFT:  Your Honor, can we have a sidebar?

12            THE COURT:  Sure.

13            (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25
```

N1B1HAD4                        Stein - Recross

1          (At the sidebar)

2          MS. WOZENCROFT:  I can make a record.

3          Your Honor, I have Ms. Stein's 3500 material, which

4  includes an email from Anthony DiPietro to the government.  And

5  it states the following:  "So I asked if she has any

6  recollection of specifically having conversations with him

7  about the fact that she was coming to see him through New

8  Jersey.  She wanted to sit with it and she'd report back, and

9  wrote back saying, 'Yes, I'd say we did have those

10 conversations.'"

11         The government has now elicited, both on direct but at

12 length on redirect, that she is positive, as she sits here,

13 that she had conversations about the GW Bridge and about how

14 she traveled, and it's important for us to be able to bring out

15 that she was not sure or she was equivocal about whether or not

16 those conversations occurred back in 2020.

17         THE COURT:  And you're trying to elicit that by a

18 conversation between her lawyer in the civil case and --

19         MS. WOZENCROFT:  It's an email from her lawyer.

20         THE COURT:  I'm not going to allow it.  I'm not going

21 to allow it.

22         MS. WOZENCROFT:  If I don't seek to move that document

23 in, I'm going to ask the question.  She can say I don't know.

24         THE COURT:  You're on thin ice there because this has

25 come up already, the relationship --

1          MS. WOZENCROFT:  Certainly.

2          THE COURT:  -- with respect to quashing that subpoena,

3     that in part, at least, that it's attorney-client privilege,

4     and I'm not going to encourage that, and I'm not going to do it

5     here either.

6          MS. WOZENCROFT:  I understand.  And just for the

7     record, the one thing I will add is that my understanding is

8     that the part of the government's opposition in the motion to

9     quash, or filing of the motion to quash, was that this

10     information can be obtained without Mr. DiPietro from the

11     actual patient or witness, so that's what we're attempting to

12     do.

13          THE COURT:  I don't exactly remember, but I'm not

14     going to allow it.

15          MS. WOZENCROFT:  Okay.

16          MS. KIM:  We'll also just note for the record that my

17     understanding is that questions were asked of the witness of

18     whether or not she knew about conversations —- is that

19     right? —- between the government and Mr. DiPietro.  I think

20     those questions were already asked of her, so I think -- and

21     her response was she didn't know.

22          THE COURT:  She said when she was introduced, he was

23     her in-between as her lawyer.  That's enough.

24          MS. WOZENCROFT:  Okay.

25

N1B1HAD4

1              (In open court)

2              MS. WOZENCROFT:  Just very briefly.

3    BY MS. WOZENCROFT:

4    Q.  On redirect, you were asked about what is now Government

5    Exhibit in evidence 906.

6    A.  Yes.

7    Q.  And that's a map that shows -- depicts two different routes

8    traveling from Rockland County to New York City, correct?

9    A.  Yes.

10   Q.  And there were time allotments on those maps -- on that

11   map, right?

12   A.  Yes.

13   Q.  And just like we spoke about before, travel time for any

14   particular route can be affected by traffic patterns, correct?

15   A.  Yes.

16             MS. WOZENCROFT:  No further questions.

17             THE COURT:  Great.

18             MS. KIM:  Nothing from the government, your Honor.

19             THE COURT:  Thanks.  We'll excuse the witness.  Thanks

20   very much.

21             THE WITNESS:  Thank you.

22             (Witness excused)

23             THE COURT:  Are there any other government witnesses?

24             MS. KIM:  I think that's it for today, your Honor.

25             THE COURT:  Oh, great.

N1B1HAD4

1          Okay.  So that is it for today.  But let me just give

2     you a heads up what I think is likely to happen.  I think that

3     the presentation of testimony by both sides should be finished

4     on Friday.  So if that schedule holds, we would then send you

5     home for the weekend, and Monday, next week, is a holiday here,

6     so we would ask you to come back on Tuesday, at which time

7     you'd have the closings.

8          You're planning to do the closings on Tuesday, right?

9          MS. KIM:  Tuesday morning.

10          THE COURT:  We'd have the closing arguments from both

11     sides and you would have me talking about with you the jury

12     instructions, and then you'd go back into the jury room to

13     deliberate.

14          So bottom line is, if that schedule holds, we're ahead

15     of the game, so to speak.  Originally I said three weeks and

16     then we said perhaps closer to two.  Could be even earlier than

17     that, sometime in the second week.  So I think that's good

18     news.

19          So anyway, thanks, everybody.  You'll remember my

20     instructions for you not to talk about the case, etc., etc., so

21     I won't go into all of them again today.  But I'll see you at

22     9:00 tomorrow morning.  Everybody?  Okay.  All right.  See you

23     then.

24          (Jury not present)

25          THE COURT:  I think that's it.  Good to see you all.

N1B1HAD4

1   I don't think you have to come early tomorrow.  Oh, yes, you

2   do.

3              MS. KIM:  We have the briefing tonight.  Yes.

4              THE COURT:  All right.  See you at 8:30.

5              MS. KIM:  Thank you, your Honor.

6              (Adjourned to January 12, 2023, at 9:00 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    INDEX OF EXAMINATION

2    Examination of:                        Page

3    EMILY ANDERSON

4    Direct By Ms. Kim . . . . . . . . . . . . . 581

5    Cross By Ms. Wozencroft . . . . . . . . . . 594

6    Redirect By Ms. Kim . . . . . . . . . . . . 612

7     KEYVAN GABBAY

8    Direct By Ms. Kim . . . . . . . . . . . . . 616

9    Cross By Ms. Wozencroft . . . . . . . . . . 637

10    LISA M. ROCCHIO PhD

11   Direct By Mr. Monteleoni . . . . . . . . . . 650

12    ROSALINA LOZADA

13   Direct By Mr. Monteleoni . . . . . . . . . . 692

14   Cross By Ms. Von Dornum . . . . . . . . . . 705

15    SARA STEIN

16   Direct By Ms. Kim . . . . . . . . . . . . .708.

17   Cross By Ms. Wozencroft . . . . . . . . . . 749

18   Redirect By Ms. Kim . . . . . . . . . . . . 764

19   Recross By Ms. Wozencroft  . . . . . . . . . 769

20                    GOVERNMENT EXHIBITS

21   Exhibit No.                         Received

22    12A  . . . . . . . . . . . . . . . . . . . 582

23    103A  . . . . . . . . . . . . . . . . . . . 709

24    103  . . . . . . . . . . . . . . . . . . . 715

25    902  . . . . . . . . . . . . . . . . . . . 724
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   903   . . . . . . . . . . . . . . . . . . . 725

2   801A   . . . . . . . . . . . . . . . . . 738

3   801B   . . . . . . . . . . . . . . . . . 740

4   906   . . . . . . . . . . . . . . . . . . . 765

5                          DEFENDANT EXHIBITS

6   Exhibit No.                                    Received

7    HH and II   . . . . . . . . . . . . . . . . 599

8    V   . . . . . . . . . . . . . . . . . . . . 758

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25